UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| HAMILTON COUNTY EMERGENCY COMMUNICATIONS DISTRICT, | |
| Plaintiff, | |
| v. | Civil Action No. 1:11-cv-00330<br>District Judge Curtis L. Collier |
| BELLSOUTH TELECOMMUNICATIONS, LLC d/b/a AT&T TENNESSEE, | |
| Defendants. | |

## DEFENDANT BELLSOUTH TELECOMMUNICATIONS, LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Defendant BellSouth Telecommunications, LLC d/b/a AT&T Tennessee ("AT&T"),

pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, hereby files this

memorandum of law in support of its motion to dismiss the Complaint filed by Plaintiff

Hamilton County Emergency Communications District ("Plaintiff" or the "District"), and

respectfully shows the Court as follows:

## I. INTRODUCTION

This lawsuit arises from a disagreement that existed over the proper interpretation of

Tennessee's Emergency Communications District Law, T.C.A. § 7-86-101 et seq. (the "Act"),

until March of this year. For years, AT&T and the Tennessee Emergency Communications

Board ("TECB"), Plaintiff's governing body, had disagreed over the number of 911 service

charges ("E911 Surcharges") to be collected from AT&T's customers who receive telephone

service through multi-channel, or "channelized," lines and remitted to the various emergency

communications districts throughout Tennessee. In a nutshell, Plaintiff and the TECB assert that

the Act required AT&T to assess E911 Surcharges on every outbound voice-capable "channel,"

whereas AT&T took the position, based on the literal language of the Act, that the number of E911 Surcharges should be based on the number of "lines," regardless of the number of voice-capable channels.

AT&T openly communicated its disagreement with the TECB over the proper interpretation and application of the Act on this point.[1] AT&T also repeatedly told the TECB precisely how it was billing E911 Surcharges on channelized lines. Ultimately, in March of 2011, AT&T acquiesced to the TECB's position, and has been assessing one E911 Surcharge per each outbound voice-capable channel since that time.

Despite AT&T ultimately agreeing to accept the TECB's position, and despite AT&T having disclosed and remitted all E911 Surcharges AT&T collected at all times, Plaintiff nevertheless alleges that AT&T somehow violated Tennessee's False Claims Act ("TFCA") by taking a position, albeit publically and in good faith, contrary to Plaintiff's interpretation of the Act. Specifically, Plaintiff alleges AT&T failed to *collect enough* 911 Surcharges under the Act by not collecting (1) a 911 Surcharge for each voice-capable channel on certain PRI lines (which lines the Complaint does not identify), (2) 100 separate 911 Surcharges per location for certain users (which users and locations the Complaint does not identify), and (3) a 911 Surcharge on certain single-channel business lines (which lines the Complaint does not identify).

These allegations do not support an alleged "false claims" violation. There is no allegation, for example, that AT&T failed to remit to Plaintiff any of the E911 Surcharges it collected or that AT&T otherwise failed to remit any money in its possession that should have been remitted under the Act. To the contrary, AT&T transmitted every E911 Surcharge it

---

[1] In a March 28, 2007 Opinion, the Tennessee Attorney General stated this disagreement presents a "difficult question" of statutory interpretation. Tenn. Att'y Gen. Op. 07-38 (Mar. 28, 2007) at 2. A true and correct copy of the Attorney General Opinion is attached as **Exhibit A** hereto.

collected, in full compliance with its "remittance" obligation under the Act. This defect in Plaintiff's TFCA claim underscores the flaw in Plaintiff's entire theory of its case against AT&T. This is not a case about whether AT&T made false representations or submitted false claims – it did not. This case concerns an openly-publicized dispute over the correct interpretation of what AT&T was required to collect, *not remit*, under the Act. Because Plaintiff does not and cannot allege that AT&T remitted less funds *than it collected*, which is AT&T's express obligation under the Act, Plaintiff has failed to allege any facts capable of supporting a violation of T.C.A. § 4-18-103(a)(7).

Plaintiff's other claims are equally without merit. Plaintiff's Count Two for violation of the Act fails because the Act does not provide Plaintiff with a private cause of action against service providers like AT&T. Plaintiff's Count Three for a declaratory judgment fails because there is no longer a controversy regarding the interpretation of the Act: as noted above, AT&T already changed its billing policies in March of this year and currently collects one E911 Surcharge for each voice-capable channel. Plaintiff's Count Four for injunctive relief likewise fails, not only because Plaintiff's claim is now moot, but also because Plaintiff has (a) not alleged any recognized basis for irreparable harm and (b) has adequate legal remedies available to it.

Accordingly, and for the reasons set forth more fully below, AT&T's motion to dismiss should be granted, and all of Plaintiff's claims should be dismissed for failure to state a claim on which relief can be granted.

3

## II. BACKGROUND

### A.    The Tennessee Emergency Communications District Law

The Act authorizes Emergency Communications Districts ("ECDs") such as Plaintiff to

assess a E911 Surcharge on telephone services for the purpose of funding Emergency 911

services in their respective districts. Telephone service providers such as AT&T collect the

monthly charges from consumers at the rate determined by the local ECD in which the

consumers' residence or business is located. The provider then remits the collected charges to

the appropriate ECDs. To be clear, telephone providers such as AT&T do not pay these charges;

Tennessee's businesses and residents do. Providers such as AT&T merely serve as a

"middleman" by collecting the charges and then passing them on to the appropriate ECDs.[2]

Enacted in 1984, the Act authorizes the imposition of E911 Surcharges on "exchange

access facilities," which "means all *lines* . . . as defined in existing general subscriber tariffs."

T.C.A. § 7-86-103(7) (emphasis supplied). When the Act was first enacted, telephone service

was typically provided over single connection analog telephone lines. Under that technology,

the number of E911 Surcharges required by the Act was straight forward: one charge per line.

Since the Act's enactment, however, there have been several advancements in telephone

service technology. One of those advancements was AT&T's deployment of multichannel

Primary Rate Interface ("PRI") lines. A PRI line is a "channelized" telephone service. This

means that, although it operates on a single "line," it provides multiple variable channels that can

each be configured to perform different functions, including data, fax, and inbound-only voice

functions, for which no E911 Surcharge is required. With PRI lines, the customer typically has

the flexibility to change the functionality of each channel at any time and without notice to

---

[2] AT&T does retain a small administrative fee (3%) for serving in this capacity, which is
expressly authorized by the Act. T.S.A. § 7-86-110(b).

4

AT&T. Thus, while each channel in a PRI line can be configured to be voice capable, at any given time, the customer might well be using it for data, fax, or inbound-only calls.

**B.**     **The Public Dispute Over the Proper Interpretation of the Act**

The language of the Act does not provide clear guidance on the number of E911 Surcharges that should be assessed on these later-developed channelized phone services. In July 2004, the Tennessee Emergency Communications Board ("TECB"), Plaintiff's governing body, issued a public statement acknowledging that providers such as AT&T were assessing different numbers of E911 Surcharges on channelized services, resulting in a billing practice that was "far from uniform." *See* TECB Policy No. 23, attached hereto as **Exhibit B**. In that same policy, the TECB announced its belief that providers should assert a separate charge for each voice-capable channel in a PRI line, even though all channels are transmitted through a single line. *Id.*

AT&T openly disagreed with the TECB's interpretation of the Act and communicated this disagreement in writing. Under AT&T's interpretation, which is based on the literal language of the Act, the charges should be based on the number of "lines," not the number of voice capable pathways.[3] In its communications with the TECB, AT&T stated precisely how it believed E911 Surcharges should be assessed on channelized services under the Act and how AT&T was assessing such charges. *Id.* (stating AT&T's precise billing policy of asserting a maximum of five E911 Surcharges on PRI lines and providing an example of the amount of E911 Surcharges that will be collected under that policy). This disagreement was neither secret nor unknown to the various ECD's in Tennessee, and Plaintiff either knew or should have known exactly how AT&T was assessing E911 Surcharges.

---

[3] Furthermore, to levy a E911 Surcharge on each voice-capable channel likely would result in an overcharge to consumers. Even though the lines may be capable of voice transmission, at any given time they may be used for data or fax function, for which no E911 Surcharge is owed. T.C.A. § 7-86-103(7).

5

Later, in March 2007, the Tennessee Attorney General weighed in on this disagreement and publicly deemed it a "difficult question" of statutory interpretation. Ex. A, p. 2. The Attorney General adopted the TECB's interpretation and, in doing so, again publicly acknowledged that providers such as AT&T were not assessing E911 Surcharges in the manner that the TECB and Plaintiff believed they should. Ex. A, p. 5. Again, AT&T openly defended its position and plainly stated the manner in which it was assessing E911 Surcharges on channelized lines.

AT&T also issued monthly statements to the various ECD's such as Plaintiff accurately setting forth the number of charges AT&T had assessed and the amounts it had collected and was remitting. These monthly reports are at the heart of this dispute and are the exact reports that Plaintiff urges are "false claims" in violation of the TFCA. Although AT&T's monthly reports accurately disclosed the number of charges it collected and although AT&T *remitted all the charges it collected*, Plaintiff argues the reports were fraudulent because the manner in which AT&T collected the underlying charges, despite the public nature thereof, did not comport with Plaintiff's own interpretation of the Act. To be clear, Plaintiff is not claiming AT&T failed to remit any charges it collected, only that AT&T did not collect enough charges in the first place.

While the Act remains unchanged and no court has ruled on the statutory interpretation issue, in February 2011 AT&T voluntarily agreed to bring its 911 billing practices in line with the Attorney General's opinion effective March 17, 2011. Nevertheless, Plaintiff now claims that AT&T "concealed" what it was doing and engaged in widespread "deception."

Although AT&T believes Plaintiff's allegations are meritless, even if they are accepted as true, they fail to state a viable cause of action and must be dismissed under Rule 12(b)(6).

6

Further, Plaintiff's non-specific allegations in support of its purported TFCA claim (Count One) fail to satisfy the requirements of Rule 9(b).

## III. ARGUMENT AND CITATIONS OF AUTHORITY

### A.    Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits courts to dismiss complaints that fail to state a claim upon which relief may be granted. It is well settled that failure to plead an essential element of a claim warrants dismissal. *See, e.g., Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 491 (6th Cir. 1990). Although the court accepts well-pleaded facts as true and in the light most favorable to the plaintiff, the facts alleged by the plaintiff must do more than merely create the suspicion of a legally cognizable right of action. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57, 562–63 (2007). Thus, dismissal under Rule 12(b)(6) is appropriate when the plaintiff has failed to allege "enough facts to state a claim to relief that is plausible on its face" and failed to "raise a right to relief above the speculative level." *Bassett v. Nat'l Collegiate Athletics Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555, 570).

Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949. Thus, "[t]o survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bowman v. U.S.*, 304 Fed. Appx. 371, 374, 2008 WL 5272503 (6th Cir. 2008) (quoting *Twombly*, 127 S. Ct. at 1964-65).

**B.**    **Plaintiff's Claim for Violation of the Tennessee False Claims Act (Count One) Should Be Dismissed for Failure to State a Claim Under Rule 12(b)(6).**

      1.    <u>Plaintiff has failed to state a claim under T.C.A. § 4-18-103(a)(7) because the Complaint does not allege AT&T remitted fewer funds than it collected.</u>

The only provision of the Tennessee False Claims Act with any potential applicability to this case is the "reverse false claim" provision, T.C.A. § 4-18-103(a)(7). That provision declares a violation of the TFCA when a person "[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease *an obligation to pay or transmit money or property* to the state or to any political subdivision." *Id.* (emphasis supplied). Plaintiff alleges AT&T falsely "decreased" its "obligation" to remit E911 Surcharges under T.S.A. § 7-86-110(a). Compl. ¶ 45.

This statute, however, does not support Plaintiff's claim. Section 7-86-100 governs the "duties of [a] service supplier" and provides, "[t]he service supplier shall *remit the funds collected* as the service charge to the district every two (2) months." T.S.A. § 7-86-110(a) (emphasis supplied). Thus, AT&T's obligation under the Act is only to remit what it collects from consumers as E911 Surcharges. *Id.*

Plaintiff's Complaint does not allege AT&T failed to remit the funds *that it collected.* Rather, Plaintiff is alleging AT&T *did not collect enough funds* in the first place. Specifically, the Complaint alleges AT&T failed to collect 911 Surcharges in three respects: (1) AT&T failed to collect a charge on each voice-capable pathway of certain unidentified channelized lines [Compl. ¶ 23]; (2) AT&T misapplied the statutory 100 charge per user per location cap to certain unidentified users [*id.* at ¶ 36]; and (3) AT&T failed to collect charges on certain unidentified single-channel business lines. *Id.* at ¶ 32. These allegations do not give rise to a TFCA claim

8

because AT&T's transmittal obligation to Plaintiff under the Act is to remit *what it collects* from the service users. T.C.A. § 7-86-110(a).

Nowhere does the Complaint dispute that AT&T actually remitted all the E911 Surcharges it collected. Accordingly, Plaintiff has failed to identify any "false claim," and therefore Count One must be dismissed. *Craighead*, 899 F.2d at 491; *see Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (affirming dismissal of false claims act claim for failing to identify false claim in violation of the act).[4]

2.     It is well-settled that a violation of an act or regulation itself does not give rise to a claim under the TFCA.

Even if AT&T had breached its remittance obligation under the Act (which it has not), the Sixth Circuit repeatedly has held that "it is not the violation of a regulation itself that creates a cause of action under the FCA." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011). Rather, the "*sine qua non*" of a False Claims violation is the submission of a *fraudulent claim* to the government. *US ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). A false claims statute therefore "attaches liability, not to the underlying fraudulent activity or the government's wrongful payment, but to the 'claim for payment.'" *U.S. v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995). Thus, "claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (citing with parenthetical *U.S. ex rel. Thompson v. Columbia / HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)). This is

---

[4] Because of the similarity between the Tennessee False Claims Act and the federal False Claims Act, Tennessee's courts rely upon federal decisions concerning interpretation of the federal Act for guidance. *State ex rel. Landenberger v. Project Return, Inc.*, No. M2007-02859-COA-R3-CV, 2009 WL 637122, *4 (Tenn. Ct. App. Mar. 11, 2009). The TFCA has not been amended in any material way since its enactment in 2001.

because "the FCA is not an enforcement device for" the underlying statute. *Thompson*, 125 F.3d at 902 (citing *U.S. ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. 1977)).

