UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| HAMILTON COUNTY EMERGENCY | ) | |
| COMMUNICATIONS DISTRICT, | ) | |
| | ) | |
| *Plaintiff*, | ) | 1:11-CV-330 (Lead Case); 1:12-CV-003; |
| | ) | 1:12-CV-056; 1:12-CV-131; 1:12-CV-138; |
| v. | ) | 1:12-CV-139; 1:12-CV-149; 1:12-CV-166; |
| | ) | 1:12-CV-176; 1:12-CV-186 |
| BELLSOUTH TELECOMMUNICATIONS, | ) | |
| LLC, d/b/a AT&T TENNESSEE | ) | Chief Judge Curtis L. Collier |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM

Tennessee has set up a system to allow individuals to call a single number, "911," to obtain

assistance in emergencies. The 911 number has become so widely known that it is now ubiquitous.

The state also set up a system to manage 911 calls and the emergency response and provided a

mechanism to fund the system. This case involves the ubiquitous emergency telephone number

"911" and how the system that manages the emergency 911 system is funded in Tennessee. Several

of the emergency 911 systems or "emergency communications districts" have brought this law suit

alleging that they have not been provided the funds they should have by one of the telephone service

providers.

The first case was brought by Hamilton County Emergency Communications District

("Plaintiff"), the entity that manages the emergency 911 system for Hamilton County, Tennessee,

against BellSouth Telecommunications, LLC d/b/a AT&T Tennessee ("Defendant") (the "Hamilton

County" action). This law suit alleges the following statutory and common law violations:

(1) violation of the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et. seq*.

(Count I);

(2) violation of the Emergency Communications District Law (the "ECD Law"), Tenn. Code. Ann. §§ 7-86-101, *et seq.* (Count II);

(3) breach of fiduciary duty (Count III);

(4) fraudulent misrepresentation (Count IV);

(5) fraudulent concealment (Count V);

(6) negligent misrepresentation (Count VI); and

(7) negligence and negligence *per se* (Count VII) (Case No. 1:11-CV-330; Court File No. 1).[1]

Plaintiff also seeks declaratory and injunctive relief. After Plaintiff filed its complaint in the Hamilton County action, several other emergency communications districts ("ECDs") filed similar actions against Defendant. Those ECDs include Bradley County ECD (1:12-CV-3), Blount County ECD (1:12-CV-56), Bedford County ECD (1:12-CV-131), Coffee County ECD (1:12-CV-138), Roane County ECD (1:12-CV-139), Franklin County ECD (1:12-CV-149), Giles County ECD (1:12-CV-166), Cheatham County ECD (1:12-CV-176), and Knox County ECD (1:12-CV-186).

Defendant filed a motion to dismiss in the Hamilton County action (Court File No. 20), and the motion is applicable to all of the related cases.[2] For purposes of resolving Defendant's motion to dismiss, the Court consolidated all of the cases. The Hamilton County action was designated as

---

[1]All court citations in this Memorandum come from the Hamilton County action (1:11-CV-330) unless otherwise indicated.

[2] Defendant initially filed a motion to dismiss in each related case as it was opened. The parties agreed the legal and factual issues raised in the briefs were similar enough among the counties that they could all be addressed together. The Court consolidated the cases for purposes of resolving Defendant's motion to dismiss in the Hamilton County action and informed the parties that its decision would apply to all related cases.

the lead case. Plaintiff filed a motion for partial summary judgment in the Hamilton County action (Court File No. 22). The Court's resolution of Plaintiff's motion for partial summary judgment will only apply to the Hamilton County action. The Court held oral arguments on Defendant's motion to dismiss and Plaintiff's motion for partial summary judgment on June 20, 2012. Counsel was present on behalf of all relevant parties and made arguments in support of their respective positions.[3]

Having considered the relevant law, the allegations in the complaint, and the parties' arguments, the Court will **GRANT IN PART and DENY IN PART** Defendant's motion to dismiss (Court File No. 20). Specifically, the Court will **GRANT** Defendant's motion to dismiss on Counts II and VII and will **DENY** Defendant's motion to dismiss on the remaining counts (Court File No. 20). The Court will **DENY** Plaintiff's motion for partial summary judgment (Court File No. 22).[4]

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Hamilton County Emergency Communications District was organized pursuant to the ECD Law, Tenn. Code Ann. §§ 7-86-101, *et seq.* (Court File No. 13 ("Compl."), ¶ 15). The ECD

---

[3] On August 15, 2012, the ten plaintiff ECDs jointly filed a supplemental brief pursuant to E.D. Tenn. L.R. 7.1(d) to inform the Court of developments in the case (Court File No. 37). In particular, the plaintiffs claim they have additional evidence showing the defendant has consistently under-reported the number of lines subject to 911 charges. They also contend the defendant submitted a June 2012 monthly report that "dramatically reduced the 911 revenue for many Districts." *Id.* at 2. The information in the plaintiffs' supplemental brief does not alter the Court's analysis, however, because sufficient information is in the record for the Court to make a decision on the pending motions based on the applicable law.

[4] On April 2, 2012, Defendant filed a motion for leave to file a surreply in opposition to Plaintiff's motion for partial summary judgment (Court File No. 32). Generally, a party may not file a surreply without approval of the court. *See* E.D. Tenn. L.R. 7.1(d). Here, the Court concludes no additional briefs are needed to decide Plaintiff's motion for partial summary judgment. Accordingly, Defendant's motion for leave to file a surreply is **DENIED** (Court File No. 32).

3

Law was passed in 1984 by the State of Tennessee to establish 911 as the primary emergency telephone number in the state. It was amended in 1998 to allow for "enhanced" 911 services. The statute authorizes the board of directors of an ECD to levy a service charge that can be "used to fund the 911 emergency telephone service." Tenn. Code Ann. § 7-86-108. Telephone "service suppliers" (that is, "any person, corporation or entity providing exchange telephone service to any service user") such as Defendant are required to bill and collect 911 charges from all "service users" (that is, "any person, corporation, or entity that is provided 911 service"). Tenn. Code Ann. §§ 7-86-103, 108. The ECD Law states that 911 charges cannot be "imposed upon more than one hundred (100) exchange access facilities per service user per location." Tenn. Code Ann. § 7-86-108.