Here, Plaintiff is attempting improperly to "enforce" a purported violation of the Act, and in doing so has failed to plead the essential elements of a TFCA claim. *See* Section IV.B.3, *infra*.[5] Accordingly, Count One should be dismissed.

3. <u>Count One should further be dismissed for failure to plead with the particularity required by Rule 9(b).</u>

It is well settled that false claims act claims are subject to the heightened pleading requirements of Rule 9(b). *See, e.g., Yuhasz*, 341 F.3d at 563 (collecting cases). To satisfy Rule 9(b), the Sixth Circuit "requir[es] plaintiffs to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Id.* at 563 (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-162 (6th Cir. 1993)). Thus, "'at a minimum, Rule 9(b) requires that the plaintiff specify the who, what, when, where, and how of the alleged fraud.'" *Sanderson*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *US ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)) (internal quotation omitted).

As applied to claimed violations of the False Claims Act, Rule 9(b) requires that a complaint set out: "(1) *precisely what statements were made in what documents* or oral representations or what omissions were made, and (2) *the time and place of each such statement* and the person responsible for making (or in the case of omissions, not making) same, and (3) *the content of such statements* and the manner in which they misled the [government], and (4) what the defendants obtained as a consequence of the fraud." *Sanderson*, 447 F.3d at 878

---

[5] Although there are limited exceptions to the rule that the TFCA cannot be used to enforce a mere violation of a statute, no such exception applies here. *See Chesbrough*, 655 F.3d at 467-68.

(quoting *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). Accordingly, the Sixth Circuit holds a complaint is subject to dismissal where it fails to identify or state the contents or date of any specific false claim that the defendant allegedly submitted. *See, e.g., U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 515 (6th Cir. 2007) (affirming dismissal where complaint lacked "specific dates or claims" that were submitted in violation of the FCA).

Plaintiff's Complaint fails to allege even the bare bones requirements of Rule 9(b) and, taken as a whole, falls well short of the pleading requirements mandated by the Rule.[6] The Complaint's allegations make no attempt to explain what is actually false or fraudulent about the alleged records "of most voice lines," "of 911 charges," or "of single circuit business lines," much less allege "the time, place or content" of the alleged falsities. *See Sanderson*, 447 F.3d at 877-78 (dismissing false claims act claim for failure to allege details of any specific false claim). Indeed, these vague allegation are precisely the type of non-specific charges upon which the Sixth Circuit affirmed dismissal of the plaintiff's complaint in *Yuhasz*. *Compare, e.g.*, Compl., ¶¶ 25, 44 (alleging non-specific falsity concerning "most voice lines" and "each voice line that Defendant omitted") *with Yuhasz*, 341 F.3d at 564-65 (affirming dismissal of non-specific allegations that "*certain* testing" was falsified and that "*many* of the certifications of compliance" were false) (emphasis in original). With specific reference to Rule 9(b)'s application in false claims cases, nowhere does the Complaint allege "precisely what statements

---

[6] Indeed, paragraph 29 is the only paragraph in the Complaint that alleges any particular dates, parties or content of any document, which are precisely the type of specific allegations mandated by Rule 9(b). That paragraph, however, merely describes a proposal that Plaintiff does not allege to contain any false statements but instead alleges to be evidence of AT&T's non-compliance with the Act. It sets forth nothing concerning any false claim allegedly submitted by AT&T and does not support a claim under the TFCA. *See Thompson*, 125 F.3d at 902 ("the FCA is not an enforcement device for" the underlying statute).

were made in what documents," nor "the time and place of each such statement," nor "the content of such statements." *Sanderson*, 447 F.3d at 878; *see Yuhasz*, 341 F.3d at 563-64 (affirming dismissal of false claims act claim where "complaint is short on specifics").

In lieu of specific factual allegations, the Complaint offers only vague and speculative statements regarding "most" or "certain" items in unspecified records and fails to provide any specifics about the contents, date or statements in any alleged false claim. *Compare* Compl. ¶¶ 25, 27, 30, 34, 38, 44 (providing no details about any particular alleged false claim) *with U.S. ex rel. Branhan v. Mercy Health Sys. of S.W. Ohio*, No. 98-3127, 1999 WL 618018, at *1 (6th Cir. Aug. 5, 1999) (affirming dismissal of complaint alleging improper billing in violation of the FCA because it "failed to allege a single specific incident in which improper billing occurred and the plaintiff never set forth the dates, times, or the names of individuals who engaged in the alleged improper billing"). Taken together, the statements in the Complaint fail to enable AT&T to prepare a pleading that is responsive to any specific allegation of fraud. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) ("[t]he purpose of Rule 9(b) is to provide fair notice to the defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud") (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988)).

Furthermore, it is well settled that merely pleading an alleged fraudulent scheme is insufficient to state a false claims act claim. *See, e.g., Sanderson*, 447 F.3d at 877-78 ("[l]ike the fraudulent scheme in *Clausen*, the accounting method at the heart of the allegation of fraud in this case is likewise not a violation of the [false claims act]"); *U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147 (D. Mass.2000) (failure to cite "a single false claim arising from an allegedly false invoice" does not meet "even a bare-bones Rule 9(b) test."). Thus,

12

because the Complaint fails to identify with particularity any specific false claim that AT&T allegedly submitted to Plaintiff, Plaintiff's TFCA claim must be dismissed. *U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 509 (6th Cir. 2007) ("an action under the FCA must allege specific false claims with particularity in order to comply with Rule 9(b)").

**C.     Plaintiff's Claim for Violation of the Emergency Communications District Law (Count Two) Must Be Dismissed Because the Act Does Not Provide a Right of Action Against AT&T.**

Nothing in the Act authorizes Plaintiff to assert a claim against AT&T or otherwise imposes any liability upon AT&T for an alleged violation of its provisions, and Plaintiff knows this. Indeed, in paragraphs 52 and 53 of its Complaint, Plaintiff recognizes that nothing in the Act expressly provides a right of action. Nonetheless, Plaintiff urges there *must* be an *implied* right of action because otherwise "no means would exist to ensure the funding of 911 services." Compl. ¶ 53.

This argument is meritless. The Act does provide Plaintiff with a right of action to recover unpaid E911 Surcharges, but not against AT&T. T.C.A. § 7-86-110(c) states "the district shall be authorized to demand payment *from any service user* who fails to pay any proper service charge, *and may take legal action, if necessary, to collect the service charge from such service user.*" (emphasis provided). Thus, while the Act provides Plaintiff with a right of action against businesses and consumers who do not pay for their 911 service, nowhere does it authorize Plaintiff to bring an action for damages against service providers, who serve simply as middlemen, to recover charges that were never billed or paid.

The Complaint also states in conclusory fashion that "[t]he Legislature intended for the District to have this right of action." This argument also is meritless. The legislature saw fit to expressly provide Plaintiff with a right of action against *service users* to recover E911

13

Surcharges. T.C.A. § 7-86-110(c). If, as Plaintiff contends, the Legislature also intended to provide a right of action against *service providers* such as AT&T, why did it not also expressly provide for one? The answer is the Legislature did not intend for Plaintiff to have a right of action against service providers because the obligation to pay for 911 service belongs to the service users, not the service providers.[7] Service providers such as AT&T act strictly as middlemen who collect and remit the charges owed to the District by service users.

The Tennessee Supreme Court has recently held that courts should be especially wary of reading new causes of action into a statute where, as here, the statute already provides other express enforcement remedies. *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850, 860 (Tenn. 2010). Under Tennessee law, when a statute does not expressly provide a right of action, Tennessee courts look to three factors to determine if the Legislature intended to imply one: "(1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute; (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying such a remedy is consistent with the underlying purposes of the legislation." *Id.* at 855. While Plaintiff will undoubtedly claim it is an intended beneficiary under the Act, the true intended beneficiaries of the Act's protections are the service users who are ensured Emergency 911 service. *See* T.C.A. § 7-86-102 (listing "Legislative Findings" and stating continuation of 911 service "is of the highest priority for the health and safety of the citizens of Tennessee," but regarding funds received by the District, stating only that such funds shall be "used exclusively in the operation of the

---

[7] Most recently, in a case involving the exact same underlying factual allegations (albeit different parties), the Hamilton County Chancery Court denied Plaintiff's claim that the Act grants it the authority and power to investigate alleged violations of the Act by service providers like AT&T. A true and correct copy of the Chancery Court's Order is attached hereto as **Exhibit C.** The Chancery Court reasoned "this Court cannot grant the District powers not provided it by the general assembly. There is no implied authority involved here." Ex. C at 17.

[District]"). Even if Plaintiff is an intended beneficiary of the Act, the Tennessee Supreme Court

has stated "[t]he mere fact" that the plaintiff is an intended beneficiary "is not alone sufficient,

however, to imply a private right of action." *Brown*, 328 S.W.3d at 858.

The fact that the Legislature expressly included a right of action against service users, but

not against service providers, however, is instructive. This fact alone rebuts any claim of

Legislative intent to imply the right of action Plaintiff urges the Court to read into the Act. *See*

*e.g.*, *Jarrett v. Kassel*, 972 F.2d 1415, 1422 (6th Cir. 1992) (argument that implying cause of

action will further the legislative purpose "loses force" in light of fact that enforcement

mechanism exists under other provisions of the statute). Indeed, in reversing an appellate

decision implying a statutory right of action under a law that already had express enforcement

provisions, the Tennessee Superior Court in *Brown* stated "[o]ur jurisprudence reflects the

United States Supreme Court's maxim that 'it is an elemental canon of statutory construction that

*where a statute expressly provides a particular remedy or remedies, a court must be chary of*

*reading others into it.'*" *Brown*, 328 S.W.3d at 860 (quoting *Transam. Mortg. Advisors, Inc. v.*

*Lewis*, 444 U.S. 11, 19 (1979)) (emphasis supplied); *see also Ellison v. Cocke Cty., Tenn.*, 63

F.3d 467, 470 (6th Cir. 1995) (describing courts as "especially reluctant" to imply additional

remedies in a statute that expressly provides a remedy).

There is also no need to read a new cause of action into the Act. The Act provides

Plaintiff with an express cause of action to recover E911 Surcharges payable under the Act

directly from service users. T.C.A. § 7-86-110(c). Further, if a service provider collected E911

Surcharges but failed to remit those charges to an ECD as required under the Act, the ECD could

bring a claim against the service provider for conversion. Because the express language of the

Act does not provide a cause of action against service providers and also contradicts any

suggestion that the Legislature intended to provide such an action, and because no such cause of action is necessary, Count Two should be dismissed as a matter of law.

**D.    Plaintiff's Claim for Declaratory Judgment (Count Three) Is Subject to Dismissal.**

Count Three is subject to dismissal because the Complaint's allegations fail to establish an "actual controversy." The Declaratory Judgment Act only permits declaratory relief where these exists "a case of actual controversy." 28 U.S.C. § 2201(a). Thus, a plaintiff seeking a declaratory judgment must allege facts that "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Martinez v. McGraw*, No. 3:08-cv-0738, 2009 WL 2447611, at *3 (M.D. Tenn. Aug. 10, 2009) (*citing Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512 (1941)). Here, Plaintiff has expressly acknowledged that AT&T has already begun to comply with Plaintiff's interpretation of the Act.[8] Accordingly, Plaintiff's claim for declaratory judgment fails to satisfy the requirement of an actual immediate controversy and Count Three must be dismissed. *See TCI/TKR Cable v. Johnson*, 30 Fed. Appx. 581, 584-85 (6th Cir. 2002) (declaratory judgment action was moot because there was no "immediate prospect" that defendant would violate the law); *Martinez*, 2009 WL 2447611, at *3-4 (dismissing plaintiff's claim for declaratory judgment in part because "there [was] no controversy").

In sum, on this exact issue of statutory interpretation that Plaintiff asserts as the basis for Count Three, AT&T voluntarily agreed to bring its billing practices in line with the TECB's interpretation of the Act in March 2011, prior to the initiation of this litigation. Ex. C at 4.

---

[8] See Petition, *In re: Petition of Hamilton County Emergency Communications District*, No. 11-0806, at 4 (Hamilton Cnty. Ch. Ct.), a true and correct copy of which is attached as **Exhibit D** hereto.

Consequently, the issue is now moot and there is no longer an "actual controversy," nor do the parties have "adverse legal interests," nor does the Complaint allege any "immediate prospect" that AT&T will revert to its prior billing practices. *Martinez*, 2009 WL 2447611 at *3. Accordingly, Plaintiff's claim for a declaratory judgment is subject to dismissal. 28 U.S.C. § 2201(a); *TCI/TKR Cable*, 30 Fed. Appx. at 584-85.