Originally, the monthly 911 charge levied by Plaintiff was $0.65 per residential line and $2.00 per business line (Compl. ¶ 18). In March 2005, however, Plaintiff received approval to increase the charge to $1.50 for residential lines and $3.00 for business lines (*id.*). Service suppliers are required to remit the funds collected to the ECD every two months and provide an accounting of the charges billed and collected. Tenn. Code Ann. § 7-86-110. They are entitled to keep three percent of the 911 charges collected as an administrative fee. *Id.* They may also bill the ECD for any 911 services that they provide to the ECD pursuant to tariff. *See* Tenn. Code Ann. § 7-86-111.

In the complaint, Plaintiff asserts Defendant began billing service users for the 911 charge around February 8, 1985 (Compl. ¶ 23). Defendant also billed Plaintiff for the services it provided Plaintiff pursuant to tariff, such as connecting access lines to Plaintiff's 911 Center and providing caller ID database services for those lines (Compl. ¶ 32). The problem, however, as alleged by Plaintiff is that "since a time presently unknown," Defendant has billed Plaintiff for connecting to Plaintiff's 911 Center lines and providing caller ID database services far in excess of the number of

4

lines for which it was billing, collecting, and remitting 911 Charges (Compl. ¶¶ 32-33). One example

is Defendant's December 2010 report submitted pursuant to the ECD Law in which Defendant

claims it collected 911 charges on 64,636 lines (Compl. ¶ 33). Yet Plaintiff avers it was billed and

it paid Defendant for services Defendant provided pursuant to tariff on 90,000 lines (*id.*).[5] Plaintiff

alleges Defendant submitted false reports in order to "conceal, avoid, or decrease its obligation to

pay or transmit 911 charges on some 25,000 telephone lines supplied by Defendant" (*id.*).

Plaintiff mentions several other practices in its complaint to illustrate Defendant's alleged

unlawful conduct. Plaintiff claims Defendant purposefully under-billed, under-collected, and

underpaid 911 charges for multiplex-circuit business lines, single-circuit business lines, and

residential lines (Compl. ¶¶ 35-71). With respect to multiplex-circuit business lines, Plaintiff

explains that, at some point, Defendant began offering its business telephone subscribers multiplex

telephone services (Compl. ¶ 35). These services typically involve "T-1 lines," which provide

twenty-four channels. When T-1 lines are implemented under the Primary Rate Interface ("PRI"),

twenty-three of those channels can be configured as voice lines and can be used to access 911

emergency services (*id.*). Plaintiff alleges Defendant was required to bill, collect, report, and remit

911 charges for every voice line but it only did so for a small number of voice lines that were part

of the multiplex circuits (Compl. ¶ 36). Plaintiff also alleges Defendant submitted false monthly and

annual reports regarding the multiplex-circuit business lines (Compl. ¶¶ 44-47).

---

[5] Similar facts are alleged by the plaintiffs in the related cases. For example, the Bradley County ECD alleges it was billed for services Defendant provided pursuant to tariff on 26,000 lines (Case No. 1:12-CV-3; Court File No. 1 ¶¶ 31-32). Yet it claims Defendant falsely reported that it only billed and collected 911 charges for 20,806 lines (*id.* ¶ 32). Similarly, the Blount County ECD claims it paid Defendant for its services provided pursuant to tariff with respect to 35,000 lines but Defendant only collected and reported 911 charges for 27,451 lines (Case No. 1:12-CV-56; Court File Nos. 1 ¶¶ 33-34, Court File No. 12-4).

Plaintiff similarly states in its complaint that Defendant failed to properly bill, collect, report, and remit 911 charges for its single-circuit business lines and residential lines. Plaintiff claims Defendant engaged in this and other conduct to gain a competitive advantage over other telecommunications providers (Compl. ¶¶ 72-77).[6] Finally, Plaintiff alleges Defendant misapplied the statutory exception provided in Tenn. Code Ann. § 7-86-108--that is, Plaintiff claims Defendant failed to bill, collect, and remit 911 charges in instances where the number of voice lines exceeded 100 for the same service user but came from multiple locations (Compl. ¶¶ 78-85).

On November 14, 2011, Plaintiff filed a complaint against Defendant. Plaintiff subsequently filed the First Amended Complaint on January 1, 2012.[7] Pending before the Court is Defendant's motion to dismiss and Plaintiff's motion for partial summary judgment. The Court agreed to consolidate the Hamilton County action with the related cases to resolve Defendant's motion to dismiss.

## II.      MOTION TO DISMISS

### A.      Standard of Review

A Rule 12(b)(6) motion should be granted when it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). For purposes of this determination, the Court

---

[6] Plaintiff gives an example in which Defendant allegedly outbid other providers in a Hamilton County request for proposal by offering to under-bill and under-collect 911 charges (Compl. ¶ 72). As a result, Defendant was able to offer the lowest proposal.

[7] Moving forward, the First Amended Complaint will simply be referred to as "the complaint."

construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). The same deference does not extend to bare assertions of legal conclusions, however, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility as explained by the Court "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**B.     Discussion**

### 1. Count I: Violation of the Tennessee False Claims Act

Defendant argues Count I should be dismissed because Plaintiff failed to allege plausible facts in its complaint to establish a Tennessee False Claims Act violation. The Tennessee False Claims Act provides, *inter alia*, that a party can be liable to the state or a political subdivision if it

7

"[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision." Tenn. Code Ann. § 4-18-103(a)(7). *Cf. U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 451 (6th Cir. 2005) (noting the Federal False Claims Act, 31 U.S.C. § 3729(b), imposes liability when "(1) a person presents a claim . . . to decrease an obligation owed to the Government; (2) the claim is false or fraudulent; and (3) the person acted knowingly . . ."). At issue is whether Plaintiff sufficiently alleged that Defendant submitted a false report and that Defendant did so knowingly. In the complaint, Plaintiff alleges Defendant "submitted false Monthly Reports and Annual Reports in which it knowingly understated tens of thousands of voice lines or pathways each month for which Defendant was required to bill, collect and remit 911 Charges" (Compl. ¶ 97).