**E.     Plaintiff's Claim for Injunctive Relief (Count Four) Is Subject to Dismissal.**

Plaintiff's claim for injunctive relief – to enjoin AT&T from collecting fewer E911 Surcharges than Plaintiff contends it should – fails as a matter of law. First, in February 2011 AT&T voluntarily agreed to bring its billing practices in line with the TECB's interpretation of the Act, and has been doing so since March 2011. Ex. C at 4. Accordingly, Plaintiff's claim is moot because there is no need to enjoin AT&T from doing something it has already ceased.

Second, Plaintiff's own allegations preclude any possibility of irreparable injury. Specifically, Plaintiffs allege they will suffer irreparable injury if AT&T does not collect and remit the number of E911 Surcharges Plaintiffs contend are required under the Act. Compl., ¶ 63. This is a claim that Plaintiffs will not receive as much money as they should. It is black letter law that a loss of money is not an irreparable injury. *See Basiccomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (harm is not irreparable if it is compensable by money damages). Plaintiff's claim of irreparable harm is further undercut by the fact that Plaintiff's most recent publically available financial statements show that Plaintiff currently has over $16 million in net assets, with over *$13 million in cash and cash equivalents*.[9] It is clear that Plaintiff is in no imminent danger of being unable to provide 911 service to its district. Thus, Count Four

---

[9] *See* documents from Hamilton County "911" Emergency Communications District Financial Statements and Supplemental Data, June 30, 2010 and 2009, attached as **Exhibit E** hereto.

17

should be dismissed because, as both a matter of law and a matter of fact, Plaintiff cannot establish a threat of irreparable harm.

Count Four is also subject to dismissal because Plaintiff has adequate legal remedies – and its right to bring an action against service users for E911 Surcharges payable under the Act. Because Plaintiff cannot show it has no adequate legal remedies, Count Four is subject to dismissal.

## CONCLUSION

For the foregoing reasons, AT&T hereby requests that the Court dismiss Plaintiffs' Complaint with prejudice in its entirety.

**DATED** this the 8th day of December, 2011.

Respectfully submitted,

s/Robert G. Norred, Jr.
Robert G. Norred, Jr.
Tenn. BPR No. 012740
Logan-Thompson P.C.
Logan-Thompson, P.C. Attorneys at Law
30 2nd Street NW
Cleveland, TN 37311
Telephone: (423) 303-1023
Email: rnorred@loganthompson.com


J. Henry Walker
Georgia Bar No. 732254
(*pro hac vice pending*)
Michael J. Breslin
Georgia Bar No. 142551
(*pro hac vice pending*)
Kilpatrick Townsend & Stockton
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309-4528
(404) 815-6500
Fax (404) 815-6555

*Attorneys for Defendant BellSouth Telecommunications, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2011, a true and correct copy of the foregoing **Defendant Bellsouth Telecommunications, LLC's Memorandum Of Law In Support Of Its Motion To Dismiss** has been filed with the U.S. District Court's CM/ECF System and that pursuant thereto, a copy of this pleading has been served upon the following persons by electronic mail:

Frederick L. Hitchcock (rhitchcock@cbslawfirm.com)
Thomas C. Greenholtz (tgreenholtz@cbslawfirm.com)
Yousef A. Hamadeh (yhamadeh@cbslawfirm.com)
Chambliss, Bahner & Stophel
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402

By: ___s/Robert G. Norred, Jr._____
Robert G. Norred, Jr.

*One of the Attorneys for Defendant*
*BellSouth Telecommunications, LLC*

# EXHIBIT A

March 28, 2007

Opinion No. 07-38

Application of E911 Charges to T-1 and PRI Circuits

## QUESTION

In accordance with Tenn. Code Ann. § 7-86-108, which authorizes the local Emergency Communications Board to impose an emergency telephone service charge on all service users to fund E911 services, how many emergency telephone service charges should be imposed on T-1 circuits capable of transmitting digital signals through 24 separate channels, and on PRI circuits capable of transmitting through 23 channels?

## OPINION

Pursuant to Tenn. Code Ann. §§ 7-86-108 and 7-86-103(7), it is the opinion of this Office that the E911 board may impose an emergency telephone service charge for each channel in a T-1 or PRI circuit that is capable of conveying an outbound voice telephone call from the service user to an E911 public safety answering point.

## ANALYSIS

Emergency communications districts are established and operate under the Emergency Communications District Law ("the Act"), codified in Tenn Code Ann. §§ 7-86-101, et seq. The Act authorizes the E911 district to levy an "emergency telephone service charge" on telephone "service users." Tenn Code Ann. § 7-86-108(a)(1). The Act defines "service user" as "any person, corporation or entity that is provided 911 service." Tenn. Code Ann. § 7-86-103(13). The Act further defines "911 service" to include:

> regular 911 service enhanced universal emergency number service or enhanced 911 service that is a telephone exchange communications service whereby a public safety answering point may receive telephone calls dialed to the telephone number 911. "911 service" includes lines and may include the equipment necessary for the answering, transferring and dispatching of public emergency telephone calls originated by persons within the serving area who dial 911 . . . .

Page 2

Tenn. Code Ann. § 7-86-103(10). Accordingly, an E911 charge may be assessed on each service user who is able to reach a public safety answering point by dialing the telephone number 911.

The Act authorizing the collection of E911 charges from "service users" mandates that the charges be collected by the telephone "service supplier." Tenn. Code Ann. § 7-86-108(d). The Act defines "service supplier" as "any person, corporation or entity providing exchange telephone service to any service user."[1] Tenn. Code Ann. § 7-86-103(14). The Act further outlines that "[n]o such service charge shall be imposed upon more than one hundred (100) exchange access facilities per service user per location." Tenn. Code Ann. § 7-86-108(A)(1)(a). The Act defines "exchange access facilities" as "all lines, provided by the service supplier for the provision of exchange telephone service, as defined in existing general subscriber services tariffs filed by the service supplier with the Tennessee regulatory authority." Tenn. Code Ann. § 7-86-103(7). Thus, it is evident that the E911 charges are imposed on service users according to the number of "lines" they are able to utilize.

Additionally, the Act indicates that the purpose of the E911 charge is to "fund the 911 emergency telephone service." Tenn. Code Ann. § 7-86-108(A)(1)(a). Moreover, the Tennessee Legislature expressly codified its desire that the E911 charge be levied in a fair and equitable manner so as to negate any competitive disadvantages, stating: "[a]ny such service charge shall have uniform application and shall be imposed throughout the entire district to the greatest extent possible in conformity with the availability of such service within the district." Id.

In sum, the Act allows the E911 district to assess a telephone service charge to all service users capable of telephoning a public safety answering point. These charges are collected by the telephone service supplier on "all lines" capable of "telephone exchange service," up to 100 lines per service user per location. The Legislature expressly declared that the purpose of the E911 charge is to pay for the 911 emergency service, and, with this in mind, the charges are to be applied uniformly. Accordingly, the language of the Act mandates that one E911 charge may be assessed for each "line" with a cap at 100 E911 charges for service users with multiple lines at the same location. The Act's language is relatively straightforward when applied in the context of traditional analog telephone exchange service, where one line supports one voice-based connection capable of accessing 911 service. The more difficult question is how the Act's one E911 charge per line mandate should be applied to voice-capable digital signals transmitted through T-1 and PRI circuits.

The Tennessee Emergency Communications Board has adopted a "policy" whereby it interprets the Act to allow for the collection of one E911 charge for "each of the twenty-four (24) lines available to the subscriber that can transmit a telephone call" in the case of a T-1 circuit, and "each of the twenty-three (23) lines used for telephonic purposes" in the case of PRI service.[2] This "policy" has not been adopted as a rule under the Uniform Administrative Procedures Act and thus lacks the force and effect of a duly-promulgated rule. It was noted in the request for this Opinion

---

[1]The term "exchange telephone service" is not defined in the Act.

[2]Tennessee Emergency Communications Board Policy 23.

Case 1:11-cv-00330   Document 7   Filed 12/08/11   Page 23 of 74   PageID #: 53

that at least one local telephone exchange service provider has elected to collect and remit only one E911 charge for its T-1 circuits and no more than five E911 charges for each ISDN circuit utilizing a PRI protocol. Other local service providers are following the Tennessee Emergency Communication Board's policy.

As a prerequisite to determining the number of E911 charges that should be assessed to T-1 and PRI digital transmission pathways pursuant to the Act, it is first necessary to briefly examine the telecommunications technology involved. While commonly referred to as a T-1 line, T-1 is more accurately defined as a voice and data transport system capable of transferring digital information at 1.455 megabytes per second over 24 dedicated channels, each channel supporting a transfer rate of 64 kilobytes per second. Accordingly, a T-1 line is actually a digital signal protocol that can operate physically through various media, including the same two-wire copper circuit as analog telephone traffic, or via fiber optics.[3] PRI, or Primary Rate Interface, is a type of protocol commonly used in an Integrated Services Digital Network (ISDN), and operates in a similar manner to that of T-1 service, with the exception that PRI service offers 23 channels (B channels) available for voice and data transfer while one channel (the D channel) is reserved for the system to communicate with itself. The advantage of T-1 and PRI protocols over traditional analog telephone service is the ability to transfer a greatly increased volume of both voice and data traffic over the same physical infrastructure by utilizing digital technology. For example, the same two-copper-wire circuit that would support only one telephone call at a time using an analog protocol could support 24 simultaneous voice telephone calls utilizing a T-1 protocol or 23 voice telephone calls under a PRI protocol.[4] Moreover, many service users prefer the T-1 and PRI service primarily because of its fast and efficient data transfer capabilities, and often utilize the technology more for this function than for traditional voice telephone exchange.

Because of the manner in which the digital signals are routed, the service supplier knows which channels under T-1 and PRI protocols are tagged for data transfer and which channels are reserved for voice telephone transmissions. As a general rule, with only a few exceptions, a T-1 or PRI circuit is dedicated to either data transfer or voice communication.[5] While current technology

---

[3] While two wires are required as a bare minimum (one talk wire and one receive wire configured to complete a circuit), a four-wire conversion, sometimes described as a four-wire access loop, is often used to transfer digital signals over greater distances.

[4] The utilization of T-1 and PRI digital transfer protocols assumes that both the service supplier has the proper equipment in its central office (CO) and the service user has the proper digital-capable equipment at its end. Service users served by a T-1 line or PRI service will have either a channel bank with multiple attachment points to utilize the channels available to them, or more often some type of computerized system that automatically manages input devices. For voice telephone exchange service, it is often a Private Branch Exchange, or PBX system, that routes calls through to available voice-dedicated channels.

[5] These exceptions include data transfer over a channel designated for voice traffic utilizing the now relatively antiquated dial-up modem. Because of the higher tariff rates for T-1 and PRI service, it would be rare indeed to have significant data transfer conducted through a channel designated for voice traffic. Also, an increasingly popular exception involves the transfer of voice communication over channels designated for

Page 4

allows the fractional use of the band-width available through a T-1 or PRI protocol, essentially allowing multiple service users to divide up the channels of a dedicated T-1 or PRI circuit, each channel is nonetheless assigned to a particular user and is dedicated to either data transfer or voice telephone service. For those channels designated for voice telephone service, three separate options are available to the end user: one-way outgoing voice calls, one-way incoming voice calls, and two-way voice calls. The service provider controls, and therefore knows, the designation of each channel. In sum, the service supplier designates and therefore knows for accounting purposes the following with regard to T-1 and PRI circuits: each channel that is assigned to each individual service user at a particular location; whether the channel is designated for data transfer or voice telephone service; and, if the channel is dedicated to voice telephone service, whether it provides incoming, outgoing, or two-way telephone service.

As noted above, the Act and the corresponding statutes allow for the collection of one E911 charge per line providing exchange telephone service. When this mandate is applied to digital service utilizing T-1 and PRI protocols, the issue is whether the E911 charges should be assessed based on the number of circuits (also called loops), or the number of digital channels contained in each circuit. Furthermore, if the fees are assessed based on the number of digital channels, another issue is whether these charges should be collected on all channels, or only those capable of connecting to 911 service. The resolution of these issues is essentially a matter of statutory interpretation.

The primary objective of statutory construction is to ascertain and give effect to the intent and purpose of the legislature. *Conley v. State,* 141 S.W.3d 591 (Tenn. 2004). When the statutory language is unambiguous, legislative intent is to be derived from the plain and ordinary meaning of the statutory language. *State v. Wilson,* 132 S.W.3d 340 (Tenn. 2004). Furthermore, the meaning of a statute is determined by viewing the statute as a whole and in light of its general purpose. *City of Lenoir City v. State ex rel. City of Loudon,* 571 S.W.2d 297, 299 (Tenn. 1978). A statute should not be given a forced construction in an effort to extend the import of the language. *State v. Butler,* 980 S.W.2d 359 (Tenn. 1998).

With these principles in mind, it is necessary to return to the language of the Act as codified in Title 7, Chapter 86. An "emergency telephone service charge" may be assessed on "service users." Tenn Code Ann. § 7-86-108(a)(1). A "service user" is "any . . . entity that is provided 911 service." Tenn. Code Ann. § 7-86-103(13). "911 service" is "a telephone exchange communications service whereby a public safety answering point may receive telephone calls dialed to the telephone number 911. . . ." Tenn. Code Ann. § 7-86-103(10). The plain and ordinary meaning of this language, viewed in its entirety and with the general purpose of the Act in mind, leads to the conclusion that the legislature intended that emergency telephone service charges apply only to voice telephone exchange communication service. Additionally, this interpretation is also implicit within the language of the Act upon consideration of the fact that the E911 public safety answering

data transfer though Voice Over Internet Protocol, or VOIP, technology. This technology presents a particular problem for the collection of E911 charges, and was recently directly addressed by the Tennessee Legislature, resulting in the amendments to the Act found in 2006 Tenn. Public Acts Chapter 925.

points can currently be reached only via voice telephone exchange communication.