Plaintiff alleges Defendant filed monthly reports that purported to accurately report the number of lines Defendant supplied to customers through its multiplex lines, single-circuit business lines, and residential lines. Those reports, however, contained false statements regarding the number of voice lines actually supplied (Compl. ¶¶ 38-39, 52-54, 62-64). For instance, around December 2010, Defendant billed Plaintiff for services provided to Plaintiff pursuant to tariff (Compl. ¶¶ 32-34). Among others, Defendant connected 90,000 lines to Plaintiff's 911 Center and provided caller ID database services for those same lines (*id.*). In Defendant's December 2010 monthly report filed pursuant to the ECD Law, however, Defendant stated it only supplied 64,636 lines and only billed

8

and collected 911 charges for those 64,636 lines (*id.*; Court File No. 25-4).[8,9] In light of the reporting discrepancy, Plaintiff asserts Defendant knowingly submitted monthly reports that understated the number of lines supplied. Plaintiff alleges Defendant did so to "maximize money that it received from the District, while simultaneously seeking to minimize, conceal, avoid, and decrease Defendant's obligation to pay or transmit money to the District" (Compl. ¶ 34).[10]

At the hearing on the motion to dismiss and in Defendant's brief, Defendant argued Plaintiff's allegations were nothing more than an "apples-to-oranges" comparison. Defendant contends the number of lines supplied for services provided pursuant to tariff must, by its very nature, be higher than the number of lines supplied in accordance with the ECD Law. For example, Defendant claims its obligations pursuant to tariff--such as providing the emergency caller ID database for all of Hamilton County--require it to bill certain access lines that are not subject to the 911 charge. Defendant also claims the number of lines upon which it assesses the 911 charge varies due to applicable exceptions and exemptions, such as the limit on billing service users on more than 100 lines per location and the exemption for lines purchased by the federal government.

In response, however, Plaintiff claims Defendant failed to report any exempted lines on its monthly report form in December 2010. Moreover, Plaintiff challenges Defendant's assertion that there is a government exemption, noting the statute provides that the 911 service charge shall be

---

[8] Similar allegations were made in the Bradley County and Blount County complaints, although the amounts billed, collected, and reported varied among the counties.

[9] The ECD law requires that the service supplier submit an annual report as well as a report every two months. Defendant, however, has been in the practice of submitting an annual report and a monthly report (as opposed to a bi-monthly report).

[10] Plaintiff makes similar allegations with respect to Defendant's annual reports (Compl. ¶¶ 44-45, 52-54, 64).

paid by "all service users, whether private or public, profit making, or not-for-profit, including governmental entities." Tenn. Code Ann. § 7-86-106. Finally, in the actual complaint, Plaintiff avers Defendant "announced to the District that its practice was to bill, collect, and remit to the District 911 Charges for all lines for which it charged telephone service tariffs" (Compl. ¶ 24). Plaintiff alleges Defendant stated "it was paying the District 911 Charges 'based on an assumption of 100% payment of telephone billing' without deduction of any amounts not collected by Defendant" (*id.*). Plaintiff also claims Defendant never informed the district it would change this practice; yet, its reports failed to reflect these amounts. Hence, at the very least, a factual dispute exists between the parties regarding approximately 25,000 lines in the December 2010 report that were unaccounted for as well as other monthly reports for which Plaintiff, at this stage, has not had an opportunity to obtain evidence.[11]

Although Defendant seeks dismissal based on its version of the facts, this cannot be the grounds for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Instead, the Court must accept Plaintiff's allegations in the complaint as true. It may be the case as Defendant argues that Plaintiff's allegations are an "apples-to-oranges" comparison, but that determination is left for a later stage in the litigation, not at this stage where the Court is called upon merely to test Plaintiff's pleadings. Construing the facts in the light most favorable to Plaintiff, as the Court must do, the Court can reasonably infer Defendant may be liable for a violation of the Tennessee False Claims Act. In other words the Court finds, in the words of *Iqbal*, it is plausible that Defendant is liable. Plaintiff has

---

[11] The Court also recognizes there is a legal dispute between the parties regarding what lines should be billed by Defendant for 911 charges. This issue need not be resolved, however, to decide Defendant's motion to dismiss, which is based in part on averments Plaintiff alleges Defendant made regarding its obligations to bill and collect 911 charges.

10

pleaded with specificity examples of fraudulent conduct on the part of Defendant. Moreover, Plaintiff has generally alleged Defendant acted knowingly for the purpose of concealing, avoiding, or decreasing an obligation to pay funds to Plaintiff. The statute defines "knowingly" as the person or party acting with "actual knowledge," "deliberate ignorance," or "in reckless disregard of the truth or falsity of the information." Tenn. Code Ann. § 4-18-102(2)(A). At a minimum, Plaintiff's allegations rise to the level of Defendant acting in "reckless disregard for the falsity of the information" based on the averments noted above. Thus, Plaintiff has sufficiently alleged facts to survive Defendant's motion to dismiss on Count I.[12]

### 2. Count II: Violation of the Emergency Communications District Law

Defendant argues Count II should be dismissed because the ECD Law does not expressly provide a right of action against service suppliers and the Court should not read into the statute an implied right of action. In *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010), the Tennessee Supreme Court explains how a court should proceed in determining whether the legislature intended to create a private right of action. A court should "begin with the express statutory language." *Id.* If the court determines there is no express language creating a private right of action, the Court must then look to see whether the legislature intended for such a right to be implied. *Id.* A court can consider: "(1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute, (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying

_____

[12] It bears repeating that the Court's decision that Plaintiff's allegations are sufficient to survive a motion to dismiss in no way should be interpreted as a view of the Court on the merit of the law suit or a prediction that Plaintiff would or would not be able to prove its allegations at a trial of this case. Again, determining the merits of Plaintiff's allegations must await a later stage of this litigation.

such a remedy is consistent with the underlying purposes of the legislation." *Id.* The plaintiff bears

the ultimate burden of establishing that a private right of action exists. *Id.* (citing *Premium Fin.*

*Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc.*, 978 S.W.2d 91, 93 (Tenn. 1998)).