The Act further states that an E911 charge is to be assessed on the first 100 "exchange access facilities" per service user per location. Tenn. Code Ann. § 7-86-108(A)(1)(a). The term "exchange access facilities" is defined as "all lines, provided by the service supplier for the provision of exchange telephone service, as defined in existing general subscriber services tariffs filed by the service supplier with the Tennessee regulatory authority." Tenn. Code Ann. § 7-86-103(7). However, despite the Act's reference to existing tariffs, the current general subscriber services tariffs on file with the Tennessee Regulatory Authority do not expressly define "exchange telephone services." Nonetheless, tariffs often define "exchange service" in language such as "[t]elecommunications service provided for subscribers within a specified geographical area for local calling and access to toll services." In short, the general subscriber services tariffs on file with the Tennessee Regulatory Authority indicate that "exchange telephone service" means voice telephone service. Accordingly, it is the opinion of this Office that the Act does not contemplate the assessment of E911 changes on lines devoted exclusively to non-voice telephone exchange service, such as T-1 or PRI channels used solely for data transfer.

The ultimate issue with regard to T-1 and PRI protocol circuits is the number of E911 charges that may be assessed when voice telephone exchange service is provided. As already noted, the Act requires the assessment of E911 charges on "service users" capable of reaching "911 Service" via voice telephone exchange service. Tenn. Code Ann. § 7-86-103(13) and (9). This E911 charge is assessed on "all lines" providing exchange telephone service, see Tenn. Code Ann. § 7-86-103(7), on a one-charge-per-line basis up to 100 charges per user per location, see Tenn. Code Ann. § 7-86-108(A)(1)(a). Moreover, the purpose of the E911 charge is to "fund the 911 emergency telephone service," and the funds are to be "used for the operation of the district and for the purchase of necessary equipment for the district." Tenn. Code Ann. § 7-86-108(A)(1)(a) and (e). With these purposes in mind, the Tennessee Legislature further mandated that the E911 charge be levied in an equitable manner, requiring that the "service charge shall have uniform application." Tenn. Code Ann § 7-86-108(A)(1)(a). Based on the plain and ordinary meaning of this language, viewed in its entirety and considering the general purpose of the Act, it is the opinion of this Office that the Act requires that one E911 charge be assessed per voice telephone pathway capable of reaching a public safety answering point by dialing 911, whether it be an analog wire circuit or a digital signal channel.

It has been brought to the attention of this Office that at least one local service provider contends that T-1 and PRI circuits amount to only one line for E911 charge purposes because these architectures are referred to in the general subscriber services tariffs by language expressed in the singular, e.g, "a line" or "a path," as opposed to "lines" or "paths." While the Act does indicate that the E911 charges are to be applied to "all lines" providing "exchange telephone service, as defined in existing general subscriber tariffs," see Tenn. Code Ann. § 7-86-103(7), the existing tariffs simply do not define the terms associated with the digital signal architecture used to convey voice traffic via T-1 or PRI protocols. However, a plain and natural reading of the Act's provisions must take into account the fact that within the telecommunications industry, multiple communication pathways are frequently referred to in the singular when bundled together. For example, a telephone cable (singular) contains multiple lines (plural); a traditional telephone line (singular) contains multiple

wires (plural); a T-2 line (singular) contains multiple T-1 circuits (plural); and, of most significance to this issue, a T-1 and PRI "line" (singular) contains multiple channels (plural). It is a well established rule of statutory construction that the singular includes the plural and the plural the singular, except when the contrary intention is clearly manifest in the language interpreted. *See* Tenn. Code Ann. § 1-3-104(c); 2A Sutherland Statutory Construction § 47.34 (6th ed. 2000). Accordingly, when all of the provisions of the Act are considered as a whole in light of its general purpose, and when the language contained in the Act and the corresponding statutes is given its plain and natural meaning, the conclusion is that each separate analog line and each separate digital channel capable of reaching 911 service should be assessed a separate E911 charge. Therefore, in an effort to give effect to the legislative intent behind the Act, the "all lines" for which an E911 charge is assessed, *see* Tenn. Code Ann. § 7-86-103(7), should be interpreted to include each digital channel within a T-1 or PRI protocol circuit that supports voice telephone exchange service capable of obtaining E911 service.

The instant request relates that at least one local service provider remits only five E911 charges per PRI circuit, apparently because its considers a FCC rule that assesses only five subscriber line charges per PRI circuit to be analogous to Tennessee's E911 charge requirements. Curiously, this same service provider also finds the FCC rules pertaining to subscriber line charges attributed to T-1 lines not to be analogous to Tennessee's E911 charge requirements, and therefore remits only one E911 charge per T-1 circuit. Consequently, it is appropriate to examine the federal telecommunications fee structure and corresponding FCC rules.

At the federal level, local exchange carriers are allowed to recover costs for establishing and maintaining telecommunication lines through several charges collected from end users, including Subscriber Line Charges (SLC). The Federal Communications Commission has "long specified that carriers . . . must assess one SLC 'per line,' which is defined to mean per channel."[6] However, because the Subscriber Line Charges are set in accordance with the FCC's "long-standing efforts to align rates with costs,"[7] the FCC "created exceptions to the general rule that one SLC be assessed for each channel of service provided"[8] and promulgated rules expressly providing that a maximum of five SLCs be assessed for circuits used to provide PRI ISDN service.[9] These exceptions were deemed necessary because service provider cost studies at that time revealed that PRI ISDN

---

[6]Federal Communications Commission Order Granting Petition for Rulemaking, Notice of Proposed Rulemaking, and Order Granting Interim Partial Waiver, FCC 04-174, released July 19, 2004, at 3 ("July 19, 2004 FCC Order"). *See also* 47 C.F.R Part 36, App.-Glossary (defining "Exchange Line" as "[a] communications channel between a telephone station, PBX or TWX station and the central office which serves it.").

[7]July 19, 2004 FCC Order, at 8.

[8]July 19, 2004 FCC Order, at 4.

[9]*See* 47 C.F. R. §§ 69.152(l) and 69.104(p). These rules were adopted in 1997 and 2001 respectively.

common line costs were approximately five times that of analog common line costs.[10] More recent cost studies have determined that T-1 services are provided in the same manner as PRI ISDN services, and therefore have the same costs.[11] Accordingly, the FCC has issued an order granting a waiver of the current rules to allow T-1 service also to be assessed SLCs at the same rate of five per channel as PRI circuits, and has issued a notice of proposed rulemaking that would expressly promulgate the rule that PRI and T-1 circuits be assessed the same number of SLCs.[12]

The key principles that can be gleaned from an examination of the FCC's treatment of Subscriber Line Charges are twofold: (1) as a general rule, "line" is to be interpreted as "channel" when dealing with digital T-1 and PRI ISDN service, and (2) federal Subscriber Line Charges are tied to the actual common line costs, and not to the volume of calls capable of being transmitted through the various lines or channels. Accordingly, the FCC's interpretation of "lines" as synonymous with digital "channels" supports the conclusions of this Opinion. Furthermore, the rationale behind the FCC rules on SLCs also clearly distinguishes its cost-based charge structure from the Tennessee E911 district's volume-based charge structure. The FCC currently allows only five SLCs per T-1 and PRI circuits because existing cost studies show that these digital circuits cost no more than five times that of analog circuits. However, there is no dispute that PRI and T-1 circuits are capable of handling up to 23 and 24 times more voice telephone exchange traffic, respectively, than a traditional analog line. Therefore, because the E911 charge is based on the number of lines capable of reaching 911 service — and not on the cost of those lines — there is no rational or objective basis to assess fewer E911 charges than actual digital channels capable of obtaining and using 911 service.

---

[10]July 19, 2004 FCC Order, at 4.

[11]*Id.*, at 6. Recent studies have revealed that the 5:1 ratio may be too generous, as the cost of T-1 and PRI circuits is now estimated to be either the same as analog lines, or at a 1.5:1 ratio. *Id.* at 8. Regardless, the Commission determined that circuits used to provide T-1 service and PRI service are functionally comparable and therefore have comparable common line costs. Therefore, adherence to the principle of aligning pricing rates with costs, as well as the desire to avoid cost disparity harmful to rural carriers that do not support PRI service, mandated that T-1 and PRI circuits be assessed the same number of SLCs. *Id.* at 15-16.

[12]*Id.* at 1-46. The only exception is that certain carriers, termed competitive eligible telecommunications carriers by the FCC, are not subject to the waiver order and must continue to use the old assessment method of 24 charges per channel for T-1 service. *Id.* at 44. *See also* 47 C.F.R. § 54.307.

In conclusion, Tenn. Code Ann. § 7-86-108 authorizes an emergency communications district to impose a "telephone service charge" to all "service users" to fund 911 emergency telephone service. Pursuant to Tenn. Code Ann. § 7-86-103 (7), this charge is assessed on "all lines" that provide "exchange telephone service." Based on the foregoing analysis, "all lines" would include all digital channels in a T-1 or PRI circuit that transmit voice telephone exchange calls capable of connecting to 911 service. In a T-1 circuit, this would include a separate E911 charge on up to 24 channels per circuit, and in a PRI circuit, up to 23 channels. The applicable statutes do not contemplate assessing E911 charges on channels dedicated exclusively to data transfer or incoming-only voice telephone exchange service. However, every digital channel in a T-1 or PRI circuit that transmits voice telephone exchange traffic capable of reaching 911 service, whether two-way or one-way outbound service, is subject to an E-911 charge.


ROBERT E. COOPER, JR.
Attorney General


MICHAEL E. MOORE
Solicitor General


GREGORY O. NIES
Assistant Attorney General

Requested by:

The Honorable Jimmy A. Eldridge
State Representative
204 War Memorial Building
Nashville, TN 37243

# EXHIBIT B

# POLICY NO. 23

## LINE CHARGES ON T1 and PRI CIRCUITS

The calculation of emergency telephone service charges on T1 and PRI circuits by local exchange carriers is far from uniform, resulting in possible competitive disadvantages in the marketplace. Inasmuch as use of the emergency telephone service charge as a competitive tool contravenes public policy, the Tennessee Emergency Communications Board ("TECB") interprets Tenn. Code Ann. § 7-86-108(a)(1)(A) as authorizing the imposition of such charges on each line in T1 and PRI circuits that can transmit a telephone call. Tenn. Code Ann. § 7-86-108 authorizes the imposition of the emergency telephone service charge on "exchange access facilities."[1] Tenn. Code Ann. § 7-86-103(b) defines "exchange access facilities" as follows:

> "Exchange access facilities" means all lines, provided by the service supplier for the provision of exchange telephone service, as defined in existing general subscriber services tariffs filed by the service supplier with the Tennessee regulatory authority;[2]

The TECB interprets this language to reach "all lines" used to provide exchange telephone service. In the case of a T1 circuit, this would include each of the twenty-four (24) lines available to the subscriber that can transmit a telephone call and, as to a PRI, each of the twenty-three (23) lines used for telephonic purposes that are available to the subscriber.

**Adopted 7-16-04**

---

[1] Tenn. Code Ann. § 7-86-108 (which states in pertinent part):

> (a)(1)(A) The board of directors of the district may levy an emergency telephone service charge in an amount not to exceed sixty-five cents (65¢) per month for residence-classification service users, and not to exceed two dollars ($2.00) per month for business-classification service users, to be used to fund the 911 emergency telephone service. Any such service charge shall have uniform application and shall be imposed throughout the entire district to the greatest extent possible in conformity with the availability of such service within the district. No such service charge shall be imposed upon more than one hundred (100) exchange access facilities per service user per location. . . . .

[2] Tenn. Code Ann. § 7-86-103(7).

# EXHIBIT C

## IN THE CHANCERY COURT OF HAMILTON COUNTY, TENNESSEE

| | | |
|---|---|---|
| IN RE: | : | DOCKET NO. 11-0806 |
| PETITION OF HAMILTON COUNTY EMERGENCY COMMUNICATIONS DISTRICT | : | PART 1 |
| | : | |
| | : | |

## MEMORANDUM OPINION AND FINAL ORDER

### I. THE PLEADINGS

On October 19, 2011, Hamilton County Emergency Communications District ("the District") filed a Petition to Permit the Investigation of Remittance of Service Charges Needed for Emergency 911 Services. The District filed its First Amended Petition to Permit the Investigation of Remittance of Service Charges Needed for Emergency 911 Services on November 2, 2011. The District added certain additional prospective defendants in this First Amended Petition. The District is responsible for providing emergency communications, *i.e.*, 911 services, to the residents of Hamilton County. These services are funded by service fees charged to telephone subscribers or "service users." These service fees are collected by the telephone "service suppliers" and then remitted to the District. The Hamilton County District, and others, are created pursuant to the Emergency Communications District Law, Tenn. Code Ann. § 7-86-101 *et seq.* This law as enacted in 1984.

In its Petition, the District alleged that it wanted to seek to preserve evidence and perpetuate testimony from certain prospective defendants. The prospective defendants were providers of telephone service providers from whom the District

1

needed to secure information (documents and/or testimony) to determine if the respective service provider had provided truthful reports and full payments. In effect, the District opined that some prospective defendants may have withheld or concealed information from the District. Thus, the District wanted to investigate the records of certain service suppliers to determine if the suppliers were correctly receiving the fees pursuant to law and remitting the fees to the District. The service suppliers retain three percent (3%) of the monies they collect and remit the balance to the District.