Here, although the statute expressly provides for a right of action against service users, it

does not provide for a similar right of action against the service supplier. *See* Tenn. Code Ann. § 7-

86-110(c) (stating "[t]he service supplier or the board of directors of the district shall be authorized

to demand payment from any service user who fails to pay any proper service charge, and may take

legal action, if necessary, to collect the service charge from such service user . . . ."). Therefore, the

Court must determine whether an implied right of action against service suppliers was intended by

the legislature.

### a. Intended Beneficiary

The Court must first determine whether Plaintiff is the "intended beneficiary." Plaintiff

contends it is the intended beneficiary of the statute's protection because it is the recipient of the 911

charges billed, collected, and remitted by service suppliers. Looking at the plain language of the

statute, however, the actual beneficiary of the statute is the public--that is, the individuals who

receive 911 service from the service suppliers. The statute explicitly states "[t]he general assembly

recognizes that *all subscribers and users of non-wireline services*, including CMRS and IP-enabled

service, which are capable of connecting users dialing or entering the digits 911 to PSAPs should

*share in the benefits* of 911 service and should *participate in the funding* of the service." Tenn. Code

Ann. § 7-86-102(b)(3). The Court recognizes that ECDs like Plaintiff are responsible for ensuring

these individuals receive 911 service. For instance, the statute provides that "the funds received from

all sources shall be used exclusively in the operation of the emergency communications district."

Tenn. Code Ann. § 7-86-102(d). Plaintiff's role, however, is functional. Although Plaintiff is the conduit through which the public receives 911 service, it is not the actual beneficiary of that service.

### b. Legislative Intent

The Court must also consider the intent of the legislature. Nothing in the legislative history of the ECD Law indicates the legislature contemplated including a right of action against service suppliers.[13] In fact, it is highly likely the Tennessee legislature did not intend to create such a right of action because the ECD Law explicitly provides that legal action can be taken against service users but not service suppliers. *See Morrison v. City of Bolivar*, No. W2011-01874-COA-R9-CV, 2012 WL 2151480, at *7 (Tenn. Ct. App. June 14, 2012) (quoting *Transmerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (stating "when a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it")).

Plaintiff, nonetheless, contends the legislature intended to create a right of action against the service supplier as evidenced by the inclusion of a good faith affirmative defense in the statute. The ECD Law states that "[g]ood faith compliance by the service supplier with this chapter shall constitute a complete defense to any legal action or claim against the service supplier arising in connection with this part." Tenn. Code Ann. § 7-86-110(e). The Court is not convinced the legislature's inclusion of this defense evinces an intent to create a right of action for the following

---

[13] Legislative history often is of marginal relevance in interpreting a statute. Legislators have different motives and purposes in supporting or opposing legislation and statements made in the process can be misleading. Resort to legislative history should only occur when the language of the statute is so ambiguous that even an unreliable legislative history may be of some assistance. *Schmitt v. City of Detroit*, 395 F.3d 327, 330 n.2 (6th Cir. 2005) ("Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared.") (quoting from concurrence by Justice Jackson in *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (concurrence)).

reasons. First, this defense was included in the same section as the provision authorizing the service supplier "to demand payment from any service user who fails to pay any proper service charge" and to "take legal action, if necessary, to collect the service charge from the service user." Tenn. Code Ann. § 7-86-110(c). Hence, one logical interpretation of the good faith defense, read together with the aforementioned provision, is that the statute protects the service supplier in the event a service user takes legal action against it when acting pursuant to § 7-86-110(c).

Plaintiff also references a decision from the Northern District of Alabama in which the court determined that Alabama's equivalent of Tennessee's ECD Law--the Alabama Emergency Telephone Services Act, Ala. Code §§ 11-98-1 *et seq.*--contains a private right of action against service suppliers. *Madison Cnty. Emer. Commc'n Dist. v. Bellsouth Telecommunications, Inc.*, No. CV-06-S-1786-NE (N.D. Ala. Mar. 31, 2009). Plaintiff further notes the Alabama statute includes a good faith affirmative defense for service suppliers. The *Madison County* case is distinguishable from the instant matter, however, because Alabama's statute expressly provides that ECDs can take legal action against various parties, including service suppliers. In fact, the statute broadly states that ECDs "shall be political and legal subdivisions of the state, *with power to sue and be sued* in their corporate names." Ala. Code § 11-98-2 (emphasis added). Tennessee's ECD Law lacks any comparable language.

### c. Underlying Purposes of the Legislation

Finally, the Court must consider the underlying purposes of the legislation. As explained earlier, the primary purpose of the statute is to establish a uniform emergency number for the public. The legislature wants to ensure all service users (that is, all persons, corporations, or entities provided 911 service) benefit from these 911 services. The statute discusses the benefits service

14

users should receive under the ECD Law as well as each user's obligation to fund these services. Hence, the inclusion of a right of action against service users who fail to pay the requisite 911 charges is perfectly aligned with the statute's goals. The Court recognizes Plaintiff may need a mechanism for ensuring service suppliers properly bill, collect, and remit 911 charges. However, the legislature's failure to include this right of action in the statute indicates the ECD Law was not intended to serve that purpose. Instead, ECDs should seek relief through other available remedies as Plaintiff has done in this very case. Because the legislature did not create a right of action against service suppliers in the ECD Law, Count II of the complaint is dismissed for failure to state a claim upon which relief can be granted.