In essence, the District was saying that it thought it had a basis to sue certain service suppliers but was not certain. If granted the investigatory power sought, the District could subpoena the records from the suspected service suppliers and take the deposition of the most knowledgeable business representative. If the District found wrongdoing and if the fees were not then paid, the District would file a lawsuit against the service provider and be free to use the (by preserving/perpetuating) evidence obtained during this investigatory stage at the trial of the anticipated litigation.

Although not a specific issue in the present case, there have been many technological advances sine the law was enacted in 1984. For example, many suppliers of telephone service providers, such as AT&T, use a channelized service. Under such, one line can carry several different functions, such as data, facsimile, in addition to telephone. Some of these lines can carry service to 24 service users. Some service users have multiple lines to a business, for example. There has been a difference of opinion in the industry as to how the 911 fee should be assessed to such service users.

2

Notice of the District's Application and the scheduled hearing date were sent to each of the service providers listed in the Petition. The "prospective defendants" were noticed by certified mail, return receipt requested.

On November 4, 2011, Matrix Telecom, Inc. filed its Opposition to the District's Petition. The District on November 8, 2011, filed a Notice of Voluntary Dismissal of Certain Prospective Defendants. Nine of the Prospective Defendants had either entered a Cooperation Agreement with the District or provided the information sought by the District. An Order was entered on November 18, 2011, dismissing, without prejudice, these nine companies. One of the Prospective Defendants dismissed was Matrix Telecom, Inc.

Century/Link filed its Response to the District's Petition on November 22, 2011. TGC MidSouth, Inc., AT&T Corporation, and AT&T of the South Central States, collectively referred to as "AT&T", filed their Response and Objection to the District's Petition, on November 23, 2011.

The District, through its Chairman, General Counsel and three Special Counsels, appeared on November 28, 2011 at the proper time. Century/Link appeared by its local counsel. AT&T appeared through its local counsel and J. Henry Walker, IV of Atlanta, Georgia. There was a motion to allow Mr. Walker to practice *pro hac vice* in this court for this case. There was no opposition to this Motion and such was permitted. Also, the District presented an Agreed Order by which Covista, Inc. was given until December 15, 2011 to supply the information requested to the District. The information requested was set forth in the Order. Also, Covista, Inc. would provide a Rule 30.02(6) corporate

3

representative for a deposition. If Covista complied with the Order, then Covista would be dismissed.

In filing its petitions, the District relied upon Tenn. Code Ann. § 4-18-104(b)(1), the inherent equitable power of the Chancery Court, and Rule 27, Tennessee Rules of Civil Procedure, as authority for its right to investigate the records of certain service suppliers prior to filing a Complaint. The court heard excellent presentations by Frederick L. Hitchcock, Special Counsel for the District, Misty Smith Kelley, counsel for Century/Link, and J. Henry Walker, IV for the AT&T Defendants. The District argued that it needed the authority to investigate certain service suppliers before filing a lawsuit. In such a manner, only a service provider who had not complied with the law would be sued.

The thrust of the prospective defendants was simple: the District had no legal authority for its pretrial discovery investigation. First, neither Tennessee Code Ann. § 4-18-104(b)(1) nor any other statute provided the District the right to perform such an investigation outside the bounds of an active lawsuit. Also, Rule 27, Tenn. R. Civ. P., is not applicable for what the District is seeking to do. The inherent power of the Chancery Court does not provide a separate basis for the District's proposed action, according to the Respondents.

After hearing the excellent legal arguments, the court took the matter under advisement to study the written legal positions of the parties. The District also filed separate written replies to Century/Link and to AT&T. Having considered such, the court is now ready to publish its decision.

4

## II. THE LEGAL ISSUES

Should the court, pursuant to applicable law, grant the District's First Amended Petition and allow it to collect records from and testimony of business representatives of telephone service providers before any lawsuit is filed by the District?

## III. THE DISCUSSION

A. The Statutory Basis.

Tennessee Code Annotated § 4-18-104(b)(1), which is part of the False Claims Act, provides as follows:

> (b)(1) The prosecuting authority of a political subdivision shall diligently investigate violations under § 4-18-103 involving political subdivision funds. If the prosecuting authority finds that a person has violated or is violating § 4-18-103, the prosecuting authority may bring a civil action under this section against that person.

The District argues that it has a mandatory duty under this law to investigate alleged violations of the law. Some service providers have cooperated with the District. Other service providers have not agreed to participate, whether due to the lack of confidentiality of records or otherwise. The District argues that its duty to investigate will be impeded and impaired if it is not allowed to pursue the desired, pre-litigation discovery.

The District concedes that this statute, by itself, does not grant the District the subpoena power and investigatory tools it seeks to use. The District has not relied upon any other statute in support of its position. The court found no appellate decisions citing § 4-18-104(b)(1).

There are statutes passed by the Tennessee general assembly which grant certain governmental units subpoena and other investigatory powers before a lawsuit or other

5

court proceeding is begun. Some examples of the general assembly's giving subpoena and investigative powers are set forth below.

Tennessee Code Annotated § 67-1-1302 is a general statute regarding taxes. It provides:

> It is the declared intent of this part that all persons, firms or corporations whatsoever having any knowledge pertaining to liabilities for taxes or fees due the state of Tennessee, and any books, papers, records or other data pertaining to liabilities for taxes or fees due the state of Tennessee, shall be subject to the subpoena power granted under this part.

Tennessee Code Annotated § 67-2-113 is more specific. It provides:

> The commissioner [of revenue] has the power to compel the attendance of witnesses and the production of evidence, by subpoena, to administer oaths and to take testimony in relation to any matter under this chapter [income taxation].

Tennessee Code Annotated § 45-17-117, dealing with "deferred presentment services," provides as follows:

> **Written complaint – Investigation – Subpoenas.**
> (a) Any person aggrieved by the conduct of a licensee under this chapter in connection with the licensee's regulated activities may file a written complaint with the commissioner [of financial institutions] who may investigate the complaint.
> (b) In the course of the investigation of the complaint, the commissioner may:
> (1) Subpoena witnesses;
> (2) Administer oaths;
> (3) Examine any individual under oath; and
> (4) Compel the production of records, books, papers, contracts or other documents relevant to the investigation.
> (c) If any person fails to comply with a subpoena of the commissioner under this chapter or to testify concerning any matter about which the person may be interrogated under this chapter, the commissioner may petition any court of competent jurisdiction for enforcement.

6

(d) The license of any licensee under this chapter who fails to comply with a subpoena of the commissioner may be suspended pending compliance with the subpoena.

(e) The commissioner shall have exclusive administrative power to investigate and enforce any and all complaints filed by any person that are not criminal in nature, which complaint relates to the business of deferred presentment services.

Tennessee Code Annotated § 45-18-120 is basically the same statute as § 45-17-117.

The commissioner of insurance is given the following powers in Tenn. Code Ann. § 56-45-111. This statute provides:

> **Commissioner – Power to enforce laws.** – The commissioner is authorized to make use of any of the powers established under the insurance code of this state to enforce the laws of this state not specifically preempted by the Risk Retention Act of 1986, including the commissioner's administrative authority to investigate, issue subpoenas, conduct depositions and hearings, issue orders, impose penalties and seek injunctive relief. With regard to any investigation, administrative proceedings or litigation, the commissioner can rely on the procedural laws of this state. The injunctive authority of the commissioner, in regard to risk retention groups, is restricted by the requirement that any injunction be issued by a court of competent jurisdiction.

Tennessee Code Annotated § 48-2-118 grants the commissioner of commerce and insurance extensive power and authority to investigate claims regarding violations of the Tennessee Securities Act of 1980. The statute, which includes the right to issue subpoenas and subpoena duces tecums, covers parts of three pages of the Code.

There are other similar statutes under Tennessee law. Although counsel for the District did not claim that the Emergency Communications District Law, Tenn. Code Ann. § 7-86-101 to 157, granted such power, the court scanned the statutes and found nothing which would apply to the issue before the court.

7

The court believes that the correct doctrine of statutory consideration to apply in this setting is *expressio unius est exclisio alterius.* The court believes that the general assembly grants authority and legal tools to investigate complaints and compliance with the law when it wants to do so. Therefore, the court holds that the general assembly's failure to add the legal tools regarding investigations under the False Claims Act means that the "prosecuting authority" does not have the authority to take depositions or subpoena records before the commencement of litigation. The court cannot read into the statute by implication, the powers and legal tools the District contends it needs to investigate its suspicions.

B. Rule 27, Tennessee Rules of Civil Procedure.

The District relies upon Rule 27 as its legal authority to preserve and perpetuate testimony and evidence before a lawsuit is filed. Rule 27.01, Tenn. R. Civ. P., relates to depositions before an action is filed. This part of the Rule reads as follows:

> **Before Action.** - (1) PETITION. A person who desires to perpetuate his or her own testimony or that of another person regarding any matter that may be cognizable in any court of Tennessee may file a verified petition in any court of record in the county of the residence of any expected adverse party. The petition shall be entitled in the name of the petitioner and shall show: 1, that the petitioner expects to be a party to an action cognizable in a court of Tennessee but is presently unable to bring it or cause it to be brought, 2, the subject matter of the expected action and the petitioner's interest therein, 3, the facts which the petitioner desires to establish by the proposed testimony and the reasons for desiring to perpetuate it, 4, the names or a description of the persons the petitioner expects will be adverse parties and their addresses so far as known, and 5, the names and addresses of the persons to be examined and the substance of the testimony which the petitioner expects to elicit from each, and shall ask for an order authorizing the petitioner to take the depositions of the persons to be

8

examined named in the petition, for the purpose of perpetuating their testimony.

(2) NOTICE AND SERVICE. The petitioner shall thereafter serve a notice upon each person named in the petition as an expected adverse party, together with a copy of the petition, stating that the petitioner will apply to the court, at a time and place named therein, for the order described in the petition. At least 20 days before the date of hearing the notice shall be served in the manner provided in Rule 4.04 for service of summons; but if such service cannot with due diligence be made upon any expected adverse party named in the petition, the court may make such order as is just for service by publication or otherwise, and shall appoint, for persons not served in the manner provided in Rule 4.04, an attorney who shall represent them, and, in case they are not otherwise represented, shall cross-examine the deponent. If any expected adverse party is a minor or incompetent the provisions of Rule 17.03 apply.

(3) ORDER AND EXAMINATION. If the court is satisfied that the perpetuation of the testimony may prevent a failure or delay of justice, it shall make an order designating or describing the person whose depositions may be taken and specifying the subject matter of the examination and whether the depositions shall be taken upon oral examination or written questions. The depositions may then be taken in accordance with these rules; and the court may make orders of the character provided for by Rules 34 and 35. For the purpose of applying these rules to depositions for perpetuating testimony, each reference therein to the court in which the action is pending shall be deemed to refer to the court in which the petition for such deposition was filed.

(4) USE OF DEPOSITION. If a deposition to perpetuate testimony is taken under these rules or if, although not so taken, it would be admissible in evidence in the courts of the state in which it is taken, or in the courts of the United States, it may be used in any action involving the same subject matter subsequently brought in a court of this state, in accordance with the provisions of Rule 32.01.

The Advisory Commission's Comments state the following as the first listed

comment. It says:

9

**Advisory Commission Comments.** Rule 27.01(3) requires that the judge before granting the petition seeking to take depositions to perpetuate evidence must find that the perpetuation of testimony may prevent a failure or delay of justice. Rule 27.01(4) allows depositions to perpetuate testimony to be used under the same conditions as are other types of depositions under Rule 32.01.

C. <u>Tennessee</u> <u>Appellate</u> <u>Authorities.</u>

The one case cited by the parties and found by the court was *Jones v. Tenn. Farmers Mut. Ins. Co.*, No. M2003-00862-COA-R3-CV, 2004 WL 179359, 2004 Tenn. App. LEXIS 64 (Jan. 27, 2004). In this case certain insureds filed a Petition, pursuant to Rule 27, Tenn. R. Civ. P., to obtain records of oral statements they had given to an adjuster before they would give a statement under oath to the insurer. The statement under oath was pursuant to the terms of the insurance policy. This case grew out of the Petitioners' home fire and subsequent claim against the company issuing the homeowner's insurance policy. The trial court granted the petition and the Court of Appeals reversed.

In the Petition filed, the Petitioners sought to take the depositions of two insurance agents who were involved in the investigation of the loss. Counsel for the Petitioners opined that he could obtain transcripts or notes of the Petitioners' unsworn statements by taking the depositions of the insurance employees in charge of the investigation. A subpoena had also issued for such records.

Judge Cain, in his opinion, set forth the history of the purpose of perpetuating testimony. He wrote:

> Depositions to perpetuate testimony existed by equity and by statute long before the adoption of Rule 27 of the Tennessee Rules of Civil Procedure or its federal

10

counterpart. In equity, "the sole object of a bill to perpetuate is to assist other Courts, and to preserve evidence to prevent future litigation. "Henry R. Gibson, *Gibsons Suits* in Chancery II, § 1194 (Arthur Crownover, Jr., rev. 5th ed. 1956). The statutory remedy was provided by Tennessee Code Annotated sections 24-1001 to 1014 (repealed). The statutes provided a summary method of perpetuating testimony with section 24-1001 (repealed) providing: "Any person may have evidence taken conditionally, to be used in pending or expected litigation, and have the same perpetuated, under the provisions of this chapter." Tenn. Code Ann. § 24-1001 (1955)(repealed).

Whether one refers to the pre-existing equity rule, the repealed statute, or Tennessee Rule of Civil Procedure 27, the limited purpose of any proceeding of this type is to perpetuate testimony in order "to preserve evidence, when it is in danger of being lost, before the matter to which it relates can be made the subject of judicial investigation." Gibson, *supra*, § 1193.