### 3. Count III: Breach of Fiduciary Duty

Defendant argues Count III should be dismissed because Defendant and Plaintiff do not have a *per se* fiduciary relationship nor has Plaintiff plausibly alleged facts demonstrating Defendant exercised "dominion and control" over Plaintiff. Tennessee law recognizes two main types of fiduciary relationships. The first is fiduciary *per se*, "such as between a guardian and ward, an attorney and client, or conservator and incompetent." *Foster Bus. Park, LLC v. Winfree*, No. M2006-02340-COA0R30CV, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009). The second type of relationship, which is not *per se* fiduciary, arises when "one party exercise[s] 'dominion and control over another.'" *Id.* (citations omitted). This latter relationship is often referred to as a "confidential relationship." *Id.* "Because confidential relationships can assume a variety of forms, the courts have been hesitant to define precisely what a confidential relationship is and the court must look to the particular facts and circumstances of the case to determine whether one party exercised dominion and control over another, weaker party." *Id.* This type of relationship can be demonstrated by

15

showing "(1) the defendant was in a position to influence or control the plaintiff; (2) the defendant used the confidences given to him or her to obtain some benefit from, or advantage over, the plaintiff; and (3) the plaintiff, as the dominated party in the relationship, suffered some detriment at the hands of the defendant." *Givens v. Mullikin*, 75 S.W.3d 383, 410 (Tenn. 2002). The party asserting that a confidential relationship exists bears the burden of proving such relationship. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002).

Plaintiff contends a fiduciary relationship exists between Plaintiff and Defendant under both common law and the ECD Law. Plaintiff broadly alleges in its complaint that Defendant and other service suppliers are the statutorily-mandated agents of ECDs like Plaintiff. As support, Plaintiff cites to an Alabama Supreme Court decision and a federal district court decision from the Northern District of Alabama as evidence that other courts have imposed a similar duty upon service suppliers. *See Madison Cnty. Emer. Commc'n Dist. v. Bellsouth Telecommunications, Inc.*, No. CV-06-S-1786-NE (N.D. Ala. Mar. 31, 2009); *T-Mobile S., LLC v. Bonet*, 85 So.3d 963 (Ala. 2011). Both of these decisions, however, were decided in light of an Alabama statute that expressly creates an agency relationship between service suppliers and ECDs. For example, the Alabama Emergency Telephone Services Act states "[e]ach CMRS provider shall act as a *collection agent* for the CMRS Fund and shall collect the CMRS service charges levied upon CMRS connections pursuant to Section 11-98-7(b)(1) . . . and remit to the board the net CMRS service charges collected . . . ." Ala. Code § 11-98-8(a) (emphasis added).[14] In contrast, the Tennessee legislature did not explicitly

---

[14] In fact, in the *T-Mobile* decision, the Alabama Supreme Court cites portions of the trial court's decision in its factual and procedural background section, including the language below:

The Court further finds that [T-Mobile] ha[s] a fiduciary responsibility to collect and/or remit the Charge to [the CMRS Board]. The statute specifically makes [T-

16

impose a fiduciary duty upon Defendant. Moreover, Plaintiff cites to no authority recognizing that the relationship between a service supplier and an ECD is *per se* fiduciary in nature.[15]

The Court must also determine whether Plaintiff has sufficiently alleged that a confidential relationship exists between the parties. In its motion, Defendant only contests Plaintiff's assertion that Defendant exercised dominion and control over it. Determining whether a confidential relationship is fiduciary in nature is largely a factual determination, and Plaintiff has pleaded plausible albeit somewhat-strained facts to survive Defendant's motion to dismiss on this Count. Plaintiff alleges Defendant was in a position to influence and control Plaintiff because Defendant exclusively held the position of billing and collecting 911 service charges from its service users (Compl. ¶¶ 111-112). Plaintiff further claims that Defendant was the only party in possession of the information necessary to determine what service charges needed to be billed and that these funds

---

Mobile an] 'agent[ ]' of the CMRS Board for the collection and remission of the Charge. § 11-98-8(a). Thus, the statute creates the agency relationship. Such a relationship is fiduciary in nature.

*T-Mobile S., LLC*, 85 So.3d at 971. The Alabama Supreme Court ultimately affirmed the trial court's interpretation of various portions of the Alabama statute.

[15] Even in the absence of express language in the statute creating a legal fiduciary duty, Plaintiff contends the parties had an agency relationship and, therefore, their relationship was *per se* fiduciary. Plaintiff cites to *Eaton* ex rel. *Johnson v. Eaton*, 83 S.W.3d 131, 135 (Tenn. Ct. App. 2001) (citation omitted), for the proposition that, "the relationship between the agent and principal is fiduciary in nature and generally treated with the same gravity and strictness as the trustee-beneficiary relationship." Even applying this interpretation of the law, the Court would still need to determine as a factual matter whether Defendant was the "agent" of Plaintiff. Given that the Court has concluded Count III should not be dismissed because Plaintiff has sufficiently pleaded the parties had a "confidential relationship," the Court need not make this determination at this time.

were the primary source of Plaintiff's operating and capital funds.

Admittedly, if the evidence later shows the parties were merely engaged in an arm's length business transaction, it is highly unlikely the Court would conclude Defendant exercised "dominion and control" over Plaintiff. *See Condo. Mgmt. Assocs., Inc. v. Fairway Vill. Owner's Ass'n, Inc.*, No. W2009-00688-COA-R3-CV, 2010 WL 424592, at *10 (Tenn. Ct. App. Feb. 8, 2010) (concluding the evidence revealed "the parties were merely engaged in an arm's length business transaction, for which no fiduciary status is conferred"). Nonetheless, for purposes of surviving a motion to dismiss, Plaintiff has pleaded facts and circumstances to demonstrate that Defendant may have been in a position to exercise dominion and control.[16] Accordingly, the Court will not dismiss Plaintiff's breach of fiduciary duty claim.

### 4. Count IV: Fraudulent Misrepresentation

Defendant contends Plaintiff failed to plausibly allege a claim of fraudulent misrepresentation. To establish a fraudulent misrepresentation claim under Tennessee law, a plaintiff must show: "(1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation." *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311

---

[16] Plaintiff has also pleaded sufficient facts to establish the second and third prongs of a confidential relationship. Plaintiff alleges in the complaint that Defendant took advantage of Plaintiff's confidences by not billing and collecting 911 charges from all relevant service users and acted unlawfully to gain a competitive advantage (Compl. ¶¶ 34, 41, 45, 52-53, 56, 66, 72-77, 80, 83). Plaintiff also has sufficiently pleaded that it suffered an injury due to Defendant's conduct (Compl. ¶ 115).