The Petition at bar seeks to perpetuate nothing but, rather, to compel the insurer to produce copies of the insureds' own statements made to the insurer at a time prior to the insureds' retention of counsel. The avowed purpose is for use by the insureds in preparation for their statements under oath to be given to the insurer pursuant to the terms of the policy. The contractual right of the insurer to compel the insured to submit to a statement under oath concerning a fire loss is unconditional. *Shelter Insurance Company v. Spence*, 656 S.W.2d 36 (Tenn. Ct. App. 1983). Appellees assert no contractual right under which they may obtain from the insurer, prior to giving an oral statement under oath, their own previous unsworn statements to insurance adjusters. The purpose of Appellees is purely tactical. They seek to discover nothing from any witness but, rather, to "discover" their own prior statements. Presumably they know what they said. At any rate, Tennessee Rule of Civil Procedure 27 is not a discovery tool.

Since the essential provisions of Tennessee Rule of Civil Procedure 27 are identical to the provisions of Federal Rule of Civil Procedure 27, federal cases construing the rule are persuasive authority in Tennessee. *Bowman v. Henard*, 547 S.W.2d 527 (Tenn. 1977); *March v. Levine*, 115

11

S.W.3d 892 (Tenn. Ct. App. 2003); *Gamble v. Hosp. Corp. of Am.*, 676 S.W.2d 340 (Tenn. Ct. App. 1984).

The leading federal case on Federal Rule of Civil Procedure 27 is *Ash v. Cort*, 512 F.2d 909 (3d Cir. 1975). In this stockholders' derivative action, the plaintiff sought to take the depositions of officers and directors of the corporation under Rule 27, asserting the case was not otherwise ripe for discovery and that the witnesses might become unavailable if discovery was further postponed. The trial court denied their Rule 27 motion, and on appeal, the Third Circuit Court of Appeals held:

> We reiterate that Rule 27 is not a substitute for discovery. It is available in special circumstances to preserve testimony which could otherwise be lost. In addition, the test of the Rule makes it clear that reversal is warranted only when the trial judge has committed an abuse of discretion. The Rule states that the trial court "may allow the taking of the depositions of witnesses to perpetuate their testimony . . . if the court finds that the perpetuation of the testimony is proper to avoid a failure or delay of justice. . . ." (Emphasis added.) F.R.C.P. 27(b).

> The present appeal must fail both because appellant misperceives Rule 27 as a substitute for general discovery and because he has failed to show any abuse of discretion by the trial court. . . .
> \* \* \* \* \*

*Ash*, 512 F.2d at 912-13 (citations omitted).

As relates to use of Rule 27 in pre-complaint proceedings, the United States District Court for the Middle District of Alabama said it all in *In re Ford*, 170 F.R.D. 504 (M.D. Ala. 1997), wherein a plaintiff sought, pre-complaint, to discover the facts surrounding the death of her husband. The court held:

> It is clear that Ford seeks to engage in discovery pursuant to Rule 27. As represented in Ford's petition, as amended, and at the December 13 hearing, she desires to know "the basic facts surrounding the death of . . . Roberts." She wants to

12

know who shot him and whether the shooting was justified.

Admittedly, Ford also asserts in her petition a desire to preserve testimony; she states that she "needs to establish an accurate account of the events that took place. . . before the memories of those involved fade or become distorted by publicity." This reason is not credible, however. Ford can do this by simply filing suit today. She presented no evidence that Sheriff Franklin's testimony is in imminent danger of being lost because he is gravely ill or about to leave the county. Ford therefore wishes only to discover or uncover what happened on November 8. The simple question for the court is whether Rule 27 authorizes such relief.

In *Business Guides v. Chromatic Communications*, 498 U.S. 533, 540, 111 S. Ct. 922-28, 112 L. Ed.2d 1140 (1991), the Supreme Court stated that courts should "give the Federal Rules of Civil Procedure their plain meaning." A court's inquiry is complete if it finds "the text of the Rule to be clear and unambiguous." *Id.* at 541, 111 S. Ct. at 928. Therefore, the first and obvious place to look to determine whether Rule 27 authorizes pre-complaint discovery is the language of the rule itself. If the language of the rule is unambiguous and dispositive and is reasonable within its context, then the court should go no further and simply should enforce the language. Here, Rule 27 meets this straightforward test.

Subsection (a)(1) of Rule 27 provides, as stated, that "A person who desires to perpetuate testimony regarding any matter that may be cognizable in any court of the United States may file a verified petition." (Emphasis added.) Subsection (a)(3) then provides that an order allowing examination may be entered only "If the court is satisfied that the perpetuation of the testimony may prevent a failure or delay of justice." (Emphasis added.) Rule 27's coverage therefore extends only to the "perpetuation" of testimony. The term "perpetuate" is defined as "to make perpetual," "preserve from extinction," or "cause to last indefinitely."

13

Webster's Third International Dictionary, unabridged 1685 (1976); see also Black's Law Dictionary 1027 (5th ed. 1979) ("perpetuating testimony" is a "means. . . for preserving the testimony of witness, which might otherwise be lost before the trial in which it is intended to be used") (emphasis added). Here, Ford seeks to discover or uncover testimony, not to perpetuate it. She seeks pre-complaint perpetuation of it. There is nothing before the court to indicate that Sheriff Franklin's testimony is in imminent danger of being lost. Rather, Ford simply wants to know who shot Roberts and why. Rule 27 simply does not provide for such discovery.

This understanding of Rule 27 is in line with that given in case law and by legal commentators as well. In *Ash v. Cort*, 512 F.2d 909, 911 (1975), the Third Circuit Court of Appeals stated that "Rule 27 properly applies only in that special category of cases where it is necessary to prevent testimony from being lost." Rule 27 is not a substitute for discovery. It is available in special circumstances to preserve testimony which could otherwise be lost." *Id.* at 912. The court then concluded that "The present appeal must fail . . . because appellant misperceives Rule 27 as a substitute for general discovery." *Id.* at 913. Similarly, in *Penn Mutual Life Ins. Co. v. U.S.*, 68 F.3d 1371, 1374-75 (1995), the D.C. Circuit Court of Appeals stated that Rule 27 requires "that a petitioner demonstrate an immediate need to perpetuate testimony." *Contrast in re Sims*, 389 F.2d 148 (5th Cir. 1967) (holding that petition properly sought to perpetuate testimony). See also Fed. R. Civ. P. 27 (1937 advisory committee notes) ("This rule offers a simple method of perpetuating testimony") (emphasis added); *In re Boland*, 79 F.R.D. 665 (D.D.C. 1978); 4 James W. Moore, et al, Moore's Federal Practice and Procedure p. 27.09 (2d ed. 1996); 8 Charles A. Wright, Arthur R. Miller, Richard L. Marcus, Federal Practice and Procedure § 2072 (2d ed. 1994).

*In re Ford*, 170 F.R.D. at 506-07.

No matter how liberally one might construe Tennessee
Rule of Civil Procedure 27, the Petition at bar cannot fall
within the scope of the legitimate purpose to be served by
perpetuation of testimony. . . .

*Jones*, 2004 Tenn. App. LEXIS 64 at * 4-13.

D. Other Authorities.

The Federal Practice & Procedure treatise covers the interpretations of the

Federal Rules of Civil Procedure. This authoritative work is sometimes referred to as

"Wright and Miller" who first authored the text. In 8A Fed. Prac. & Proc. Civ. § 2071

(3rd ed.), the following quotes are found:

> The scope of discovery available under this rule is
> not as broad as that provided for discovery generally under
> Rule 26. Rule 27 is intended only for the perpetuation of
> testimony or other evidence. It is drafted
> to apply to situations where, for one reason or
> another, testimony might be lost to a prospective
> litigant unless taken immediately, without waiting
> until after a suit or other legal proceeding is
> commenced. Such testimony would thereby be
> perpetuated or kept in existence and, if necessary,
> would be available for use at some subsequent time.
>
> At first, some concern was expressed that this rule
> might be used for the purpose of discovery before action is
> commenced and might enable a person to fish for some
> ground for bringing suit. The early commentators agreed
> that this was not the purpose of the rule, and, despite an
> occasional intimation to the contrary, the courts have
> generally agreed that to allow Rule 27 to be used for this
> purpose would be an "abuse of the rule."

One citation is most interesting. Part of footnote five contains the following:

> " The type of fishing which the rules do not tolerate is
> fishing before action to try to discover some ground for
> bringing suit. No discovery process can be used by the
> plaintiff before he has filed his complaint, and the
> provisions for perpetuating testimony are not designated for

15

discovering grounds for bringing action but only for perpetuating evidence already known." Sunderland, Discovery before Trial under the New Federal Rules, 15 Tenn. L. Rev. 737, 744 (1939).

This treatise sets forth many federal cases that have interpreted Fed. R. Civ. P. 27. Most have denied the District's view of Rule 27. It is not this court's function to review all of those cases.

The essence of the District's position is set forth in the First Amended Petition filed on November 2, 2011, at 5-6.

> The failure and refusal of each Prospective Defendant to cooperate with the District's statutorily authorized investigation evidences an intent to conceal and withhold information that will establish whether each Prospective Defendant violated the False Claims Act, Tenn. Code An.. § 4-18-101, *et seq.*, and other applicable law by filing false reports with the District and failing to remit service charges as required by law. The information concerning the compliance with the duties imposed upon each Prospective Defendant by law is solely within the possession and control of each respective Prospective Defendant. In the absence of the relief sought in this Petition, the District reasonably fears that relevant information necessary for the prosecution of litigation against each of the Prospective Defendants will be concealed, lost, or destroyed.

Most of the federal cases interpreting Rule 27 hold that conclusory statements, without specific and particular facts for perpetuating testimony, are not sufficient for relief.

E. Equity Powers.

The court has not found any independent authority of a Chancery Court to allow the District to participate in pre-litigation discovery. The

16

provision of Rule 27.03, Tenn. R. Civ. P., is similar to Rule 60.02, Tenn. R. Civ. P. The fact that a court can determine the same type issue in an independent action does not mean the court does not have to follow the law. Section 46.02, *Gibson's Suits* in Chancery (10th ed. 2004) says nothing more than what Rule 27 provides. No additional authority is provided for an independent action.

## IV. THE CONCLUSION

The court is going to deny the District's Petition. There are several reasons.

First, the District is a creation of the general assembly. When it desires to do so, the general assembly gives specific authority and power to an official or governmental agency to investigate alleged violations of applicable law before litigation is commenced. The general assembly did not grant such authority and power to the Emergency Communications Districts it created. This court cannot grant the District powers not provided it by the general assembly. There is no implied authority involved here.

Second, the historical usage of Rule 27 has been very limited. Most federal decisions hold that Federal Rule 27 cannot be use for open, pre-trial discovery. This court agrees.

Third, if Rule 27, Tenn. R. Civ. P., could be used by any governmental unit, or perhaps any person at all, for pre-filing discovery to determine if it has grounds for a lawsuit or not, then the general assembly has wasted its time is enacting laws that specifically grant certain agencies or persons the authority to investigate claims before a lawsuit is filed. The general assembly is presumed to know the law. The Supreme Court

proposes Rules of Civil Procedure and the general assembly has to agree with such proposals before the proposed rules are effective and "become law."

Fourth, the only Tennessee appellate decision found is the *Jones* case referred to above. It seems pretty clear that the *Jones* court narrowly construed Rule 27. This trial court took an oath to follow the law. Decisions of the Court of Appeals are to be followed by trial courts unless a later appellate decision overrules or modifies the initial decision. This court must follow *Jones* until *Jones* is modified or overruled.

This Order is intended to be a Final Order. Obviously, the District can appeal this decision to the Court of Appeals. Also, the District may file a Complaint and seek the discovery available to litigants under the Tennessee Rules of Civil Procedure. Either way, the District and other Districts could seek an act of the general assembly giving Districts the investigatory tools and authority sought to be used in this matter. The court notes that at least nine suppliers have agreed to cooperate with and/or provide the requested information to the District after it filed its initial petition.

Therefore, the above constitutes the court's findings of fact and conclusions of law. Based upon such, it is hereby ORDERED:

1. That the First Amended Petition to Permit the Investigation of Remittance of Service Charges Needed for Emergency 911 Services is denied; and

2. That the Clerk's costs, if any are due, are adjudged against the District, for which execution may enter.

ENTER :

W. FRANK BROWN, III
CHANCELLOR, PART 1

18

# CERTIFICATE OF SERVICE

I hereby certify that a copy of this Memorandum Opinion and Final Order has

Been duly served upon the following parties by placing in the U.S. Mail with sufficient

postage thereon to carry same to its destination.

Michael J. Mahn, Esquire
711 Signal Mountain Road, PMB 316
Chattanooga, TN 37405

Frederick L. Hitchcock, Esquire
1000 Tallan Building
Chattanooga, TN 3740

8x8, Inc.
Attn: Dan Weirich
Chief Financial Officer
810 W. Maude Avenue
Sunnyvale, CA 94085-2910

Network Telephone Corporation
600 Willowbrook Office Park
Fairport, NY 14450-4233

AT&T Communications of
South Central States
AT&T Corporation
TCG Midsouth, Inc.
J. Henry Walker, IV, Esquire
Kilpatrick Townsend & Stockton, LLP
1100 Peachtree Street, Ste: 2800
Atlanta, GA 30309-4528

BCN Telecom, Inc.
550 Hills Drive, Ste: 110
Bedminster, NJ 07921-1537

Deltacom, Inc.
c/o Henry M. Walker, Esquire
Bradley Arnt Boult Cummings, LLP
Roundabout Plaza
1600 Division Street, Ste: 700
Nashville, TN 37203

Granite Telecommunications
Attn: Calvin Neztsosie
100 Newport Avenue Extension
Quincy, MA 02171-1759

Access Point, Inc.
110 Crescent Green, Ste: 109
Cary, NC 27518-8105

Talk America, Inc.
600 Willowbrook Office Park
Fairport, NY 14450-4233

Rob Norred, Esquire
Logan-Thompson, P.C.
30 2nd Street NW
Cleveland, TN 37311

US LEC of Tennessee, Inc.
600 Willowbrook Office Park
Fairport, NY 14450-4233

19

XO Communications
c/o Henry M. Walker, Esquire
Bradley Arant Boult Cummings, LLP
Roundabout Plaza
1600 Division Street, Ste: 700
Nashville, TN 37203

CenturyLink, Inc.
c/o Misty Kelley, Esquire
Baker, Donelson, Bearman, Caldwell &
  Berkowitcz, PC
1800 Republic Centre
633 Chestnut Street
Chattanooga, TN 37450

This the 6 day of December, 2011.