18

(Tenn. 2008) (citation omitted).

Here, the main issues contested by Defendant are whether Plaintiff plausibly alleges Defendant misrepresented material facts and whether Plaintiff plausibly alleges it justifiably relied upon Defendant's misrepresentations. Plaintiff has sufficiently pleaded both. The Court already explained in its discussion regarding Count I that Plaintiff plausibly alleges Defendant submitted false or fraudulent monthly and annual reports. In particular, Plaintiff alleges the number of lines that Defendant billed pursuant to tariff were far in excess of those Defendant claimed it supplied in its monthly reports for purposes of collecting 911 charges under the ECD Law. Based upon these same facts, Plaintiff alleges with respect to Count IV that Defendant "omitted a significant number of voice lines or pathways capable of providing a pathway to the District's 911 Center" and "under-reported the amount of 911 charges owed" (Compl. ¶ 121). Because the purpose of the monthly and annual reports was to "communicate the basis for the emergency service charge payment due to the District," Plaintiff has sufficiently alleged Defendant "misrepresented material facts" (Compl. ¶ 122). Defendant also alleges Plaintiff either made these misrepresentations with actual knowledge or did so recklessly because Defendant was statutorily required to determine (and capable of determining) the correct number of lines that should be billed (Compl. ¶ 123). Taken as a whole, Plaintiff's factual allegations regarding misrepresentation are plausible on their face.

The only other part of Plaintiff's fraudulent misrepresentation claim that Defendant contests at this stage is whether Plaintiff reasonably relied on the misrepresented material facts. Here, the Court again concludes Plaintiff's allegations taken as true are plausible. Plaintiff contends it had no knowledge that Defendant was concealing this information, and it relied on Defendant's representations to its detriment (Compl. ¶ 124). In particular, Plaintiff alleges facts showing

19

Defendant had exclusive access to the number of lines and voice pathways that were actually billed (Compl. ¶¶ 48, 60, 70). Because Plaintiff has alleged plausible facts for its fraudulent misrepresentation claim, the Court will not dismiss Count IV.

### 5. Count V: Fraudulent Concealment

Defendant argues Plaintiff failed to plausibly allege a claim of fraudulent concealment. To establish fraudulent concealment under Tennessee law, a plaintiff must show that "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538-39 (Tenn. 1998) (citations omitted). Defendant argues Plaintiff has failed to sufficiently allege facts that Defendant had a duty to disclose a known fact; that there was a misrepresentation; and that Plaintiff justifiably relied on that misrepresentation. The Court addressed the latter two arguments above with respect to Count IV--that is, Plaintiff has sufficiently pleaded facts demonstrating there was a misrepresentation on the part of Defendant and that Plaintiff justifiably relied on that misrepresentation.

The one issue that remains is whether Defendant had a duty to disclose a known fact. The statute does not expressly impose a duty to disclose on Defendant. However, Tennessee courts have generally found that a duty to disclose information can arise under three circumstances: "(1) where there is a previous definite fiduciary relation between the parties, (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other, and (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith." *See GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 195 (Tenn. Ct. App. 2010). The Tennessee Supreme Court has also explained that

> [f]iduciary relationship, confidential relationship, constructive fraud and fraudulent concealment are all parts of the same concept. [T]he nature of the relationship which creates a duty to disclose, and a breach of [that] duty constitutes constructive fraud or fraudulent concealment, springs from the confidence and trust reposed by one in another, who by reason of a specific skill, knowledge, training, judgment or expertise, is in a superior position to . . . act on behalf of the party bestowing trust and confidence in him.

*Shadrick v. Coker*, 963 S.W.2d 726, 736 (Tenn. 1998) (quoting *Garcia v. Presbyterian Hosp. Ctr.*, 593 P.2d 487, 489-90 (N.M. Ct. App. 1979)). Here, the Court has determined it is a question of fact whether Plaintiff and Defendant's relationship was fiduciary in nature--that is, whether there was a confidential relationship between the parties and Defendant exercised dominion and control over Plaintiff. Although the parties dispute whether such a relationship existed, Plaintiff sufficiently pleaded facts to survive a motion to dismiss on its breach of fiduciary duty claim. Accordingly, taking Plaintiff's allegations as true that the relationship between the parties was fiduciary in nature, the Court can also conclude at this stage that Defendant has sufficiently pleaded facts demonstrating Defendant had a duty to make a full and complete disclosure (*see* Compl. ¶ 131). Of course, if Defendant can establish later in the proceedings that there is no fiduciary relationship between the parties, the Court will need to revisit the issue of whether there was a duty to disclose.

Because Plaintiff has alleged plausible facts to demonstrate Defendant may be liable for fraudulent concealment, the Court concludes Count V should not be dismissed.

### 6. Count VI: Negligent Misrepresentation

The only issues Defendant disputes with respect to Plaintiff's negligent misrepresentation claim are whether Plaintiff plausibly alleged a misrepresentation of material fact and whether Plaintiff reasonably relied on that misrepresentation. *See Merriman v. Smith*, 599 S.W.2d 548, 556 (Tenn. Ct. App. 1979). However, for the same reasons this Court concluded with respect to Counts

IV and V that Plaintiff had sufficiently pleaded facts demonstrating Defendant had misrepresented material facts and that Plaintiff had justifiably relied on the misrepresentation, the Court reaches the same conclusion with respect to Count VI. Accordingly, Count VI should not be dismissed.