**S. LEE AKERS, CLERK AND MASTER**


BY: _____
Deputy Clerk

20

# EXHIBIT D

# IN THE CHANCERY COURT FOR HAMILTON COUNTY, TENNESSEE

IN RE: )
  ) CASE NO.: 11-0806
PETITION OF HAMILTON COUNTY )
EMERGENCY COMMUNICATIONS ) PART 1
DISTRICT )

## FIRST AMENDED PETITION TO PERMIT THE INVESTIGATION OF REMITTANCE OF SERVICE CHARGES NEEDED FOR EMERGENCY 911 SERVICES

Petitioner, the Hamilton County Emergency Communications District ("District"), by and through undersigned counsel, petitions this Court pursuant to Tenn. Code Ann. § 4-18-104(b)(1), *et seq.*, and Rule 27 of the Tennessee Rules of Civil Procedure to perpetuate the testimony and preserve evidence in the control of the following prospective defendants (collectively known as "Prospective Defendants"), against which the District anticipates bringing an action cognizable in a court in Tennessee:

| | |
|---|---|
| 8x8, Inc. | Global Crossing Local Services |
| Access Point, Inc. | Granite Telecommunications |
| AT&T Communications of | Matrix Telecom, Inc. |
|     Southern Central States | Momentum Telecom, Inc. |
| AT&T Corporation | Network Telephone Corporation |
| BCN Telecom, Inc. | Nextiva, Inc. |
| Birch Communications, Inc. | NOS Communications |
| Birch Telecom of the South | Quantumshift Communications, Inc. |
| BullsEye Telecom, Inc. | Talk America, Inc. |
| Business Telecom, Inc. | TCG Midsouth, Inc. |
| CenturyLink, Inc. | US LEC of Tennessee, Inc. |
| Covista, Inc. | XO Communications |
| Deltacom, Inc. | |

The District is presently unable to bring the suit because each Prospective Defendant has withheld or concealed information necessary to the filing of such suit.

2011 NOV -2 PM 1: 02

FILED
S. LEE AKERS, C&M

08746_01/1101/FLH-1179188_4

In this petition, the District describes the subject matter of the expected action and the District's interest in it; the facts that the District desires to establish by the proposed testimony and the reasons it is necessary to perpetuate it; the name and address of each Prospective Defendant; and the persons to be examined and the information to be obtained in such testimony.

## DISTRICT'S PUBLIC SAFETY RESPONSIBILITIES

The District is an emergency communications district created under Tenn. Code Ann. § 7-86-101, *et seq.*, which is responsible for providing life-saving 911 services to the residents of Hamilton County. The District is the provider in Hamilton County of 911 emergency telephone services, which permit persons to quickly and efficiently request emergency police, fire, ambulance, and other emergency services.

In 1998, in the course of passing legislation that expanded the scope and financing of emergency 911 services, the Tennessee General Assembly found and declared, among other things, that "the continued viability of the lifesaving 911 emergency communications service is of the highest priority for the health and safety of the citizens of Tennessee." *See* 1998 Tenn. Pub. Acts, ch. 1108, § 2, codified as Tenn. Code Ann. § 7-86-102(b)(1). Under the framework established by the General Assembly to provide for the "continued viability of the lifesaving 911 emergency communications services," service charges fees are to be collected and remitted to the Emergency Communications District by telephone "service suppliers," such as Prospective Defendants, and others who provide exchange telephone service to any service user. *See* Tenn. Code Ann. § 7-86-103(14). A "service user" is any person, corporation or entity that is provided 911 service. *See* Tenn. Code Ann. § 7-86-103(13).

2

## PROSPECTIVE DEFENDANTS' LEGAL DUTIES
## TO REMIT SERVICE CHARGES

Each Prospective Defendant is required by Tennessee law to remit service charges to the District for each telephone line provided by the Prospective Defendants that is capable of transmitting a telephone call to the District's 911 service center. For business lines, the current service charge is $3.00 per voice pathway capable of reaching a public safety answering point by dialing 911. *See* Tenn. Code Ann. § 7-86-108.

The business lines upon which the service charge is to be remitted include all pathways provided by each Prospective Defendant to its respective business subscribers either as single-circuit lines or as part of a multiplex telephone service capable of transmitting multiple voice or data pathways over independent channels on a single multiplexed copper circuit. These multiplex services can typically include, but are not limited to, T-1 services or Primary Rate Interface ("PRI") services. Through the use of multiplexed circuits, voice communication can occur on as many as 24 separate channels through a single wired circuit. A service provider is thus required to collect from each service user the applicable service charge on all channels in these multiplexed circuits capable of connecting to 911 service. *See* Tenn. Code Ann. §§ 7-86-103(7); 7-86-108(A)(1)(a); Tenn. Atty. Gen. Op. 07-38 (March 28, 2007) (appended as Exhibit A); Tennessee Emergency Communications Board Policy No. 23 (July 16, 2004) (appended as Exhibit B).

Pursuant to Tenn. Code Ann. § 7-86-110(a), each Prospective Defendant has at all relevant times been required to remit service charges at least every two (2) months. The remittances are accompanied by reports of the number of residential and business lines provided by each Prospective Defendant in Hamilton County as to which the service charges are to be

3

remitted. Pursuant to Tenn. Code Ann. § 7-86-110(d), each Prospective Defendant has also been required to file an annual report of the total number of residential and business lines provided by the respective Prospective Defendants in Hamilton County during the previous year and the total service charges due to the District on all such lines. An example of an annual report, which must be certified by the telephone utility as to its accuracy, is attached as Exhibit C.

## THE SUBJECT MATTER OF THE EXPECTED LITIGATION

On February 3, 2011, the largest service supplier in the State of Tennessee announced at a meeting of the Tennessee Emergency Communications Board ("TECB") that it had *begun* to comply with applicable Tennessee law by collecting and remitting service charges for all business lines, thus acknowledging that it had previously failed to collect and remit service charges on all business lines as required by law. The TECB executive director also announced that the TECB was investigating the fee collection and remittance practices of another large service supplier.

Based upon this and other information available to him, the District's General Counsel reasonably suspects that each Prospective Defendant has violated the False Claims Act, Tenn. Code Ann. § 4-18-101, *et seq.*, and other applicable law by failing to remit service charges and by filing false reports with the District. **Pursuant to Tenn. Code Ann. § 4-18-104(b)(1), the District's General Counsel[1] is required to diligently investigate the suspected violations of the False Claims Act by each Prospective Defendant, and the District's General Counsel is authorized to file suit if a violation is discovered.**

---

[1]      Petitioner is a "political subdivision" under the False Claims Act. *See* Tenn. Code Ann. § 4-18-101(4). Petitioner's General Counsel is the "prosecuting authority of a political subdivision" under the False Claims Act. *See* Tenn. Code Ann. §§ 4-18-101(5), 4-18-104(b).

4

Consistent with the requirements of applicable law, on September 29, 2011, the District's General Counsel transmitted the investigative demand, an exemplar of which is attached as Exhibit D (the "Investigative Demand") to each Prospective Defendant, requesting the production of information concerning collection and remittance of service charges for business lines provided by that Prospective Defendant in Hamilton County. The Investigative Demand requested that, if the Prospective Defendant was willing to cooperate with the investigation, the Prospective Defendant was to advise the District's General Counsel of that willingness in writing by October 14, 2011. The Investigative Demand also gave notice that if no response was received by October 14, 2001, it would be necessary to conclude that Prospective Defendant would not cooperate with the investigation. **Each of the Prospective Defendants has failed and refused to respond to the Investigative Demand or has failed and refused to agree to cooperate with the statutorily-authorized investigation into its remittance of monies owed to the District for the District's provision of life-saving 911 services.**

The District's anticipated suit will seek to recover, among other things, service charges that each Prospective Defendant has at all times relevant been required to remit to the District. The District's suit will also seek other relief available under law, including treble damages, civil penalties, costs, and attorneys' fees.

## DISCOVERY IS NECESSARY TO
## PREVENT A FAILURE OR DELAY OF JUSTICE

The failure and refusal of each Prospective Defendant to cooperate with the District's statutorily authorized investigation evidences an intent to conceal and withhold information that will establish whether each Prospective Defendant violated the False Claims Act, Tenn. Code Ann. § 4-18-101, *et seq.*, and other applicable law by filing false reports with the District and

5

failing to remit service charges as required by law. The information concerning the compliance with the duties imposed upon each Prospective Defendant by law is solely within the possession and control of each respective Prospective Defendant. In the absence of the relief sought in this Petition, the District reasonably fears that relevant information necessary for the prosecution of litigation against each of the Prospective Defendants will be concealed, lost, or destroyed.

## FACTS TO BE ESTABLISHED BY THE PROPOSED TESTIMONY

The District desires to establish and preserve the following facts through the proposed testimony and production of document and other information with respect to each Prospective Defendant:

(a)     The Prospective Defendant's number of multiplexed circuits, including, but not limited to, T-1 and PRI circuits, in service for business use within Hamilton County, Tennessee, as of the last business day of each month commencing with July, 2001.

(b)     For each of the Prospective Defendant's multiplexed circuits, including, but not limited, to T-1 and PRI circuits, within Hamilton County, Tennessee identified for business use for each month, the number of lines or channels that are or were usable to transmit a voice communication or voice telephone call, as of the last business day of each month beginning July, 2001.

(c)     The number of business lines provided by the Prospective Defendant via multiplexed circuits, including, but not limited to, T-1 and PRI circuits, that were included in monthly, bimonthly, and/or annual reports to the District, beginning with the reports containing information for the month of July, 2001.

6

(d)     The full amount of emergency telephone service charges ("911 Charges")
collected by the Prospective Defendant and remitted to the District by the
Prospective Defendant for business lines provided through multiplexed circuits,
including, but not limited to T-1 and PRI circuits, for each month commencing
July, 2001, and the amount of administrative fees assessed and deducted in each
such month relating to the 911 Charges.

(e)     The identities, addresses, and roles of all of the Prospective Defendant's
employees, agents, or contractors involved at any time since July, 2001, in
collecting, remitting, and/or reporting 911 Charges to emergency communication
districts and in establishing or implementing policies or procedures concerning
collecting, remitting, and/or reporting the 911 Charges.

(f)     The policies or procedures that the Prospective Defendant had in place at any time
since July, 2001, that addressed or related to collecting, remitting, and/or
reporting 911 Charges to emergency communication districts.

(g)     The Prospective Defendant's total number of all business lines provided by the
Prospective Defendant, whether via multiplexed circuits, single circuits, or
otherwise, in service for business use within Hamilton County, Tennessee, as of
the last business day of each month commencing with July, 2001.

(h)     The total number of all business lines provided by the Prospective Defendant,
whether via multiplexed circuits, single circuits, or otherwise, that were included
in monthly, bimonthly, and/or annual reports to the District, beginning with the
reports containing information for the month of July, 2001.

7

08746_01/1101/FLH-1179188_4

(i)     The full amount of emergency telephone service charges collected by the Prospective Defendant and remitted to the District by the Prospective Defendant for all business lines provided by Prospective Defendant, whether via multiplexed circuits, single circuits, or otherwise, for each month commencing July, 2001, and the amount of administrative fees assessed and deducted in each such month relating to the 911 Charges.

The District desires to perpetuate the proposed testimony and preserve the relevant records, because the information concerning the compliance of each Prospective Defendant with its obligations to remit 911 Charges and to file truthful reports is solely within the possession and control of that Prospective Defendant. The District is not now, nor has it ever been, in possession of information sufficient to determine if the various Prospective Defendants have met their duties to the District under applicable law. The failure and refusal of these Prospective Defendants to cooperate with the District's investigation evidences an intent to conceal and withhold information. Should the relief sought not be granted, each Prospective Defendant may conceal, modify, destroy, or lose relevant records.