### 7. Count VII: Negligence and Negligence *Per Se*

Defendant contends Plaintiff's negligence *per se* and common law negligence claims should be dismissed. To establish a negligence *per se* cause of action under Tennessee law, a plaintiff must demonstrate "the statute violated was designed to impose a duty or prohibit an act for the benefit of a person or the public." *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994). The plaintiff must also establish that it "was within the class of persons that the statute was meant to protect." *Id.*; *see Rains v. Bend of the River*, 124 S.W.3d 580, 591 (Tenn. Ct. App. 2003) (stating "[t]he two threshold questions in every negligence per se case are whether the plaintiff belongs to the class of persons the statute was designed to protect and whether the plaintiff's injury is of the type that the statute was designed to prevent"). Notably, many of the factors a court must consider in determining whether the legislature intended to create a private right of action also apply in the context of determining whether the legislature intended to create a statutory standard of care. *Rains*, 124 S.W.3d at 589 n.5.

"[T]o trigger the doctrine, the statute must establish a specific standard of care." *Id.* at 590. In *King v. Danek*, 37 S.W.3d 429, 460 (Tenn. Ct. App. 2000), the Tennessee Court of Appeals explained that even if the plaintiffs are within the protected class, a negligence *per se* claim will fail "unless the statute establishes a standard of care." The court offered the following reasoning:

> Where a statutory provision does not define a standard of care but merely imposes an administrative requirement, such as the requirement to obtain a license or to file a report to support a statutory scheme, violation of such requirement will not support a negligence per se claim. Even if the regulatory scheme as a whole is designed to

> protect the public or promote safety, the licensing duty itself is not a standard of care, but an administrative requirement.

*King*, 37 S.W.3d at 460 (quoting *Talley v. Danek Med.*, 179 F.3d 154, 159 (4th Cir. 1999)). Here, Plaintiff is not within the protected class the statute was meant to protect for the same reason Plaintiff was not an "intended beneficiary" in the Court's discussion on Count II–the statute was primarily designed to protect the public and prevent service users from abdicating their responsibility to pay 911 charges.

Even more importantly, Plaintiff has not demonstrated the ECD Law created a statutory standard of care. The ECD Law primarily imposes administrative requirements on service suppliers like Defendant to bill, collect, and remit 911 charges. One of Defendant's duties is to submit annual and bi-monthly (or in this case, monthly) reports of the amounts billed and collected. That "duty," however, is an administrative requirement, not a standard of care. *See King*, 37 S.W.3d at 460. Because the ECD Law did not create a standard of care as a matter of law, Plaintiff's negligence *per se* claim must be dismissed.

Similarly, Plaintiff's common law negligence claim must also be dismissed. To establish a common law negligence claim in Tennessee, a plaintiff must show "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005). The primary element disputed by Defendant is whether Defendant owes Plaintiff a duty of care. "Duty is the legal obligation a defendant owes to a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). Whether a duty exists is a question of law. *Hale*, 166 S.W.3d at 716.

23

In the complaint, Plaintiff contends the common law imposes a duty on Defendant to "bill, collect, report, and remit to the District the 911 charges in good faith and in accordance with the standards applicable to reasonable service suppliers" (Compl. ¶ 144). Plaintiff cites to no authority, however, establishing that Tennessee courts have ever imposed such a duty of care. Moreover, the Court agrees with Defendant's contention that the common law tort claim of negligence was not intended for the purposes suggested by Plaintiff. Nowhere in the complaint does Plaintiff allege a harm or injury other than economic loss. In many contexts, a party cannot recover under a negligence claim "for purely economic loss absent physical injury or property damage." *See United Textile Workers of Am., AFL-CIO v. Lear Siegler Seating Corp.*, 825 S.W.2d 83, 87 (Tenn. Ct. App. 1990); *see also Ladd Landing, LLC v. Tenn. Valley Auth.*, No. 3:11-CV-596, 2012 WL 2190811, at *5-6 (E.D. Tenn. June 14, 2012). For all of these reasons, the Court concludes Plaintiff's common law negligence claim should also be dismissed.

### 8. Count VIII: Declaratory Judgment

Defendant argues Plaintiff's request for a declaratory judgment should be dismissed because there is no present controversy between the parties. To bring a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, there must be an "actual controversy." Moreover, the "controversy" at issue "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). Defendant claims it is in compliance with the ECD Law and has been since March 2011, when the Tennessee Attorney General issued Opinion No. 07-38 (Court File No. 29 at 23). The opinion offered guidance on how service suppliers should bill PRI and T-1 lines. Defendant also claims it has no intention of changing its billing practices now that it is in compliance. Based on these facts, Defendant argues

Count VIII is moot.

To survive a motion to dismiss, however, Plaintiff need only allege plausible facts that demonstrate, among other things, an actual controversy exists. In the complaint, Plaintiff states an actual controversy exists with respect to Defendant's legal obligations under the ECD Law to "bill, collect, and remit to the District payment of emergency 911 Charges based on the number of voice lines or pathways capable of connecting to the District's 911 Center" (Compl. ¶ 153). Throughout the complaint, Plaintiff alleges Defendant did not bill, collect, and remit 911 charges as required by the statute. Taking these allegations as true, Plaintiff has sufficiently demonstrated an actual controversy exists. Therefore, Defendant's request for a declaratory judgment should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### 9. Count IX: Permanent Injunction

Defendant contends the Court should dismiss Plaintiff's request for a permanent injunction. In determining whether to grant a party's request for injunctive relief, a court should consider the following factors: "(1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Actual success on the merits is also considered by courts determining whether to grant a permanent injunction. *See, e.g., Layman Lessons, Inc. v. City of Millersville*, 636 F. Supp. 2d 620, 655 (M.D. Tenn 2008) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)). Here, the only factor contested by Defendant is whether Plaintiff experienced irreparable harm. Plaintiff alleges Defendant's failure

to satisfy its obligations under the ECD Law has caused irreparable harm because Plaintiff "relies upon the 911 charges to provide funding for its vital operations" (Compl. ¶ 159). Hence, Defendant's failure to properly bill, collect, and remit 911 charges has affected both Plaintiff's funding source and its operations. For purposes of pleading facts to survive a motion to dismiss, Plaintiff's factual allegations are sufficient. Accordingly, Plaintiff's claim for injunctive relief should not be dismissed.

In sum, the Court will **DISMISS** Counts II and VII pursuant to Fed. R. Civ. P. 12(b)(6). All other counts will proceed.