## INFORMATION CONCERNING
## THE PROSPECTIVE DEFENDANTS

Each of the Prospective Defendants has substantial operations in Hamilton County, and the matters addressed in this petition relate to the activities of the individual Prospective Defendants in this County. The principal business address is of each Prospective Defendant and the address of their respective Registered Agents are as follows:

8

| Principal Place of Business | Registered Agent Address |
|---|---|
| **8x8, Inc.**<br>810 W. Maude Avenue<br>Sunnyvale, CA 94085-2910 | CT Corporation<br>818 W. Seventh Street<br>Los Angeles, CA 90017 |
| **Access Point, Inc.**<br>1100 Crescent Green, Suite 109<br>Cary, NC 27518-8105 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **AT&T Communications of Southern Central States**<br>One AT&T Way<br>Room 4A428<br>Bedminster, NJ 07921 | CT Corporation System<br>800 Gay Street<br>Suite 2021<br>Knoxville, TN 37929 |
| **AT&T Corporation**<br>675 W. Peachtree Street NW<br>Suite 4500<br>Atlanta, GA 30375 | CT Corporation System<br>800 Gay Street<br>Suite 2021<br>Knoxville, TN 37929 |
| **BCN Telecom, Inc.**<br>550 Hills Drive, Suite 110<br>Bedminster, NJ 07921-1537 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Birch Communications, Inc.**<br>3060 Peachtree Street NW<br>Suite 1060<br>Atlanta, GA 30305 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Birch Telecom of the South**<br>3060 Peachtree Street NW<br>Suite 1060<br>Atlanta, GA 30305 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **BullsEye Telecom, Inc.**<br>25925 Telegraph Road, Suite 210<br>Southfield, MI 48033-2527 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **Business Telecom, Inc.**<br>7037 Old Madison Pike, Suite 400<br>Huntsville, AL 35806-2107 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **CenturyLink, Inc.**<br>100 Centurylink Drive<br>Monroe, LA 71203-2041 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |

9

| | |
|---|---|
| **Covista, Inc.**<br>225 E 8th Street, Suite 400<br>Chattanooga, TN 37402-2200 | Covista, Inc.<br>c/o Frank Pazera<br>4803 Highway 58<br>Chattanooga, TN 37416 |
| **Deltacom, Inc.**<br>7037 Old Madison Pike NW<br>Huntsville, AL 35806-2107 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **Global Crossing Local Services**<br>225 Kenneth Drive<br>Rochester, NY 14623-4277 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Granite Telecommunications**<br>100 Newport Avenue Extension<br>Quincy, MA 02171-1759 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Matrix Telecom, Inc.**<br>433 E. Las Colinas Blvd.<br>Irving, TX 75039-5581 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Momentum Telecom, Inc.**<br>2700 Corporate Drive, Suite 200<br>Birmingham, AL 35242-2733 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Network Telephone Corporation**<br>600 Willowbrook Office Park<br>Fairport, NY 14450-4233 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Nextiva, Inc.**<br>8125 North 86th Place<br>Scottsdale, AZ 85258-4310 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **NOS Communications**<br>250 Pilot Road, Suite 300<br>Las Vegas, NV 89119-3514 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **Quantumshift Communications, Inc.**<br>12657 Alcosta Blvd.<br>San Ramon, CA 94583 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **Talk America, Inc.**<br>600 Willowbrook Office Park<br>Fairport, NY 14450-4233 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |

08746_01/1101/FLH-1179188_4

| | |
|---|---|
| **TCG Midsouth, Inc.**<br>1 ATT Way, Room 4A428<br>Bedminster, NJ 07921-2693 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **US LEC of Tennessee, Inc.**<br>600 Willowbrook Office Park<br>Fairport, NY 14450-4233 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **XO Communications**<br>13865 Sunrise Valley Drive<br>Herndon, VA 20171 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |

## IDENTIFICATION OF PERSON(S) TO BE DEPOSED
## AND INFORMATION TO BE DISCOVERED

The District desires to examine by oral deposition one or more corporate representative(s) of each of the Prospective Defendants to be designated pursuant to Tenn. R. Civ. P. 30.02(6) to testify concerning the subjects identified in this Petition. The District requests that the witness(es) designated by each Prospective Defendant be instructed to produce at the deposition true and correct copies of all business records upon which the testimony will be based or which have been used in preparation of the testimony. The location of the deposition shall be at 1000 Tallan Building, Two Union Square, Chattanooga, Tennessee 37402, on a date and at a time established by this Court.

## CONCLUSION

As shown above, the District has a potential claim against each of the Prospective Defendants arising from their individual failures to remit to the District all required service charges and to file truthful reports. The information needed to pursue this claim is known only to each of the respective Prospective Defendants, and the Prospective Defendants have failed and

11

refused to cooperate with the statutorily-authorized investigation of the District's General Counsel. In furtherance of its duty to conduct an investigation under Tenn. Code Ann. § 4-18-104(b)(1), the District reasonably fears that necessary information may be hidden, modified, destroyed, or lost before suit can be filed. In order to preserve necessary documentary evidence and perpetuate necessary testimony, the District respectfully asks the Court to enter an Order with respect to each Prospective Defendant:

(1) authorizing the District to depose the Prospective Defendant, through a Tenn.R.Civ.P. 30.02(6) representative(s);

(2) compelling the Prospective Defendant to designate one or more corporate representative for the subject deposition; and

(3) instructing the Prospective Defendant to produce to the District all documents and other information related to the topics described herein.

Dated: November 2, 2011.

**[signatures on following pages]**

12

08746_01/1101/FLH-1179188_4

## VERIFICATION

I, Frederick L. Hitchcock, Special Counsel for the Hamilton County Emergency Communications District and acting on behalf and at the direction of the District and its General Counsel in this action, hereby verify under oath that the facts set forth in this Petition are true and correct to the best of my knowledge, information, and belief.

_____
Frederick L. Hitchcock

STATE OF TENNESSEE )
COUNTY OF HAMILTON )

Sworn to and subscribed before me, this the 2nd day of November, 2011.

Notary Public: _Pamela H. Vassos_

My commission expires: _1/10/15_

Respectfully submitted,

By: _Michael J. Mahn w/ perm. Tom Greenholtz_
Michael J. Mahn, BPR #001200
711 Signal Mountain Road, PMB 316
Chattanooga, Tennessee 37405
Phone: 423.280.3005
Facsimile: 423.370.1332

*General Counsel for the Hamilton County*
*Emergency Communications District*

~and~

By: _Tom Greenholtz_
Frederick L. Hitchcock, BPR #005960
Tom Greenholtz, BPR #20105
Yousef A. Hamadeh, BPR #25425
Chambliss, Bahner & Stophel, P.C.
1000 Tallan Building
Two Union Square
Chattanooga, Tennessee 37402
Telephone: (423) 757-0222
Facsimile: (423) 508-1222
rhitchcock@cbslawfirm.com
tgreenholtz@cbslawfirm.com

*Special Counsel for the Hamilton County*
*Emergency Communications District*

14

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing pleading was emailed and was served upon the following person(s) via ☐ hand delivery or ☑ United States first class mail, **certified, return receipt requested,** with proper postage applied thereon to ensure prompt delivery:

| Principal Place of Business | Registered Agent Address |
|---|---|
| **8x8, Inc.**<br>810 W. Maude Avenue<br>Sunnyvale, CA 94085-2910 | CT Corporation<br>818 W. Seventh Street<br>Los Angeles, CA 90017 |
| **Access Point, Inc.**<br>1100 Crescent Green, Suite 109<br>Cary, NC 27518-8105 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **AT&T Communications of Southern Central States**<br>One AT&T Way<br>Room 4A428<br>Bedminster, NJ 07921 | CT Corporation System<br>800 Gay Street<br>Suite 2021<br>Knoxville, TN 37929 |
| **AT&T Corporation**<br>675 W. Peachtree Street NW<br>Suite 4500<br>Atlanta, GA 30375 | CT Corporation System<br>800 Gay Street<br>Suite 2021<br>Knoxville, TN 37929 |
| **BCN Telecom, Inc.**<br>550 Hills Drive, Suite 110<br>Bedminster, NJ 07921-1537 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Birch Communications, Inc.**<br>3060 Peachtree Street NW<br>Suite 1060<br>Atlanta, GA 30305 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Birch Telecom of the South**<br>3060 Peachtree Street NW<br>Suite 1060<br>Atlanta, GA 30305 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **BullsEye Telecom, Inc.**<br>25925 Telegraph Road, Suite 210<br>Southfield, MI 48033-2527 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |

15

08746_01/1101/FLH-1179188_4

| | |
|---|---|
| **Business Telecom, Inc.**<br>7037 Old Madison Pike, Suite 400<br>Huntsville, AL 35806-2107 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **CenturyLink, Inc.**<br>100 Centurylink Drive<br>Monroe, LA 71203-2041 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Covista, Inc.**<br>225 E 8th Street, Suite 400<br>Chattanooga, TN 37402-2200 | Covista, Inc.<br>c/o Frank Pazera<br>4803 Highway 58<br>Chattanooga, TN 37416 |
| **Deltacom, Inc.**<br>7037 Old Madison Pike NW<br>Huntsville, AL 35806-2107 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **Global Crossing Local Services**<br>225 Kenneth Drive<br>Rochester, NY 14623-4277 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Granite Telecommunications**<br>100 Newport Avenue Extension<br>Quincy, MA 02171-1759 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **Matrix Telecom, Inc.**<br>433 E. Las Colinas Blvd.<br>Irving, TX 75039-5581 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Momentum Telecom, Inc.**<br>2700 Corporate Drive, Suite 200<br>Birmingham, AL 35242-2733 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Network Telephone Corporation**<br>600 Willowbrook Office Park<br>Fairport, NY 14450-4233 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **Nextiva, Inc.**<br>8125 North 86th Place<br>Scottsdale, AZ 85258-4310 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |
| **NOS Communications**<br>250 Pilot Road, Suite 300<br>Las Vegas, NV 89119-3514 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |

16

08746_01/1101/FLH-1179188_4

Case 1:11-cv-00330   Document 7   Filed 12/08/11   Page 69 of 74   PageID #: 99

| | |
|---|---|
| **Quantumshift Communications, Inc.**<br>12657 Alcosta Blvd.<br>San Ramon, CA 94583 | National Registered Agents, Inc.<br>2300 Hillsboro Road, Suite 305<br>Nashville, TN 37212 |
| **Talk America, Inc.**<br>600 Willowbrook Office Park<br>Fairport, NY 14450-4233 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **TCG Midsouth, Inc.**<br>1 ATT Way, Room 4A428<br>Bedminster, NJ 07921-2693 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **US LEC of Tennessee, Inc.**<br>600 Willowbrook Office Park<br>Fairport, NY 14450-4233 | CT Corporation System<br>800 S. Gay Street, Suite 2021<br>Knoxville, TN 37929 |
| **XO Communications**<br>13865 Sunrise Valley Drive<br>Herndon, VA 20171 | Corporation Service Company<br>2908 Poston Avenue<br>Nashville, TN 37203 |

This 2nd day of November, 2011.

Tom Greenholtz

17

08746_01/1101/FLH-1179188_4

# EXHIBIT E

# HAMILTON COUNTY "911" EMERGENCY COMMUNICATIONS DISTRICT

### Chattanooga, Tennessee

### FINANCIAL STATEMENTS AND SUPPLEMENTAL DATA

### June 30, 2010 and 2009

**JOHNSON, HICKEY & MURCHISON, P.C.**
Certified Public Accountants
Chattanooga, Tennessee

# HAMILTON COUNTY "911" EMERGENCY COMMUNICATIONS DISTRICT
## STATEMENTS OF NET ASSETS
### JUNE 30, 2010 AND 2009

|  | 2010 | 2009 |
|---|---|---|
| **ASSETS:** |  |  |
| Cash | $ 250,638 | $ 2,068,131 |
| Certificates of deposit and money market accounts | 12,813,431 | 12,659,827 |
| Accounts receivable – telephone service charges | 287,938 | 313,604 |
| Account receivable - other | 50,424 | 3,100,039 |
| Accrued interest receivable | – | 86,656 |
| Accounts receivable for accumulated leave | 243,152 | 271,426 |
| Capital assets, net of accumulated depreciation and amortization | 4,214,390 | 4,850,762 |
| Total assets | 17,859,973 | 23,350,445 |
| **LIABILITIES:** |  |  |
| Accounts payable | 961,772 | 4,012,022 |
| Accumulated leave | 540,177 | 618,696 |
| Total liabilities | 1,501,949 | 4,630,718 |
| **NET ASSETS:** |  |  |
| Invested in capital assets | 4,214,390 | 4,850,762 |
| Unrestricted | 12,143,634 | 13,868,965 |
| Total net assets | $ 16,358,024 | $ 18,719,727 |

(The accompanying notes are an integral part of these statements.)

11

# HAMILTON COUNTY "911" EMERGENCY COMMUNICATIONS DISTRICT
## STATEMENTS OF CASH FLOWS
### FOR THE YEARS ENDED JUNE 30, 2010 AND 2009

|  | 2010 | 2009 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Receipts from telephone companies | $. 3,024,849 | $ 3,355,568 |
| Receipts from State for shared wireless revenues and operational funding | 2,492,741 | 1,712,794 |
| Receipts from other local governments | 7,960,816 | – |
| Receipts from others | 10,039 | 10,935 |
| Payments to suppliers and others | (1,242,898) | (1,400,471) |
| Payments for employees | (12,691,570) | (824,702) |
| Payments to City and County | (1,008,759) | (1,008,759) |
| Net cash provided (used) by operating activities | (1,454,782) | 1,845,365 |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:** | | |
| Purchase of capital assets | (368,061) | (685,511) |
| Proceeds from settlement for damaged dispatch chairs | – | 30,000 |
| Net cash used by capital and related financing activities | (368,061) | (655,511) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Interest received | 158,954 | 300,924 |
| Net cash provided by investing activities | 158,954 | 300,924 |
| **NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | (1,663,889) | 1,490,778 |
| **CASH AND CASH EQUIVALENTS:** | | |
| Beginning | 14,727,958 | 13,237,180 |
| Ending | $ 13,064,069 | $ 14,727,958 |
| **RECONCILIATION OF CASH AND CASH EQUIVALENTS:** | | |
| Cash | 250,638 | 2,068,131 |
| Certificates and money market accounts | 12,813,431 | 12,659,827 |
|  | $ 13,064,069 | $ 14,727,958 |

(The accompanying notes are an integral part of these statements.)