### III. MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A. Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-CV-63, 2009 WL

3762961, at *2-3 (E.D. Tenn. Nov. 4, 2009) (explaining the Court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### B.    Discussion

Plaintiff moves for summary judgment on its claims for declaratory and injunctive relief. Plaintiff seeks a declaration that "Defendant is obligated under Tennessee law to bill all of its telephone subscribers in Hamilton County for 911 Charges upon all voice lines or pathways capable of reaching the District's 911 Center, up to 100 lines per user per location, and to report and remit to the District all 911 Charges billed and collected" (Court File No. 23 at 1). Plaintiff also requests that the Court permanently enjoin Defendant from not billing, collecting, reporting, and remitting 911 charges. The Court will address each matter in turn.

### 1. Count VIII: Declaratory Judgment

Plaintiff moves for the Court to grant its declaratory judgment claim. The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its

jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The "controversy" at issue "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997). Moreover, "[i]t must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character . . . ." *Id.* at 241. The basic question a court should ask is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Whether a district court grants a party's request for a declaratory judgment is in the court's "sound discretion." *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 325 (6th Cir. 1984). The following considerations should guide a court in determining whether the issuance of a declaratory judgment is proper: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* at 326.[17]

Plaintiff argues the Court should grant its request for a declaratory judgment because the

---

[17] The Sixth Circuit has also established a five-factor test that courts can apply in making this determination: "(1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata;' (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *Id.*

judgment pertains solely to an issue of law. Yet issuing a declaratory judgment at this stage is premature and inappropriate for several reasons. First, viewing the facts in the light most favorable to Defendant, the nonmoving party–as is required at the summary judgment stage–Plaintiff has not established there is an "actual controversy" that needs to be decided. Defendant contends it is in compliance with the ECD Law, and this is a major factual dispute between the parties that would need to be further explored before the Court would issue a declaration regarding the ECD Law. For purposes of this motion, the Court must take as true that Defendant is in compliance with the ECD Law. Defendant claims the provisions of the law that it had initially interpreted differently–that is, how it should assess 911 charges on multiplex circuits–were addressed in Opinion No. 07-38 of the Tennessee Attorney General. Defendant claims it altered its practices in March 2011 to be in full compliance. Other than that issue, Defendant contends it has always acted in accordance with the requirements of the ECD Law and shares Plaintiff's interpretation of the statute.[18]

    In light of the factual matters that still need to be addressed to define the boundaries of the dispute, the Court concludes issuing a declaratory judgment at this stage will not clarify or settle legal relations between the parties (especially when Defendant contends it is in agreement as to the meaning of the law). Moreover, the Court concludes granting Plaintiff's request will not resolve or even "afford relief" from the underlying issues in this case. With that said, the Court reaches this conclusion primarily because the need for a declaratory judgment has not been established based on the evidence in the record. At this point, Defendant has not even submitted an answer to Plaintiff's complaint nor have the parties engaged in formal discovery. Accordingly, the Court will deny as

---

[18] As noted earlier in the motion to dismiss discussion regarding Count I, Defendant also offers several explanations for why the amounts reported as billed and collected pursuant to the ECD Law differed from the amounts it billed pursuant to tariff.

premature Plaintiff's motion for partial summary judgment with respect to Count VIII.

## 2. Count IX: Permanent Injunction

Plaintiff also seeks the issuance of a permanent injunction. The decision to grant a permanent injunction is an equitable decision and is well within the discretion of the district court. *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Supreme Court has established a four-factor test for determining whether a permanent injunction should be granted. The court must determine "(1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* This analysis takes into account the fact that a court typically grants a permanent injunction after a trial or a final decision on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 396 (1981). Hence, a court should also consider the plaintiff's actual success on the merits when deciding whether to grant a permanent injunction. *See Am. Civil Liberties Union of Kentucky v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)).

Here, Plaintiff fails to address the issue of actual success on the merits in any of its briefs. This is a significant oversight given that the parties have not engaged in formal discovery and Defendant has not even submitted an answer to Plaintiff's complaint. Accordingly, the Court has little to no evidence at this stage of the proceedings to determine Plaintiff's likelihood of success on the merits nevermind Plaintiff's "actual" success on the merits. For this reason alone, the Court should deny Plaintiff's request for a permanent injunction.

Even after balancing the other factors, the Court reaches the same conclusion. In particular,

at this stage, the factors regarding irreparable harm and the existence of adequate alternative remedies weigh in favor of Defendant. "Although stated as two separate factors under *eBay*, the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff." *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 982-83 (W.D. Tenn. 2006). Here, Plaintiff contends Defendant's failure to bill and collect 911 charges has led Plaintiff to be designated a "financially distressed district" and has resulted in operating losses and negative changes in net assets during each of the last three fiscal years. Although Plaintiff claims its status as a "financially distressed district" has resulted in the imposition of various limitations and obligations, for the most part, the harm alleged by Plaintiff is monetary. Plaintiff would be able to obtain damages through this lawsuit if Defendant is found in violation of the various common law and statutory claims brought against it. Moreover, the ECD Law authorizes the board of directors of the ECD to take legal action against service users who fail to pay the required 911 charge.[19] Hence, Plaintiff does have other adequate remedies available to it. The Court concludes, at this stage, Plaintiff has failed to demonstrate that the Court should grant a permanent injunction. Therefore, Plaintiff's motion with respect to Count IX is denied.


IV.     **CONCLUSION**

For the foregoing reasons, the Court will **GRANT** Defendant's motion to dismiss on Counts II and VII and will **DENY** Defendant's motion to dismiss on the remaining counts (Court File No.

---

[19] Plaintiff claims Defendant refuses to fully disclose its records. Therefore, Plaintiff is unable to investigate which service users are not being billed and which service users are not paying. However, assuming the parties engage in further discovery, Plaintiff should be able to obtain additional information that would assist it in making many of these determinations. This issue should not create a complete roadblock to Plaintiff having an adequate remedy at law.

31

20). The Court will **DENY** Plaintiff's motion for partial summary judgment (Court File No. 22).

An Order shall enter.

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**