UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| HAMILTON COUNTY EMERGENCY | ) | |
| COMMUNICATIONS DISTRICT, *et al.*, | ) | |
| | ) | 1:11-CV-330 (Lead Case); 1:12-CV-003; |
| Plaintiffs, | ) | 1:12-CV-056; 1:12-CV-131; 1:12-CV-138; |
| | ) | 1:12-CV-139; 1:12-CV-149; 1:12-CV-166; |
| v. | ) | 1:12-CV-176; 1:12-CV-186 |
| | ) | |
| BELLSOUTH TELECOMMUNICATIONS, | ) | Judge Curtis L. Collier |
| LLC, d/b/a AT&T TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

**M E M O R A N D U M**

For many years, the Tennessee 911 emergency telephone call system has served and continues to serve a very worthwhile public purpose. That system relies upon the collection of mandatory fees from subscribers to telephone land lines. However, as communication technology has advanced, the telecommunications industry has become much more sophisticated, and communications technology inconceivable in the not-too-distant past is in common use today. A result of this tremendous advance in technology is that more and more people rely upon telecommunications by methods other than land lines. This has resulted in a decrease in the number of telephone subscribers supporting the 911 system and a decrease in the revenue on which these systems must operate. And with the advance in communication technology and its ever-increasing technological complexity, it is much more difficult for the non-technician to understand how that technology functions and how telecommunication companies use that technology. As is true in many industries, the new technological environment has its own technical vocabulary.

The case before the Court presents the question of whether one such company, Defendant BellSouth Telecommunications, LLC, d/b/a AT&T Tennessee ("BellSouth" or "Defendant"), has properly billed its subscribers for 911 services as required by Tennessee law and has properly remitted those collections to the Plaintiff Emergency Communications Districts (the "Districts" or "Plaintiffs")[1] to which they were due. The parties are sharply divided on the factual issues and the law. They have engaged in lengthy litigation at considerable costs.

Because of the advanced technology, the technical detail, and the technical language involved, the facts of this case are somewhat difficult to master. Ultimately, however, the resolution of this case does not depend on technological questions but rather on general principles of law that are familiar and well known. Thus, while the case law on the specific questions presented is sparse, these general, familiar principles guide the determination of this case. Applying these principles and the sparse case law available, the Court will **GRANT** Defendant BellSouth's motion for partial summary judgment (Court File No. 152) and motion for summary judgment (Court File No. 256) and will **DENY** the Districts' second motion for partial summary judgment (Court File No. 248).[2]

---

[1] Districts from the following counties filed related suits: Hamilton County (Lead Case, No. 1:11-CV-330), Bradley County (1:12-CV-3), Blount County (1:12-CV-56), Bedford County (1:12-CV-131), Coffee County (1:12-CV-138), Roane County (1:12-CV-139), Franklin County (1:12-CV-149), Giles County (1:12-CV-166), Cheatham County (1:12-CV-176), and Knox County (1:12-CV-186). Because the issues in the cases are so similar, the cases have been consolidated. All filings have been made in the Hamilton County case and the motions apply to each case.

[2] The parties have also filed several motions to strike. BellSouth moved to strike portions of certain depositions offered by the Districts (Court File No. 277). Because even considering this evidence the Court will grant summary judgment to BellSouth, the Court will **DENY** the motion as **MOOT**. The Districts have moved to (1) strike paragraphs 5–10 of Jeannie Gustafson's declaration (Court File No. 279) and (2) strike certain evidence pursuant to judicial estoppel (Court File No. 280). Because the Court did not consider the portion of Gustafson's declaration

2

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................... 4

II.    DECLARATORY AND INJUNCTIVE RELIEF ............................................ 6

III.   STANDARD OF REVIEW ...................................................................... 8

IV.   ANALYSIS ........................................................................................... 9

  A.    STATUTE OF LIMITATIONS ................................................................ 9

  B.    BELLSOUTH'S RESPONSIBILITY FOR NON-RESELLER CLECS' 911 CHARGES .................................................................................... 11

     1.   The Parties' Arguments ........................................................... 14

     2.   Statutory Construction ............................................................. 17

     3.   The Court's Reading ................................................................ 18

     4.   Other Arguments Raised by the Parties .................................... 22

  C.    FIDUCIARY DUTY CLAIMS ............................................................... 23

     1.   *Per Se* Fiduciary Duty ............................................................. 24

     2.   Confidential Relationship ........................................................ 28

  D.    FRAUD-BASED CLAIMS ................................................................... 33

     1.   Background .............................................................................. 33

     2.   Tennessee False Claims Act .................................................... 37

     3.   Fraudulent Misrepresentation ................................................. 49

     4.   Fraudulent Concealment ......................................................... 49

     5.   Negligent Misrepresentation .................................................... 52

V.    CONCLUSION .................................................................................... 55

---

to which the Districts object, the Court need not rule on the motion to strike it. Similarly, the Court did not rely on the evidence the Districts claim BellSouth should be estopped from offering. As the Court explains in Part IV.D.2 *infra*, even if it were to grant estoppel on the issue, summary judgment would nonetheless be appropriate. The Court will thus **DENY** these motions as **MOOT**.

# I.  INTRODUCTION

This lawsuit arises at the confluence of two regulatory systems: the Tennessee system designed to ensure the continued existence of 911 as the universal emergency number and the federal system designed to facilitate the deregulation of the telecommunications industry.

Before the federal Telecommunications Act of 1996, the telecommunications industry was dominated by monopolists, so-called Incumbent Local Exchange Carriers ("ILECs"), like BellSouth.  To facilitate entry by new competitors, the Telecommunications Act forced these ILECs, who had made huge investments in infrastructure, to allow competitors access to this infrastructure.  These competitors are called Competitive Local Exchange Carriers ("CLECs").

In 1984 Tennessee passed the Emergency Communications District Law (the "911 Law"), Tenn. Code Ann. §§ 7-86-101, *et seq*., to formally establish 911 as the primary emergency telephone number for all Tennessee residents.[3]  The 911 Law created Emergency Communications Districts ("ECDs"), municipal corporations which run the 911 call centers in each county and route calls to the proper emergency service.  To support these functions, the 911 Law allows the ECDs to levy a charge (the "911 charge") on telephone lines.  Telephone "service suppliers"[4] such as BellSouth are required to bill and collect these 911 charges from

---

[3] A sweeping overhaul of the statute became law on April 25, 2014.  911 Funding Modernization and IP Transition Act of 2014, 2014 Tenn. Pub. Acts 795.  Although the changes do not necessarily affect liability and damages in this case, they vitiate the need for the declarative and injunctive relief sought by the Districts.  *See infra* Part II.  Numerous statutory provisions were deleted or relocated within the Tennessee Code after the 2014 amendment.  This memorandum refers to the statutory sections as they appeared when the instant cases were filed.

[4]  A "service supplier" is "any person, corporation or entity providing exchange telephone service to any service user . . . ."  Tenn. Code Ann. § 7-86-103(15).

their "service users."[5]  *Id.*  Service suppliers must then report and remit the 911 charges at least every two months to the ECDs.  *Id*.  To ensure that the 911 system remained viable in the new landscape created by the Telecommunications Act, the Tennessee Regulatory Authority issued a rule in 1998 (the "TRA Rule") allocating responsibility for the collection and remission of 911 charges between the ILECs and the various types of CLECs.

The Districts brought the instant action to recover 911 charges they believe BellSouth should have assessed and remitted.  They seek recovery on several theories, which can be grouped into three main categories.  The Districts first sought to recover directly under the 911 Law.  This theory was rejected by the Court at the motion to dismiss stage because the 911 Law does not provide a direct cause of action against service suppliers like BellSouth (Court File Nos. 38 & 39.  Next, the Districts seek to recover for BellSouth's alleged failure to collect and remit certain 911 charges under several tort theories: breach of fiduciary duty, violation of the Tennessee False Claims Act ("TFCA"), fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation.  Relatedly, the Districts seek declaratory and injunctive relief confirming the Districts' reading of the 911 Law.  Finally, the Districts assert that BellSouth is liable for the failure of certain CLECs to collect and remit 911 charges associated with those CLECs' customers.  The Districts read the law as imposing responsibility for collecting 911 charges on any line provided by BellSouth.  And because these CLECs either lease or interconnect with BellSouth's network to provide service, the Districts reason that BellSouth is obligated to collect and remit 911 charges on those lines, in addition to the lines it provides to its own end-user customers.

---

[5] A "service user" is "any person, corporation, or entity that is provided 911 service . . . ."  Tenn. Code Ann. § 7-86-103(16).

5

The Court will first address the propriety of declaratory and injunctive relief. The Court will then proceed to the question of statutory interpretation: whether BellSouth may be held liable for these CLECs' failure to collect and remit 911 charges. Finally, the Court will assess whether the Districts have met their burden of production as to each of the substantive tort theories asserted by the Districts.[6]

## II.   DECLARATORY AND INJUNCTIVE RELIEF

BellSouth argues it would be improper for the Court to enter a declaratory judgment (either on summary judgment or after trial) addressing the issues set forth by the Districts given that the Tennessee legislature recently passed a law updating the 911 Law and putting to rest the disputed issues. *See* 911 Funding Modernization and IP Transition Act of 2014, 2014 Tenn. Pub. Acts 795.  In evaluating requests for declaratory relief under 28 U.S.C. § 2201, courts should consider:

> (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

---

[6] The Districts filed a supplemental brief under Local Rule 7.1(d) based on the recent case of *Century Tel of Alabama, LLC v. Dothan-Houston County Comm. District*, -- So. 3d --, No. 1131313, 2015 WL 5725111 (Ala. Sept. 30, 2015) (Court File No. 324).  BellSouth responded (Court File No. 325).  The Districts do not tie the *Century Tel* decision to any of their specific arguments, only stating generally that *Century Tel*'s two holdings—first, that recent amendments to Alabama's Emergency Telephone Service Act were an amendment, not a repeal, of the previous version of the statute, and second, that the statute authorizes a private right of action— "should be applied in the present case" (Court File No. 324 at 4).  The Court has reviewed the authority and arguments in the Districts' supplemental brief, and finds they have no relevance to the issues before it on the parties' motions for summary judgment.

6

*Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 813 (6th Cir. 2004) (citations omitted).

Here, the second prong—whether the relief would serve a "useful purpose"—is dispositive. "The 'useful purpose' served by a declaratory judgment is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing." *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004). "When a law has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot." *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013) (quoting *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc)) *accord Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004) (holding that a declaratory judgment action regarding the legality of a zoning regulation was rendered moot by the passage of a new zoning ordinance). Declaratory relief is also improper where the issues will be adjudicated in connection with a pending claim for damages. *See AmSouth Bank*, 386 F.3d at 787 ("Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified.").

Applying the principles above, the passage of the 911 Modernization Act means there is no longer a "live controversy," and thus the "useful purpose" prong is not met. *See Bituminous Cas. Corp.*, 373 F.3d at 813. Furthermore, many of these issues will be resolved in connection with the affirmative claims for damages. Declaratory relief is thus not proper. And, of course, it would not be appropriate for the Court to issue an injunction requiring BellSouth to comply with a statute that is no longer in effect. Accordingly, the Court will **DENY** summary judgment to the

7

Districts on their requests for declaratory and injunctive relief and **GRANT** summary judgment to BellSouth to the extent it argues that the issue is moot.

## III.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

8

## IV.    ANALYSIS

The Districts' overarching argument is that, through various improper means and inaccurate interpretations, BellSouth has failed to collect and remit 911 charges on all required lines under the 911 Law.  The Districts assert two theories of liability in this case.  First, they claim BellSouth tortiously misrepresented its failure to remit 911 charges on lines it provided to its own customers and is liable to the Districts for those charges.  Second, the Districts assert BellSouth is liable for 911 charges on the lines of certain CLECs who essentially lease access to BellSouth's network elements.  In assessing the latter category of claims, the Court concludes the plain language of the 911 Law does not impose liability on BellSouth for remitting 911 charges on the CLECs' lines.  As to the former, the Court concludes the Districts have failed to adequately support the substantive tort theories under which they seek recovery.  The Court will thus grant BellSouth's motions for summary judgment.

The Court will first address BellSouth's argument that the statute of limitations bars the claims made by the Districts.  Finding BellSouth's argument unavailing, the Court will then proceed to the interpretive question of whether BellSouth may be liable for CLEC lines in addition to its own.  Finally, the Court will address the Districts' substantive tort claims.

### A.    STATUTE OF LIMITATIONS

BellSouth argues that many of the Districts' claims are barred by the statute of limitations.  Tennessee law provides a three-year statute of limitations on claims sounding in negligence, fraud, and breach of fiduciary duty.  Tenn. Code Ann. § 28-3-105; *Elec. Power Bd. of Chattanooga v. Monsanto Co.*, 879 F.2d 1368, 1375 (6th Cir. 1989) (three-year limitations period for fraud and negligence); *Cagle v. Hybner*, No. M200602073COAR3CV, 2008 WL

9

2649643, at *13 (Tenn. Ct. App. July 3, 2008) (three-year limitations period for breach of fiduciary duty). "Ordinarily, a claim accrues when the plaintiffs discover their injury or 'through the exercise of reasonable care and diligence [it] should have been discovered.'" *Elec. Power Bd. of Chattanooga*, 879 F.2d at 1376 (quoting *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 491 (Tenn. 1975)) (alterations in original).

However, the Districts assert, and the Court agrees, that the common law doctrine of *nullum tempus occurit regi*, codified at Tenn. Code Ann. § 28-1-113, applies in this case and saves the non-TFCA claims[7] from the application of the statute of limitations. *See* Tenn. Code Ann. § 28-1-113 (providing that "[t]he provisions of this title do not apply to actions brought by the state of Tennessee, unless otherwise expressly provided."). Under this doctrine, "[t]he statute of limitations does not run against the sovereign or the state, or against a county, when [the sovereign, state, or county is seeking] to enforce a demand arising out of, or dependent upon, the exercise of its governmental functions as an arm of the state." *Hamilton Cnty. Bd. of Educ. v.*

---

[7] The Districts acknowledge that, because the TFCA contains its own statute of limitations that expressly references actions brought by the state, the doctrine does not apply to the TFCA claims. *See Dunn v. W. F. Jameson & Sons, Inc.*, 569 S.W.2d 799, 801 (Tenn. 1978) ("When the State is acting in its sovereign capacity, it is not barred by any statute of limitation unless the particular statute of limitation expressly provides that it applies to actions brought by the State."). Because the TFCA statute expressly references claims brought by the state—a TFCA claim "may not be filed more than three (3) years after the date of discovery by the official of the state or political subdivision charged with responsibility to act in the circumstances or, in any event, no more than ten (10) years after the date on which the violation . . . was committed," Tenn. Code Ann. § 4-18-106—the doctrine does not apply. The Districts disclaim any TFCA claim arising more than ten years prior to this suit, and because the Court is granting summary judgment to BellSouth based on the merits, the Court need not decide when the Districts discovered the alleged violations. Although there is some disagreement, most courts find that the statute of limitations period for the False Claims Act is not jurisdictional. *See, e.g., U.S. ex rel. Dugan v. ADT Sec. Servs., Inc.*, No. CIV.A.DKC 20033485, 2009 WL 3232080, at *3 (D. Md. Sept. 29, 2009) (collecting cases).

*Asbestospray Corp.*, 909 S.W.2d 783, 785 (Tenn. 1995) (quoting *Wood v. Cannon Cnty.*, 166 S.W.2d 399, 401 (Tenn. Ct. App. 1942)) (alterations in original). The doctrine does not apply, however, with respect to municipal claims "which are of a private or corporate nature and in which only its local citizens are interested, as distinguished from a public or governmental matter in which all the people of the state are interested." *Id.* (quoting *Wood*, 166 S.W.2d at 401).

Here, the Districts are municipal corporations that the State of Tennessee has created to ensure "the continued viability of the lifesaving 911 emergency communications service [which] is of the highest priority for the health and safety of the citizens of Tennessee." Tenn. Code Ann. § 7-86-102. Although the 911 Law set up statewide 911 coverage to be administered on the county level, the provision of 911 services for all counties involves a "public or governmental matter in which all the people of the state are interested" and thus, the statute of limitations does not run against the Districts with regard to their non-TFCA claims.

## B. BELLSOUTH'S RESPONSIBILITY FOR NON-RESELLER CLECS' 911 CHARGES

Both BellSouth and the Districts seek summary judgment on the legal issue of whether BellSouth is responsible for collecting and remitting 911 charges on lines it leases to other telephone companies (which then sell phone service to end users) in addition to the 911 charges it collects and remits from its own end-user customers. This is, in essence, a second theory of liability which would expand dramatically the number of charges for which BellSouth could be held liable. To understand the parties' arguments, it is necessary to first understand some of the history behind the system.

In 1984 Tennessee passed the 911 Law to establish 911 as the primary emergency telephone number for all Tennessee residents. The 911 Law created Emergency

11

Communications Districts ("ECDs"), municipal corporations which run the 911 call centers in each county and route calls to the proper emergency service. An ECD "may levy an emergency telephone service charge . . . [on residential and business] service users, to be used to fund the 911 emergency telephone service." Tenn. Code Ann. § 7-86-108(a)(1)(A). This "charge shall be added to and may be stated separately in the billing by the service supplier to its telephone subscribers within the geographical area of the district." § 7-86-108(c). Service suppliers must collect the 911 charge "at regular billing intervals in accordance with the regular billing practice of the service supplier." *Id.* The charge then must be remitted to the relevant district. *Id.*

Although the law does not define "telephone subscriber," it does define "service supplier." As noted above, a "service supplier" is "any person, corporation or entity providing exchange telephone service to any service user." Tenn. Code Ann. § 7-86-103(15). A "service user," in turn, is "any person, corporation or entity that is provided 911 service." Tenn. Code Ann. § 7-86-103(16). There is no definition of "exchange telephone service" in the 911 Law itself, but Tennessee's telecommunication regulation statute defines "basic local exchange telephone services" as "telecommunications services which are comprised of an access line, dial tone, touch-tone and usage provided to the premises" of an end-user. Tenn. Code Ann. § 65-5-108(a)(1). The statute defines "911 service" as "regular 911 service[,] enhanced universal emergency number service or enhanced 911 service that is a telephone exchange communications service whereby a public safety answering point may receive telephone calls dialed to the telephone number 911." Tenn. Code Ann. § 7-86-103(10). It "includes lines and may include the equipment necessary for the answering, transferring and dispatching of public emergency telephone calls originated by persons within the serving area who dial 911 . . . ." *Id.*

12

The confusion arises from the particular structure of the telecommunications industry in the aftermath of the deregulation of the telecommunications industry, accomplished by the Telecommunications Act. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). Before the passage of the Telecommunications Act, several large companies dominated the market for local telephone service and acted as state-regulated monopolies. These firms are known as Incumbent Local Exchange Carriers ("ILECs"), and BellSouth was one of them. ILECs had invested heavily in the expensive equipment necessary to set up local exchange networks. To facilitate market entry and increase price and service competition, the Telecommunications Act forced ILECs to share their networks with competitors, known as Competitive Local Exchange Carriers ("CLECs"). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 549 (2007).

Section 251(c) of the Telecommunications Act established three ways for ILECs to share their networks with CLECs. First, a CLEC that already had a network could "interconnect' its network to the ILEC's network to expand the CLEC's customer base. 47 U.S.C. § 251(c)(2). These are known as "Facility-Based CLECs" because they had their own pre-existing facilities. Second, CLECs could lease unbundled network elements from ILECs in order to provide their own service to customers. 47 U.S.C. § 251(c)(3). These are known as "UNE-P CLECs." The third type of CLECs are companies that purchase telephone service from ILECs and then resell the service to customers. 47 U.S.C. § 251(c)(4). These are known as "Reseller CLECs." Unlike Facility-Based CLECs and UNE-P CLECs, Reseller CLECs do not lease any equipment from ILECs; rather, they purchase service from ILECs wholesale and resell it to end users.

Faced with the prospect of numerous CLECs coming into local markets in the wake of the Telecommunications Act, the Tennessee legislature passed a law in 1995 empowering the Tennessee Regulatory Authority ("TRA") to implement deregulation and, while doing so, to

13

ensure 911 charges were properly being paid. 1995 Tennessee Laws Pub. Ch. 408 (S.B. 891). The act required that "all telecommunications services providers who provide basic local exchange telephone service or its equivalent provide . . . access to 911 emergency services . . . ." Tenn. Code Ann. § 65-4-124. In April 1998, the TRA enacted a regulation to "provide specific rules for Incumbent Local Telecommunications Service Providers and Competing Local Telecommunications Service Providers to ensure the continuation of reliable and affordable Enhanced 911 Emergency Service after deregulation occurs." Enhanced 911 Service Requirements After Deregulation, Tenn. Comp. R. & Regs. 1220-04-08-.13 (the "TRA Rule"). The TRA Rule provides that "Incumbent Enhanced 911 Emergency Service Providers shall continue to offer Enhanced 911 service and shall . . . [b]ill, collect and remit the Enhanced 911 fees associated with its subscribers (including non-facilities based resellers) to the appropriate Emergency Communications District . . . ." Tenn. Comp. R. & Regs. 1220-04-08-.13(2). With regards to the new market-entrant CLECs, the regulation provides as follows:

> All other Incumbent Local Telecommunications Service Providers, Competing Local Telecommunications Service Providers and Shared Tenant Service Providers providing basic local exchange telephone service or its equivalent shall enter into Interconnection Agreements with the Incumbent Enhanced 911 Emergency Service Provider to provide Emergency 911 Service and shall . . . [b]ill, collect and remit the Enhanced 911 fees associated with its subscribers (including non-facilities based resellers) to the appropriate Emergency Communications District . . . .

Tenn. Comp. R. & Regs. 1220-04-08-.13(3).

### 1. The Parties' Arguments

The Districts assert that under the 911 Law and implementing regulations, BellSouth is responsible for remitting 911 charges on any line it leases to a CLEC in addition to the 911 charges it remits from its own end-user customers. BellSouth disagrees. To resolve this dispute,

14

the Court must determine whether Facility-Based and UNE-P CLECs[8] ("non-Reseller CLECs") are "telephone subscribers"/"service users" under the 911 Law such that BellSouth is responsible for collecting 911 charges from them.

The central question before the Court is whether the UNE-P CLECs to which BellSouth leases network elements and Facility-Based CLECs which BellSouth allows to interconnect with its network are "telephone subscribers" to which BellSouth provides telephone service as a "service supplier" under the 911 Law. BellSouth argues that, under the clear language of the statute, non-Reseller CLECs cannot be considered "telephone subscribers" or "service users" of BellSouth's. Accordingly, BellSouth argues it cannot be held liable (jointly or otherwise) for the 911 charge billing and remitting practices of these CLECs. BellSouth argues that there is no suggestion in the text that telephone companies could be jointly responsible for 911 charges.

BellSouth points out that the language of the 911 Law does not suggest the possibility of multiple "service suppliers" for a single "telephone subscriber." The 911 Law states that each 911 charge "shall be added to and may be stated separately in *the* billing by *the* service supplier to *its* telephone subscribers within the geographical area of the district. The service charge shall be collected at regular billing intervals in accordance with the regular billing practice of *the* service supplier." Tenn. Code Ann. § 7-86-108(c) (emphasis added). BellSouth argues that a "telephone subscriber within a specific geographic area" is properly read to refer to actual end users (whether individuals or entities). Thus "service supplier" would refer only to the entity that has the direct service and billing relationship with the subscriber—i.e. the end user's telephone company.

---

[8] Both parties agree that BellSouth is liable for remitting charges for Reseller CLECs.

The Districts argue that the unambiguous language of the statute means exactly the opposite: BellSouth is liable for 911 charge billing and remittance for all of the non-Reseller CLECs' customers.  The Districts' logic is as follows: BellSouth is a service supplier of what the Districts call "jointly provided" lines because it provides lines and thus, they argue, exchange telephone service to non-Reseller CLECs (the CLECs then use those lines to provide service to the end users).  Because non-Reseller CLECs are provided lines, and "'911 service' includes lines," Tenn. Code Ann. § 7-86-103(10), they are "service users"—"corporation[s] or entit[ies] that [are] provided 911 service," Tenn. Code Ann. § 7-86-103(16).  Because BellSouth provides the lines that constitute 911 service to the non-Reseller CLECs, BellSouth is the service supplier and the CLECs are service users.  BellSouth is thus responsible for the remittance of 911 charges for the CLECs' customers in addition to its own.[9]

In a further effort to show that BellSouth was the "service supplier" and non-Reseller CLECs the subscribers, the Districts point to the declaration of David J. Mafara, Sr. ("Malfara"), the President and Chief Executive Officer of ETC Group, LLC, a business management and technology consulting company.  Malfara explains that "[i]n all cases where CLECs use BellSouth exchange access facilities to permit telephone calls to be completed, CLEC customers completing a call to a 911 Call Center will, and must, make use of BellSouth exchange access

---

[9] Originally, the Districts argued that both Facilities-Based CLECs and UNE-P CLECs "jointly" provide lines.  But in their supplemental brief following discovery, the Districts argue BellSouth is *solely* responsible for collecting and remitting 911 charges for UNE-P arrangements and only Facility-Based CLECs "jointly" provide lines to end users.  BellSouth notes that this theory would lead to the curious result that UNE-P CLECs are not "service suppliers" *to their own customers* (i.e. those who directly subscribe to telephone service from the UNE-P CLECs).  Because the Court concludes BellSouth is not responsible for either, the Court need not address this distinction.

16

facilities" (Court File No. 154-3, Ex. C, Malfara Decl. ¶ 9).[10]  BellSouth acknowledges that end users ultimately use in some way the exchange access facilities built and controlled by BellSouth, but argues that does not preclude the CLEC leasing the exchange access facilities from being designated as the "service supplier" to the end-user or subscriber.

## 2.    Statutory Construction

As with any question of statutory construction, the Court begins its analysis with the 911 Law itself.  "When construing statutes, [courts] are to ascertain and give effect to the intention and purpose of the legislature." *State v. Hannah*, 259 S.W.3d 716, 721 (Tenn. 2008).  Courts should "derive the legislature's intent 'whenever possible from the natural and ordinary meaning of the language used without forced or subtle construction that would limit or extend the meaning of the language.'"  *Id.* (quoting *Lipscomb v. Doe*, 32 S.W.3d 840, 844 (Tenn. 2000)). "When the statutory language is clear and unambiguous, [courts] must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004).

If a statute is ambiguous—that is, if it communicates multiple meanings—courts should then look to "the entire statutory scheme and elsewhere to ascertain the legislative intent and purpose." *Id.*  Courts must consider "[t]he background, purpose, and general circumstances under which words are used in a statute . . . ." *Id.*  It is not appropriate "to take a word or a few words from its context and, with them isolated, attempt to determine their meaning." *Id.*

---

[10] BellSouth moved to strike paragraphs 6–8 of Malfara's declaration. As the Court explained in note 2 *supra*, because the Court is granting summary judgment in favor of BellSouth even considering the declaration, the Court will deny the motion as moot.

17

Statutory language must always "be construed with the saving grace of common sense." *State ex rel. Maner v. Leech*, 588 S.W.2d 534, 540 (Tenn. 1979).

In construing a law, "a state agency's interpretation of a statute that the agency is charged to enforce is entitled to great weight in determining legislative intent." *Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761 (Tenn. 1998) (citing *Nashville Mobilphone Co., Inc. v. Atkins*, 536 S.W.2d 335, 340 (Tenn. 1976)). That said, "an agency's statutory interpretation is not binding on the courts." *Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 523 (Tenn. 2013).

### 3. The Court's Reading

The statute defines "service user" as "any person, corporation or entity that is provided 911 service." Tenn. Code Ann. § 7-86-103(16). The non-Reseller CLECs are provided with lines, and 911 service includes lines. Tenn. Code Ann. § 7-86-103(10). These definitions might be read (in isolation) to mean that non-Reseller CLECs are service users. But, reading the statute as a whole, it is clear that non-Reseller CLECs are "service suppliers" not "service users" and are thus responsible for collecting and remitting 911 charges from their "telephone subscribers." BellSouth is not responsible, jointly or otherwise, under the 911 Law for any failure to do so.

The text of the statute contemplates only one service supplier per service user. Tenn. Code Ann. § 7-86-108(c) (providing that each 911 "service charge shall be added to and may be stated separately in *the* billing by *the* service supplier to *its* telephone subscribers within the geographical area of the district. The service charge shall be collected at regular billing intervals in accordance with the regular billing practice of *the* service supplier.") (emphasis added). And it would be curious if CLECs—who unquestionably fit the definition of service supplier—were

18

not considered the service supplier to their own customers. The most logical reading of the law is that the "service supplier" is the firm directly doing business with the end user.

The 911 charge is money paid for the emergency-number service. Putting aside the statutory definitions for a moment, the user of the service is the person who can use the phone to dial 911. And so, construing the words "service user" and "telephone subscriber" in light of this common-sense reading, it is clear that the law cannot be read to make the non-Reseller CLECs "service users." Non-Reseller CLECs are not "subscribers" provided with 911 *service* just because they lease lines from BellSouth. Non-Reseller CLECs do not and cannot use these lines to dial 911. Non-Reseller CLECs lease the lines (or "exchange access facilities") from BellSouth. They then become "service suppliers" to the end users—"telephone subscribers"/"service users" (i.e. "any person, corporation or entity that is provided 911 service")—because they provide these end users with telephone service.

Such a reading is also consistent with the definition of exchange telephone services in Tennessee's telecommunications regulation statute. This provision defines "basic local exchange telephone services" as "telecommunications services which are comprised of an access line, dial tone, touch-tone and usage provided to the premises" of an end-user. Tenn. Code Ann. § 65-5-108(a)(1). As noted above, a "service supplier" is "any person, corporation or entity providing exchange telephone service to any service user." Tenn. Code Ann. § 7-86-103(15). A "service supplier"[11] is the firm directly doing business with the end-user and providing that end

---

[11] As noted above, a "service supplier" is "any person, corporation or entity providing exchange telephone service to any service user." Tenn. Code Ann. § 7-86-103(15).

user "an access line, dial tone, touch-tone." A "service supplier" is not the firm leasing exchange access *facilities* to a competing telephone company. [12]

The regulations promulgated pursuant to the statute provide further support for the Court's reading. The TRA Rule provides: "the Incumbent Enhanced 911 Emergency Service Provider shall continue to offer Enhanced 911 service and shall . . . [b]ill, collect and remit the Enhanced 911 fees associated with its subscribers (including non-facilities based resellers) to the appropriate Emergency Communications District . . . ." Tenn. Comp. R. & Regs. 1220-04-08-.13(2). Critically, the regulation provides in the next section that:

> All other Incumbent Local Telecommunications Service Providers, *Competing Local Telecommunications Service Providers* and Shared Tenant Service Providers providing basic local exchange telephone service or its equivalent shall enter into Interconnection Agreements with the Incumbent Enhanced 911 Emergency Service Provider to provide Emergency 911 Service and shall . . . [b]ill, collect and remit the Enhanced 911 fees *associated with its subscribers* (including non-facilities based resellers) to the appropriate Emergency Communications District . . . .

Tenn. Comp. R. & Regs. 1220-04-08-.13(3) (emphasis added).

The TRA Rule clearly provides that each "Competing Local Telecommunications Service Provider" [or CLEC] is responsible for collecting and remitting 911 charges "associated with *its*

---

[12] The Districts argue that this definition of "exchange telephone service" should be ignored because it is taken out of context in that it comes from a separate law dealing with price regulation. But the Court disagrees. "A familiar canon of statutory construction is that statutes with a common purpose will use common definitions." *State v. Sherman*, 266 S.W.3d 395, 405 (Tenn. 2008). And so it is reasonable to expect that the Tennessee legislature would use "telephone service" similarly in two statutes regulating the telecommunications industry. Furthermore, consistent with the Court's approach, a Tennessee Attorney General opinion has read these two statutes together in addressing whether 911 charges may be assessed for cell phone service. Tenn. Op. Att'y Gen. No. 96-004, 1996 WL 21047, at *1 (Jan. 16, 1996). The opinion reads § 65-5-108 (formerly Tenn. Code Ann. § 65-5-208(a)(1)) into the 911 Law context, noting that, "[r]ead together, [Tenn. Code Ann. § 65-4-101(a)(6) and Tenn. Code Ann. § 65-5-208(a)(1))] reflect an intent to limit the term 'service supplier' in the Emergency Communications District Law to a phone company that . . . supplies exchange telephone service through physical telephone lines." *Id.*

20

*subscribers* (including non-facilities based resellers)." *Id.* (emphasis added). There is no indication—explicitly or implicitly—anywhere in the regulation that ILECs like BellSouth would also be responsible for handling the 911 charges of the non-Reseller CLECs' subscribers. Rather, the regulation clearly provides that ILECs are responsible for charges associated with *their own* subscribers (including Reseller CLECs).

The Districts read the TRA Rule differently, arguing that it actually confirms that non-Reseller CLECs are "subscribers" BellSouth must bill for 911 charges. The Districts focus on the statement that an ILEC's subscribers "include non facility-based resellers." Tenn. Comp. R. & Regs. 1220-04-08-.13(2). According to the Districts, Reseller CLECs are merely one *example* of a subscriber; the Court should thus draw the implication that subscriber also includes non-Reseller CLECs.

The Court finds this argument entirely unpersuasive. The rule does not use "such as" or some like phrase to denote that Reseller CLECs are merely an example of a subscriber. Rather, the more logical reading is that "subscribers" specifically includes Reseller CLECs in addition to the direct end users one would normally think of as subscribers. The clause clarifies that ILECs are responsible for Reseller CLECs' 911 charge collection, while remaining silent on the status of non-Reseller CLECs. The inclusion of Reseller CLECs and not non-Reseller CLECs strongly suggests that non-Reseller CLECs are not to be included as the ILEC's subscribers.[13] *See POM*

---

[13] The Districts also assert that "the TRA Rule was a temporary one, much of which was intended by its terms to expire on June 6, 1999" (Court File No. 154, pp. 21–22). The Court fails to see the relevance of the temporal limitation to the analysis here. One would think that the TRA would make sure that all of its regulations—even those that are temporary—are consistent with the statute they seek to implement. In any event, the four-year limit only pertained to Section 2 of the rule, not Section 3. Section 3, which does not have an expiration provision, provides that *both* ILECs and non-Reseller CLECs are required to handle their own subscribers' 911 Surcharges. Tenn. Comp. R. & Regs. 1220-04-08-.13(3).

*Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) (applying the principle of *expressio unius est exclusio alterius*).

And the failure to include the non-Reseller CLECs makes perfect sense given that the very next section of the TRA Rule—which the Districts neglect to discuss—states that "Competing Local Telecommunications Service Providers [i.e., CLECs] . . . providing basic local exchange telephone service or its equivalent shall . . . [b]ill, collect and remit the Enhanced 911 charges associated with *its subscribers* (including non-facilities based resellers) to the appropriate Emergency Communications District . . . ." Tenn. Comp. R. & Regs. 1220-04-08-.13(3) (emphasis added). So the TRA Rule clearly indicates non-Reseller CLECs should collect and remit for *their* subscribers. As noted above, the statute and regulations do not appear to envision responsibility and liability for 911 charges falling on *both* the non-Reseller CLEC and the ILEC for a given end user. The Court sees no grounds for reading such joint liability into the statute or regulation, especially given that the very purpose of the statute was to allow the TRA to sort out the respective responsibilities of ILECs and CLECs with regard to collecting 911 charges.

### 4. Other Arguments Raised by the Parties

The parties also raise several non-text-based arguments in support of their respective positions. BellSouth argues that because the 911 charge is a tax, it should be construed against the taxing entity. BellSouth also invokes the canon against absurd results and argues that holding BellSouth liable for its competitors' lines would be unworkable because it would require BellSouth to access its competitors' proprietary information. The Districts argue in support of their contrary reading that BellSouth has acknowledged its responsibility for 911 charges through

22

various contractual arrangements. The Districts also point to analogous contractual arrangements with Reseller CLECs that demonstrate that their reading is not implausible.

Because the Court agrees with BellSouth's reading of the statute, the Court need not address the tax argument or the canon against absurd results. The Court is not persuaded by the Districts' other arguments. Representations made by private parties in contractual arrangements cannot override the plain language of a statute. Furthermore, while the canon against absurd results counsels that the implausibility of a particular reading counsels against adopting such a reading, the inverse of that proposition is not true. Just because the result is plausible does not mean the reading is correct.

*       *       *

Ultimately, the Districts' reading strains the language of the 911 Law. For the reasons stated above, the language and context of the 911 Law do not make BellSouth liable for the 911 charges related to non-Reseller CLECs. Further, even if the statute were not clear, the other factors discussed above—most importantly the way in which the Tennessee Regulatory Authority has interpreted the 911 Law—lead to the same conclusion. The Court will thus **GRANT** BellSouth's motion for summary judgment on this issue.

## C. FIDUCIARY DUTY CLAIMS

The Districts ask the Court to find that BellSouth owes fiduciary duties to the Districts as a matter of law. The Districts move for summary judgment on their claim that BellSouth breached a fiduciary duty owed to them arising either under a *per se* fiduciary theory or because a confidential relationship exists. BellSouth cross moves for summary judgment asking the Court to find that no such relationship exists.

23

### 1. *Per Se* Fiduciary Duty

This Court determined at the motion-to-dismiss stage that the Districts' breach of fiduciary duty claim could go forward based on the possibility of a confidential relationship. [14]

---

[14] At the motion-to-dismiss stage, the Court, referencing Plaintiff Districts' confidential relationship theory, noted that "Plaintiff has pleaded plausible albeit somewhat-strained facts to survive Defendant's motion to dismiss" the breach of fiduciary duty claim (Court File No. 38, p. 17). In their arguments at the motion-to-dismiss stage, the Districts cited to two cases construing an analogous Alabama statute. In these cases, the Northern District of Alabama and the Alabama Supreme Court reached the conclusion that Alabama's 911 law creates a *per se* fiduciary duty. *Madison Cnty. Emer. Commc'n Dist. v. Bellsouth Telecomms., Inc.*, No. CV-06-S-1786-NE, 2009 WL 9087783 (N.D. Ala. Mar. 31, 2009); *T-Mobile S., LLC v. Bonet*, 85 So.3d 963 (Ala. 2011). Alabama's law states that "[e]ach CMRS provider shall act as a collection agent for the CMRS Fund and shall collect the CMRS service charges levied upon CMRS connections pursuant to Section 11-98-7(b)(1) . . . and remit to the board the net CMRS service charges collected . . . ." Ala. Code § 11-98-8(a) (emphasis added).

In its ruling on the motion to dismiss, the Court noted that, unlike the 911 Law in Alabama, Tennessee's 911 law contains no "collections agent" and thus does not explicitly establish an agency relationship. In a footnote, this Court left the door open to showing that there was a *per se* fiduciary relationship not expressly provided for in the Tennessee 911 Law (Court File No. 38, p. 17, n.15).

The Districts now argue that *Madison County* did not actually involve the section of Alabama's 911 law where the phrase "collections agent" appeared, Ala. Code § 11-98-8(a). *See Madison Cnty. Emer. Commc'n Dist.*, 2009 WL 9087783. It is true that court did not base its determination that BellSouth was an agent on any specific terminology in the statute. Rather, it based its conclusion on the nature of the relationship. The court's reasoning, however, appears to indicate that it concluded that there was a fiduciary duty under an analysis similar to that which would be conducted in Tennessee to determine whether a "confidential relationship" existed. *Compare id.* at *13 (describing the issue as whether one party occupies a position of trust and superior knowledge such that there is an overmastering influence or unfair advantage) *with Givens*, 75 S.W.3d at 410 (providing that "a plaintiff may recover damages from an abuse or breach of a confidential relationship only by showing that (1) the defendant was in a position to influence or control the plaintiff; (2) the defendant used the confidences given to him or her to obtain some benefit from, or advantage over, the plaintiff; and (3) the plaintiff, as the dominated party in the relationship, suffered some detriment at the hands of the defendant."). To the extent that *Madison County* has any bearing, it bears on the issue of whether there was a confidential relationship, not whether the 911 Law creates a *per se* fiduciary relationship. In any event, for the reasons discussed below, the Court concludes that, on the undisputed facts, the parties were not in a confidential relationship (*see* Part IV.C.2 below).

24

It did not reach whether the 911 Law could have imposed a *per se* fiduciary relationship based on agency.

A *per se* fiduciary duty may be created by the presence of an agency relationship. *Marshall v. Sevier Cnty.*, 639 S.W.2d 440, 446 (Tenn. Ct. App. 1982). "In its broadest sense, the concept of agency 'includes every relation in which one person acts for or represents another.'" *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000) (quoting *Kerney v. Aetna Cas. & Sur. Co.*, 648 S.W.2d 247, 253 (Tenn. Ct. App. 1982)). An agent "undertakes to transact some business, or to manage some affair, for another, by the authority and on account for the latter, and to render an account of it." *Sec. Fed. Sav. & Loan Ass'n of Nashville v. Riviera, Ltd.*, 856 S.W.2d 709, 715 (Tenn. Ct. App. 1992) (quoting *Miller v. Ins. Co. of N. Am.*, 366 S.W.2d 909, 911 (Tenn. 1963)). Creating a principal-agent relationship "does not require an explicit agreement, contract, or understanding between the parties." *White*, 33 S.W.3d at 723. Instead, "[w]hether an agency exists 'is a question of fact under the circumstances of the particular case; and whether an agency has been created is to be determined by the relation of the parties as they in fact exist under their agreement or acts.'" *Id.* (quoting *McCay v. Mitchell*, 463 S.W.2d 710, 715 (1970)). "The analysis hinges on the [principal's] right to control the agent's actions and, ultimately, the fact of actual control over the agent." *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009) (internal citations omitted).

The Districts argue they had control over BellSouth and the parties were in a trust relationship[15] sufficient to establish a *per se* fiduciary relationship. As evidence of control, the

_____

[15] The Districts argue that the Districts placed trust in BellSouth and that this should support a finding of an agency relationship, because many of the Tennessee cases describe agency as a "trust relationship." *See, e.g.*, *Cagle v. Hybner*, 2008 WL 2649643 at *7 (Tenn. Ct. App. July 3, 2008) ("In Tennessee, the relation of principal and agent is a trust relation."). BellSouth

Districts point to Section 7-86-108 of the 911 Law which gives the Districts the power to set the applicable 911 charge and to require BellSouth to assess that charge on its customers. Tenn. Code Ann. § 7-86-108(e). And while this is not complete control, the Districts point out that "a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment." Restatement (Third) of Agency § 1.01, cmt. c (2006). The Districts argue that because they had full control over the setting of the rate and could require BellSouth to collect at that rate, they had sufficient control to render BellSouth their agent.

Finally, the Districts point to sales-tax cases where companies were found to be agents of the state for remittance purposes even when the underlying statutes did not use wording indicating the presence of an agency relationship. In *Davis v. State*, for instance, the Texas Court of Appeals noted that, "even though the [tax act's] detailed provisions for collection and payment of sales taxes contain no express language describing the seller as an agent for the collection of the state's taxes or providing that the taxes collected be held in trust for the state, the Act's provisions nevertheless set forth an implicit agency-principal relationship . . . ." 904 S.W.2d 946, 953 (Tex. App. 1995). *See also City of Pearland v. Reliant Energy Entex*, 62 S.W.3d 253, 256 (Tex. App. 2001) ("When collecting sales tax, *Entex* acts as an involuntary agent of the state and that role is separate from its role as a public utility selling gas to its customers."); *Kmart Props., Inc. v. N.M. Taxation & Revenue Dep't*, 131 P.3d 27, 35 (N.M. Ct.

correctly points out, however, that when the law of agency speaks of a "trust relationship," it is not describing a separate ground for a finding that an agency relationship exists where evidence of control is lacking; rather, it is simply describing the nature and attributes of the presumed relationship. *See John J. Heirigs Constr. Co. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986) ("The right of control is the primary or essential test of an agency relationship without which no agency exists.").

26

App. 2002), *rev'd on other grounds* 139 P.3d 172 (N.M. 2005) ("Unlike an income tax, a sales and use tax can make the taxpayer an agent of the state, obligated to collect the tax from the consumer at the point of sale and then pay it over to the taxing entity.").

BellSouth contends that the Districts have insufficient control to be considered principals, given that they cannot exercise control over how BellSouth bills, collects, or remits 911 charges. BellSouth also points out that according to the 911 Law, the Districts do not in fact have total control over the rate charged. Rather, before a District may raise the rate, they must present the proposed rate increase to the county legislative body, which then holds a public hearing; the District must then seek approval from the Tennessee Emergency Communications Board ("TECB"); and finally, the District must submit the proposed increase to the District's voters during a regularly scheduled election. Tenn. Code Ann. § 7-86-108. As further evidence of the Districts' lack of control, BellSouth notes that it has for years refused to bill for certain lines (some of which are the basis for the instant suit) the Districts believed were required under the 911 Law.

Considering the Districts' evidence and arguments and applying the above legal standard, the Court concludes that there is not sufficient evidence from which a reasonable juror could find that there was an agency relationship between the Districts and BellSouth. The only real evidence of control presented by the Districts is their ability to set the 911 charge rate, and even that is highly circumscribed. Even drawing all reasonable inferences in the Districts' favor, this is insufficient to establish a *per se* fiduciary relationship under Tennessee law.

The tax cases cited by the Districts all deal with the fiduciary duty that arises *after* taxes have been collected by the "agent" business; they do not address whether a business is an agent for the purpose of collecting taxes in the first instance, which is the issue in the present case.

27

Indeed, in both *Davis* and *City of Pearland*, the Texas Court of Appeals drew the line at precisely this point. *Davis*, 904 S.W.2d at 953 ("We hold that because of the implicit agency relationship set forth in the Act, sales tax monies are state funds *from the moment of the seller's collection*, and the seller, as the state's agent, has not only a statutory duty but also a fiduciary duty to remit these funds to the state." (emphasis added)); *City of Pearland*, 62 S.W.3d at 256 ("Sales tax monies become state funds at the moment of collection, and Entex merely holds these funds in trust until they are remitted to the state."). The Districts' theory would essentially make every business that collects taxes a fiduciary of the entity to which it remits taxes both before and after it collects those taxes. This would establish a strict-liability cause of action by the principal against the tax collector, something that does not currently exist in Tennessee. Such a dramatic change in the law of agency in Tennessee may be within the power of the state legislature, but it is not within the power of a federal district court. Even taking all evidence in the light most favorable to the Districts, the Districts have failed to establish a *per se* fiduciary relationship.

## 2. Confidential Relationship

The Districts also argue BellSouth has a fiduciary duty based on a confidential relationship with the Districts. To recover damages from an abuse or breach of a confidential relationship, a plaintiff must show that

> (1) the defendant was in a position to influence or control the plaintiff; (2) the defendant used the confidences given to him or her to obtain some benefit from, or advantage over, the plaintiff; and (3) the plaintiff, as the dominated party in the relationship, suffered some detriment at the hands of the defendant.

*Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002). A confidential relationship does not arise whenever a relationship exhibits mutual trust and confidence; "[r]ather, the relationship is more accurately described as one in which confidence is

28

placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party." *Id.* (internal quotation marks omitted). Courts look to the facts and circumstances of each case in making this determination, *id.*, but the burden is on the party asserting the claim to show such a relationship exists, *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). "[A]bsent extraordinary circumstances, parties dealing at arm's length[] in a commercial transaction lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673 (Tenn. 2013) (Koch, J., concurring).

The parties discuss a number of cases that shed light on confidential relationships. In *Condo. Mgmt. Assocs., Inc. v. Fairway Vill. Owner's Ass'n, Inc*., property developer Fairway contracted for property manager CMA to collect rent and fees on behalf of Fairway, maintain Fairway's books, and contract for maintenance and improvement on Fairway's property. No. W2009-00688-COA-R3-CV, 2010 WL 424592, at *3 (Tenn. Ct. App. Feb. 8, 2010). After a breakdown in the relationship, Fairway terminated the agreement. CMA filed suit for breach of contract and Fairway counterclaimed for, among other things, breach of fiduciary duty on a confidential relationship theory. *Id*. at *1. Addressing whether the parties were in a confidential relationship, the Tennessee Court of Appeals explained that even though CMA "was the sole entity entrusted to conduct all affairs, financial and otherwise" of Fairway, they were engaged in an arm's-length business relationship rather than a confidential one. *Id.* at *10. The court held that although some Tennessee cases had previously noted that "[a] party who manages the financial affairs of another has a confidential relationship with that person," that statement more aptly describes relationships such as between an attorney and client, between family members,

29

between a manager and musician, or when one person manages another's financial affairs. *Id.* at *9 (quoting *In re Estate of Wakefield*, No. M1998-00921-COA-R3-CV, 2001 WL 1566117 (Tenn. Ct. App. Dec.10, 2001) (alteration in original). Fairway had "taken this quotation out of context" when it attempted to apply the statement to the parties' arm's-length business transaction. *Id.* at *9.

The facts presented to the Tennessee Court of Appeals in *Foster Bus. Park, LLC v. Winfree* were more complex, but the question boiled down to whether there was a confidential relationship between a business and a lender. No. M200602340COAR3CV, 2009 WL 113242, at *12–13 (Tenn. Ct. App. Jan. 15, 2009). Even though the business owner placed "trust and confidence" in the lender's advice and relied on loans from the lender to supply a large portion of its revenue, the lender did not "control" the business, and further, because the parties did not share the same interests, the business owner should have known it was an arm's-length relationship and not a confidential one. *Id.* at *15.

The Districts claim they were forced to act in reliance on (and put their confidence in) BellSouth to act in good faith and be honest when fulfilling its obligations under the 911 Law, given that BellSouth had the sole ability to bill and collect from its subscribers.[16] The Districts also claim that BellSouth was not forthcoming when the Districts contacted it to determine

---

[16] Court File No. 271-31, Randy Porter Dep., pp. 67–78 (testifying that the ECD has to rely on phone company representations about collection and remitting of 911 Charges because the ECD had no way to perform an audit); Court File No. 271-18, Stuermer Dep., p. 58 ("[T]there was no way for us to—to identify if one carrier or provider was complying or not. We didn't have specific information as to Bellsouth."); *id.* at 135 ("[W]e were—we had to trust the vendors to give us that information and we worked off that information."). These assertions are contradicted by Tenn. Comp. R. & Reg. 1220-04-08-.13(2)(g) and (3)(e) which require BellSouth "to provide a mutually agreeable means of auditing the subscriber base by number and type by the Emergency Communications District auditor."

30

whether 911 charges were being handled properly.[17]   The Districts argue that BellSouth's exclusive possession of the information necessary to verify compliance with the statute, coupled with BellSouth's status as the Districts' single largest source of revenue, produced a disparity in power and rendered the Districts financially dependent, such that BellSouth was able to dominate the Districts.

BellSouth disputes that it had any sort of dominion or control over the Districts.  It points out that the Districts were entitled to, but never did, ask for an audit of BellSouth's billing practices.  Tenn. Comp. R. & Reg. 1220-04-08-.13(2)(g), (3)(e).  BellSouth also provides evidence that the Districts' directors, not BellSouth, controlled how the Districts use their funds and go about their work, and that BellSouth's only role is to collect and remit the 911 charges.[18]  The 911 Law requires service suppliers to bill 911 charges to subscribers and remit them to the Districts.  Under the law, this is an obligation to the public, and there is nothing in the law providing for either party's control over the other.

Financial dependence combined with superior access to information is not sufficient to show a confidential relationship.  Businesses are often in a situation where the loss of one key customer or supplier could cause financial ruin, but as Tennessee courts have repeatedly

---

[17] Court File No. 271-19, Deford Dep., pp. 81–82 (stating regarding getting information on what lines came with the 911 Law, "[BellSouth AT&T employees] didn't discuss this type thing or they won't discuss it" with the ECD); Court File No. 271-20, Coker Dep., p. 165 ("When people have called and tried to get information [about how BellSouth's tariffs are calculated], I do not believe they've got any answers."). The Districts also cite to page 131 of Stuermer's deposition, reportedly marked exhibit 21 and found at Court File No. 271-18, to support this contention. That page is not included and is thus not part of the record, so the Court cannot consider Stuermer's statement on this point.

[18] Court File No. 283-1, Stuermer Dep., p. 188 (noting that, "other than providing us the money that we need to spend," BellSouth does not influence how the Hamilton County ECD spends its money).

31

emphasized, "absent extraordinary circumstances, parties dealing at arm's length[] in a commercial transaction lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship." *See, e.g.*, *Dick Broad. Co.*, 395 S.W.3d at 673 (Koch, J., concurring); *Secur Am. Bus. Credit v. Schledwitz*, No. W2012-02605-COA-R3CV, 2014 WL 1266121, at *29 (Tenn. Ct. App. Mar. 28, 2014) (quoting *Dick Broad. Co.*, 395 S.W.3d at 673 (Koch, J., concurring)). This is also not uncommon in some governmental settings, where the source of revenue to a government body is largely one very sizeable employer that has an outsized economic presence in the particular jurisdiction.

Considering the evidence regarding the relationship between BellSouth and the Districts in the light most favorable to the Districts, and upon a review of the relevant legal authority, the Court concludes there is no genuine issue of material fact with regard to whether a confidential relationship existed. The Court must keep in mind that "a confidential relationship is not one merely exhibiting mutual trust and confidence." *Givens*, 75 S.W.3d at 410. The Districts may well have trusted BellSouth and put their confidence in BellSouth to adequately handle 911 charges. But the facts here show two parties in an arm's-length business relationship. Just like CMA in *Fairway*, BellSouth was given the responsibility (albeit by statute rather than by contract) to handle the collection of certain money on behalf of the Districts. But as in *Fairway*, this alone does not mean that BellSouth is in a confidential relationship with the Districts. Rather, the parties remained in an arm's-length business relationship. The Districts have not shown that a reasonable juror could find that this was a relationship "in which confidence is placed by [the Districts] in [Bellsouth] and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and

32

control over the weaker or dominated part[ies]." *Id.* There is simply not sufficient evidence that BellSouth exercised dominion and control over the Districts.

*    *    *

Having found there is no genuine issue of material fact as to the presence of a fiduciary relationship, whether through the existence of a *per se* fiduciary duty or through a confidential relationship, the Court will **DENY** the Districts' summary judgment motion on the claims arising out of an alleged fiduciary duty on BellSouth's part and **GRANT** Bellsouth's motion for summary judgment on these claims.

### D.    FRAUD-BASED CLAIMS

The Districts claim BellSouth assessed and remitted 911 charges on fewer lines than it was legally obligated to and committed fraud by representing that it had assessed and remitted in full compliance with its legal obligations. Specifically, the Districts point out that the reports that accompanied BellSouth's remittances to the Districts contained significantly fewer lines than the annual reports that formed the basis for BellSouth's claimed administrative fees. To evaluate these arguments, it is necessary to understand how BellSouth handled the 911 charges.

#### 1.    Background

Under the 911 Law, BellSouth does not "pay" the 911 charges, but rather bills its subscribers and remits the money, along with monthly reports, to the Districts. BellSouth bills 911 charges through its Customer Records Information System ("CRIS"). By analyzing lines' Universal Service Order Codes ("USOC") and other data, CRIS assesses 911 charges on qualifying lines that can make an outbound 911 call. The CRIS uses a Taxing Area Rate Code

33

("TAR Code") to determine which county the line goes to and thus what the amount of the charge should be, as each county sets its own rate.

Prior to July 2010, BellSouth represented in each of its monthly reports submitted to the Districts along with its remittances that "[i]n accordance with the Tennessee Legislature, BellSouth has billed and collected Emergency Telephone Surcharges as stated below" (Court File No. 272-4, L. Fisher Decl., ¶ 10, Ex. A ). For ease of reference, the Court will refer to these statements collectively as "the Compliance Statement."[19] The reports then list gross counts for the lines billed and gross amounts for the charges remitted (*id.*).

The Districts provide evidence showing differences between the number of lines upon which BellSouth billed 911 charges and the number of lines for which BellSouth submitted tariff charges ("Tariff Charges") to the Districts. Tariff Charges are charges BellSouth assesses to the Districts each month for the 911 equipment and services BellSouth provides them. Like 911 charges, Tariff Charges are assessed on a per-line basis. The Districts' expert report shows that BellSouth assessed and remitted 911 charges on significantly fewer lines than it included when assessing Tariff Charges (Court File No. 271-11, Ex. 12, ¶¶ 1–7).

---

[19] After July 2010, the monthly remittance reports were submitted by BellSouth's agents, Thompson Reuters and KPMG. These reports followed a different format; with BellSouth's approval, BellSouth's agents completed new forms, which had spaces to identify the number of "gross units," from which would be subtracted "exempt units," resulting in "units subject to tax" (Court File No. 285-3, L. Fisher Dep., pp. 144–47). However, nothing was listed in the "exempt units" category on the completed forms, and thus "gross units" equaled the "units subject to tax." BellSouth also submitted annual reports on a form supplied by the TECB. That form had spaces to indicate the "Number of Business Lines" and the "Number of Residential Lines" (Court File No. 285-5, Ex. 66). BellSouth did not list all the lines in service, but only those it billed for 911 charges. The Districts argue that these statements were false for the same reasons that the monthly reports were false—they failed to identify the lines BellSouth was not billing. The Court's analysis applies with equal force to these reports, and so the Court will not treat them separately.

34

BellSouth explains these discrepancies as follows. First, BellSouth bases Tariff Charges on a yearly count of applicable lines in December, and this figure remains set for the entire next year (Court File No. 266, Madkins Decl. ¶¶ 2, 7–8; Court File No. 258-1, Darr Dep., p. 96). The 911 charges, on the other hand, are based on the actual number of qualifying lines in service *each month* (Court File No. 258-3, L. Fisher Decl., ¶¶ 3–4). Monthly landline counts have been steadily declining. (Court File No. 258-3, Turner Decl., ¶¶ 3–11, Ex. A) Thus, when the Districts' expert report compares Hamilton County's December 2010 Tariff Charges (which are based on the 90,000 lines that existed in December 2009) with BellSouth's December 2010 remittance of roughly 65,000 911 charges, this results in an apparent difference of almost 35,000 lines. BellSouth asserts that by December 2010 the lines in Hamilton County had fallen to roughly 74,000 (not the 90,000 the Districts' expert used in his calculation), and so a full two-thirds of the alleged "underbilling" shown in the Districts' comparison is explained by recognizing the timing difference between when lines are counted for Tariff Charge purposes and when they are counted for 911 charge purposes (Court File No. 258-3, Turner Decl., ¶¶ 3–11, Ex. A.; Court File No. 26, Madkins Decl., ¶¶ 2, 7–8, Ex. B).

Second, BellSouth points to evidence showing that the remainder of the discrepancy is due to lines for which BellSouth asserts it appropriately assessed Tariff Charges, but for which BellSouth does not believe it is required to bill and remit 911 charges under the 911 Law (Court File No. 258-1, Reed Dep., pp. 113, 115; Court File No. 259-1, Turner Expert Report, ¶¶ 109–115). These lines include payphones,[20] lines excluded by the 911 Law's 100-line cap,[21] lines for

---

[20] The 911 Law's definition of "911 Service" expressly excludes dial-tone-first payphones. Tenn. Code Ann. § 7-86-103(10). BellSouth still provided 911 data services on payphone lines though, so Bellsouth asserts it properly included them when setting its Tariff Charges (Court File No. 258-1, Reed Dep., p. 135; Court File No. 259-1, Turner Expert Report ¶¶ 61–62).

35

which another telephone company is the "service supplier,"[22] and lines supplied to the federal government. The Districts strongly dispute whether BellSouth properly exempted such lines (except payphones). These disagreements will be discussed in much greater detail below in analyzing the Districts' TFCA claims. *See infra* Part IV.D.2. BellSouth's point here, however, is simply to account for the line-count discrepancy. After examining an eleven-month sample of BellSouth's billing records, BellSouth's expert concluded that BellSouth correctly identified eligible lines 99.4% of the time and that BellSouth billed and remitted 911 charges on 100.26% of those eligible lines[23] (Court File No. 259-1, Turner Expert Report ¶¶ 11–15, 107–108).

Throughout this litigation, the Districts have asserted that BellSouth engaged in fraudulent billing practices to gain a competitive advantage over other providers. In support of its competitive advantage theory, the Districts point to an instance in 2011 in which BellSouth stated in a bid that its Hamilton County 911 charge rate was $2.00 rather than the correct $3.00 charge (Court File No. 271-12, p. 96).

BellSouth vigorously disputes this and asserts it has never negotiated or manipulated 911 billing to win business (Court File No. 258-1, Daniel Dep., pp. 274–75, 282, 286; Court File No. 258-1, Thompson Dep., pp. 24–25). Because 911 charges are not negotiable with respect to the subscriber, BellSouth contends it simply charges subscribers based on the type of line and the

---

[21] The 911 Law caps the number of any customer's lines that can be assessed a 911 Charge at 100, Tenn. Code Ann. § 7-86-108(a)(1)(A), but there is no such cap on the lines counted when setting the Tariff Charges (Court File No. 279-4, Madkins Decl., Ex. A).

[22] As the Court has already concluded, BellSouth is not responsible for remitting 911 charges on non-Reseller CLECs. *See supra* Part IV.B.3.

[23] BellSouth's report assumes BellSouth had the better end of the above interpretive disagreements.

county (Court File No. 258-3, Reed Decl., ¶ 5). With regard to the above referenced 2011 transaction, BellSouth points to evidence showing this was an unintentional typo of which BellSouth first became aware in the instant litigation (Court File No. 258-1, Daniel Dep., p. 262; Court File No. 258-1, Reynolds Dep., pp. 26–28, 31, 128–129). BellSouth asserts that it actually billed the subscriber in this transaction at the normal rate. Furthermore, even if BellSouth did bill a lower *rate*, this would not support the Districts' theory that BellSouth was intentionally billing on fewer *lines*. BellSouth also takes issue with the very premise of the Districts' argument that billing fewer 911 charges would benefit BellSouth. BellSouth asserts it actually benefits from billing as many 911 charges as possible, in that BellSouth receives an administrative fee for each charge collected.

### 2. Tennessee False Claims Act

The Districts claim BellSouth violated the Tennessee False Claims Act ("TFCA") by submitting false reports to the Districts in an effort to avoid billing, collecting, and remitting certain 911 charges. The Districts read the Compliance Statement—"In accordance with the Tennessee Legislature, [BellSouth] has billed and collected the Emergency Telephone Surcharge as stated below"—as a representation by BellSouth that it collected and remitted *all* 911 charges required under the 911 Law. BellSouth argues its reports truthfully stated the number of lines against which it *actually assessed* a 911 charge.[24] Furthermore, even if BellSouth was certifying

---

[24] Setting aside whether such a statement implicates TFCA liability, BellSouth argues that its remittance reports did not certify that it had billed all required 911 charges. Its corporate representative, Fisher, states that in both the pre- and post-July 2010 forms, BellSouth was representing only that it billed and remitted the numbers and amounts in the reports, not that it billed and remitted for all eligible lines (Court File No. 272-4, L. Fisher Decl., ¶ 10, Ex. A). In other words, when the reports stated "[i]n accordance with the Tennessee Legislature, BellSouth has billed and collected Emergency Telephone Surcharges as stated below," they meant that,

37

compliance, BellSouth asserts that it believed it was complying with the law, and so any disagreement was the result of a legitimate interpretive dispute, not fraud.

Because there are few decisions applying the TFCA, a relatively new law, Tennessee courts look to interpretations of analogous provisions of the federal False Claims Act ("FCA") for guidance. *See State ex rel. Landenberger v. Project Return, Inc.*, No. M200702859COAR3CV, 2009 WL 637122, at \*4 (Tenn. Ct. App. Mar. 11, 2009). In considering any false claim case, courts must be mindful that the "False Claims Act is not a vehicle to police technical compliance" with underlying statutes or regulations. *U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 717 (6th Cir. 2013) (quoting *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532 (6th Cir. 2012)).

Under the provision of the TFCA at issue in this case, a defendant may be liable if it:"[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any

---

pursuant to the 911 Law, BellSouth reported the surcharges "billed and collected." That is, the reports represented that, in accordance with the 911 Law's requirement to report all charges billed and collected, BellSouth provided them as "stated below."

The Districts argue Fisher's testimony is contradicted by statements made by BellSouth's corporate representative in an Alabama case based on an analogous Alabama law. In that case, BellSouth's representative stated that "in accordance with the Alabama Legislature" meant Bellsouth was "billing that 911 fee according to the terms of the law" (Court File No. 285-2, McNorton Dep., pp. 17–18). The Districts argue that BellSouth should be judicially estopped from arguing otherwise. BellSouth, however, contends that the Rule 30(b)(6) representative merely stated that it was her "understanding" that similar introductory language represented that BellSouth was billing the 911 surcharges "according to the terms of the law." She never actually stated BellSouth was representing that it billed all 911 Charges required under the law, or accounted for all lines in service. Because the Court concludes that the Districts have not met their burden even assuming the Districts' reading of BellSouth's statements is correct, the Court need not reach the judicial estoppel issue.

38

political subdivision." Tenn. Code Ann. § 4-18-103(a)(7).[25] This cause of action is often referred to as a "reverse false claim." In an ordinary false claim case, "a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). A reverse false claim, on the other hand, occurs when "the action of the defendant results not in improper payment to the defendant from the government, but rather no payment (or reduced payment) to the government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003).

Under the "false certification" theory, a defendant may be liable for falsely certifying compliance with a statute or regulation where such compliance is a prerequisite for receiving payment. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Importantly, "[a] false-certification theory only applies where the underlying regulation is a 'condition of payment,' meaning that the government would not have paid the claim had it known the provider was not in compliance." *U.S. ex rel. Hobbs*, 711 F.3d at 714. False-certification theories break into two

---

[25] This provision of the TFCA was word-for-word the same as the federal analog at the time the TFCA was enacted, with the exception that the federal statute has "Government" instead of "political subdivision." 31 U.S.C. § 3729(a)(7) (2006). The federal statute after which the current Tennessee version was modeled had been construed by courts, including the Sixth Circuit, to have a contemporaneity requirement; that is, the provision required "proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation . . . ." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 736 (6th Cir. 1999)). Congress amended the provision in 2009. Courts have construed the new version as removing the contemporaneity requirement. *See, e.g.*, *United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, -- F. Supp. 3d --, 2015 WL 1502378, at *14 (N.D. Ill. Mar. 25, 2015) ("It is doubtful that a contemporaneity requirement, if in fact it existed, survived the amendment to the reverse false claims provision."). For the purposes of the instant case, the contemporaneity requirement applies, as the TFCA was modeled after the original version.

categories: express false certifications and implied false certifications. "In an express false certification, the defendant is alleged to have signed or otherwise certified to compliance with some law or regulation on the face of the claim submitted[,]" whereas "[u]nder an implied certification theory, a facially truthful claim can be construed as false if the claimant 'violates its continuing duty to comply with the regulations on which payment is conditioned.'" *Id.* (quoting *Chesbrough*, 655 F.3d at 468).[26]

The Districts' theory is that, by including the Compliance Statement in its reports to the Districts, BellSouth represented that each report included *all* lines required to be assessed 911 charges under the 911 Law. The Districts assert that the reason BellSouth's monthly reports conveyed that it was complying with the 911 Law was to avoid billing, collecting, and remitting additional 911 charges. The Districts assert this was false and point to five categories of lines which they assert BellSouth should have billed and remitted charges on, but did not.

A reverse false claim is established if the plaintiff can show:

(1) the defendant made, used or caused to be used a statement or record to conceal, avoid or decrease an obligation to the government; (2) the statement or

---

[26] The instant case raises a question as to whether one can proceed on a false-certification theory in the context of a reverse false claim action. A false-certification cause of action ordinarily requires that the statute or regulation with which the defendant certifies compliance be a *condition of payment* (that is, payment by the government to the defendant). *See U.S. ex rel. Hobbs*, 711 F.3d at 714. The instant case does not allege improper payments from the Districts to BellSouth. Rather, the issue is whether BellSouth improperly *withheld* funds from the Districts. That, of course, is the defining feature of a reverse false claim. In this context, the condition-of-payment element becomes unclear. Although uncommon, there are some cases where plaintiffs have been allowed to proceed on a false certification theory in the context of a reverse false claim action. *See, e.g.*, *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217 (11th Cir. 2012) (explaining a reverse false claim whereby a medical company, in an attempt to conceal overpayments from the government and thus avoid remitting money it owed to the government, submitted a "certification of compliance" even though it was not abiding by the rules with which it was certifying compliance). Because the Districts have failed to meet their burden even assuming false certification is a viable theory in this kind of reverse false-claim action, the Court need not decide whether such a theory is viable.

40

record was false or fraudulent; (3) the defendant knew the statement or record was false or fraudulent; and (4) the defendant "made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law."

*U.S. ex rel. Augustine v. Century Health Servs., Inc*., 136 F. Supp. 2d 876, 888 (M.D. Tenn. 2000) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc*., 190 F.3d 729, 737 (6th Cir. 1999)). The objective falsehood and knowledge elements may be collapsed into one analysis, as "it is impossible to meaningfully discuss falsity without implicating the knowledge requirement." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). The alleged false claim must contain an "objective falsehood" that the Defendant knew was false. *U.S. ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) *aff'd*, 302 F.3d 637 (6th Cir. 2002). And "knowingly" means that a person has "actual knowledge of the information," acts in "deliberate ignorance of the truth or falsity of the information," or acts "in reckless disregard of the truth or falsity of the information." Tenn. Code Ann. § 4-18-102(2)(A).[27]

Although the TFCA does not require proof of specific intent, Tenn. Code Ann. § 4-18-102(2)(B), neither "errors based simply on faulty calculations or flawed reasoning" nor "imprecise statements or differences in interpretation growing out of a disputed legal question are . . . false under the [TFCA]." *U.S. ex rel. Lamers*, 168 F.3d at 1018; *see also U.S. ex rel. Swafford v. Borgess Med. Ctr*., 24 F. App'x 491, 2001 WL 1609913, at *1 (6th Cir. 2001) (per curiam) ("Disputes as to the interpretation of regulations do not implicate False Claims Act liability.") (citing *Hagood*, 81 F.3d at 1477). "Where there are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant's actions

---

[27] The TFCA's knowledge requirement tracks the language in the federal statute. *See* 31 U.S.C. § 3729(b)(1).

are in good faith, the claimant cannot be said to have knowingly presented a false claim." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003).

Assuming BellSouth was certifying compliance, the Court must determine whether there were in fact legitimate grounds for the disagreement; "[t]he statutory phrase 'known to be false' does not mean incorrect . . . , it means a lie." *Hagood*, 81 F.3d at 1478. The Districts' evidence must at least show that BellSouth's reading is so unreasonable that the arguments could not have been made in good faith and thus no "legitimate grounds for disagreement" existed. *Southland Mgmt. Corp.*, 326 F.3d at 684.

As noted above, the Districts assert that there are five categories of lines upon which BellSouth was not properly billing and remitting 911 charges. In Part IV.B, the Court already determined that BellSouth's reading of the statute was correct in that the statute did not make BellSouth responsible for non-Reseller CLECs, thus its exclusion of those lines from its reports was not fraudulent. The Court will address each of the remaining disputed issues in turn, not to resolve the ultimate question, but to determine whether there were legitimate grounds for disagreement.

### a)      100-Line Cap

Under the 911 Law, the 911 charge may not "be imposed upon more than one hundred (100) exchange access facilities per service user per location." Tenn. Code Ann. § 7-86-108(a)(1)(A). The law does not further define location, and—although the language may seem simple on its face—applying it in practice reveals ambiguities. BellSouth provides as a hypothetical a company that leases multiple floors in the same building: Is each floor a separate location? The Districts reply that "location" should be based on distinct physical locations to

which emergency services might respond. But even that does not resolve the ambiguity. Chattanooga is home to several universities. Does the one-hundred-line cap apply to these universities on a per-building basis even if these buildings are connected? What about if they share the same mailing address? The Tennessee Advisory Commission on Intergovernmental Relations (TACIR) noted these ambiguities in a 2005 study it undertook on the 911 Law (Court File No. 283-1, p. 49, TACIR Report ("[t]he definition of location is ambiguous and does not appear to be uniformly applied. There have been questions about a college or university as well as bank branches being considered as 'one location' or not.")).

In an attempt to resolve this ambiguity, BellSouth used the TAR code, which consists of three digits signifying the city and three digits signifying the county, as a proxy for location. (Court File No. 259-1, Turner Expert Report ¶ 66). It then billed customers for up to 100 lines per TAR code (*id.*). In light of the ambiguities identified above, such an interpretation was not unreasonable. No evidence has been produced that supports an inference of bad faith on the part of BellSouth.

### b) Centrex Lines

The Centrex system is a shared telephone service system used to provide service to multiple users in the same location. The system takes advantage of the fact that not all telephones in a given business are likely to be in use making external calls simultaneously. The system is based on two components: stations and Network Access Registers ("NARs"). A station is the physical telephone handset, and the NAR is the mechanism by which a station is able to make an external call. There are fewer NARs than there are stations, so if all the stations

43

attempted to make external calls simultaneously, some of them would receive busy signals until other stations completed their calls.

BellSouth is required by the 911 Law to bill for each "exchange access facility" it provides. Tenn. Code Ann. § 7-86-108(a)(1)(A). "'Exchange Access Facilities' means all lines, provided by the service supplier for the provision of exchange telephone service . . . ." Tenn. Code Ann. § 7-86-103(7). As noted above, the 911 Law does not expressly define "exchange telephone service," but another Tennessee statute does define "[b]asic local exchange telephone services" as "an access line, dial tone, touch-tone and usage." Tenn. Code Ann. § 65-5-108(a)(1). Reasoning that exchange telephone service means the number of simultaneous outbound calls (and thus 911 calls) a Centrex system can make, BellSouth assessed 911 charges based on the number of NARs provided, rather than on the number of stations (Court File No. 272-4, Kelley Aff., pp. 12–13). The Districts argue that this reading is incorrect; each station has a line attached to it and is capable of making a call, so each station should be assessed the 911 charge. Without reaching the question of which reading is correct, it is clear that BellSouth's interpretation is not so unreasonable as to give rise to an inference of bad faith. Therefore, the dispute as to the proper billing practices regarding Centrex lines does not give rise to TFCA liability.

### c) Multiplex Lines

One of the principal disagreements between the parties is the treatment of "multiplex lines"—i.e., a single line supporting multiple independent call channels. The parties' disagreement centers on Primary Rate Interface ("PRI") lines, which support up to 23 simultaneous call channels. The 911 Law was silent on how multiplex lines should be treated,

44

and BellSouth's initial position was that each line was subject to only one 911 charge rather than separate charges for each channel. However, BellSouth ultimately assessed five charges per multiplex line based on the FCC's decision (related to a separate FCC purpose) authorizing no more than five "End User Common Line Charges" on each PRI line (Court File No. 258-3, Reed Decl., ¶ 6; Court File No. 258-1, Reed Dep., p. 148; Court File No. 258-1, Maciejewski Dep., p. 47). BellSouth has presented evidence it did not conceal its PRI billing policy; it disclosed the practice to the TECB, the TRA, and any ECD that asked (Court File No. 258-3, Sutton Decl., ¶ 14, Ex. D; Court File No. 258-3). It was also subject to audits, if requested, that would show this information. *See* Tenn. Comp. R. & Regs. 1220-4-8-.13(g).

According to BellSouth's evidence, since the early 1990s, the ECDs and BellSouth debated the latter's treatment of multiplex lines (*See, e.g*., Court File No. 258-1, Brumit Dep. pp. 52, 66, 92, 94–95; Court File No. 258-1, Stuermer Dep., pp. 44–47). In 2000 and 2001, the TECB held meetings, attended by at least one ECD executive, as well as by BellSouth representatives, to discuss line bundling, and PRI lines in particular (Court File No. 258-3, Sutton Decl., Ex. B; Court File No. 258-1, Thompson Dep., pp. 15, 17, 22; Court File No. 258-1, Shaffer Dep., pp. 28–31, 90–91, 134–35; Court File No. 258-1, Wilson Dep., pp. 84–86). For example, Michael Mahn ("Mahn"), lawyer and business advisor to most of the Districts, attended a July 2001 public TECB meeting where multiplex line billing practices were discussed (Court File No. 258-3, Sutton Decl., Ex. A, p. 3 (noting that a Ms. Sellers updated the TECB on issues under discussion by the T1-CLEC Committee—the Committee created to address line-bundling issues like Multiplex)). Later, the director of the TECB alerted the ECDs in a December 2003 letter that service suppliers were not billing multiplex lines in a uniform manner and that they should bill 911 charges on *every* voice-capable channel by April 2004 (Court File No. 258-3,

Sutton Decl., ¶ 13, Ex. C). Mahn also informed the Hamilton and Bradley ECD boards in June 2004 that telephone companies were not in compliance with the multiplex line policy outlined in the TECB letter of December 2003 (Court File No. 258-1, Wilson Dep., pp. 155–56, Ex. 74; Court File No. 258-2, Stuermer Dep., Ex. 192).

Weighing in on the dispute, the TECB issued "Policy 23" in July 2004, which interpreted the 911 Law as "authorizing the imposition of [911 charges] on each line in T1 and PRI circuits that can transmit a telephone call" (*See* Court File No. 258-1, Wilson Dep., Ex. 75). Yet, BellSouth refused to abide by the Policy 23 interpretation and continued to express its disagreement with the policy. The TECB alerted its board members to this, including Wanda Moody, former treasurer of Plaintiff Knox County ECD (Court File No. 258-3, Sutton Decl., Ex. E).

In March 2007, the Tennessee Attorney General issued an opinion agreeing with Policy 23 and stating that "the E911 board may impose an emergency telephone service charge for each channel in a T-1 or PRI circuit that is capable of conveying an outbound voice telephone call from the service user to an E911 public safety answering point." Tenn. Att'y Gen. Op. 07-38 (Mar. 28, 2007). In May 2007, Mahn notified Plaintiff Hamilton ECD that "BellSouth does not agree with the AG's opinion and has resisted to date" (Court File No. 258-2, Stuermer Dep., Ex. 200, p. 2; Court File No. 258-1, Allen Dep., p. 84). After the instant lawsuit was filed, BellSouth agreed to bill for each voice channel in multiplex lines and began collecting in March 2011 (Court File No. 258-3, Sutton Decl., Ex. A, p. 3).

The Districts have presented no evidence that any of the above events did not happen. Instead, the Districts rely on declarations and depositions from District representatives stating that they did not know about the dispute. Whether or not the Districts knew it was happening is

46

immaterial. The question is whether a jury looking at this evidence could conclude that BellSouth did not have a legitimate disagreement as to the proper interpretation of the statute, but rather was engaged in a bad-faith effort to conceal its failure to bill these lines from the Districts. The above undisputed facts tell a familiar story of an interpretive dispute and simply do not show that BellSouth acted unreasonably or in bad faith.

### d)      Federal Government Lines

The Districts argue that BellSouth was also not justified in failing to assess the 911 charges on lines it provides to federal agencies. In support of their position that federal entities are not exempt, the Districts rely on a 1995 Opinion of the Tennessee Attorney General concluding that the 911 charge is not a tax and therefore federal agencies are not exempt (Court File No. 271-42, Tenn. Op. Atty. Gen., No. U95-013 (Mar. 3, 1995)). BellSouth responds that, notwithstanding the Tennessee attorney general opinion (which is not binding even within Tennessee, *see id.*), the Federal Government considers the charges to be a tax and will not pay (Court File No. 299-23, Fisher Dep., p. 115). The Districts repeatedly emphasize that the ECD Law admits of no exemption for the Federal Government. But that is irrelevant; any exemption from state taxes would be based not on the state law itself, but on the Supremacy Clause of the Constitution. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). While the Districts claim that the Federal Government has not specifically refused to pay a 911 charge, BellSouth points to an opinion of the Comptroller General of the United States concluding that "9-1-1 emergency service charges imposed by districts established in Tennessee under that state's Emergency Communications District Law are actually taxes and may not be paid by the federal government." Comptroller General of the United States, 9-1-1 Emergency No. Fee, State of

Tennessee, B-230691, 1988 WL 227111 (May 12, 1988). Siding with the Comptroller General of the United States in a dispute regarding the taxation of federal entities may not *always* be correct, but at least in this context, it cannot be said to be in bad faith or illegitimate.

*     *     *

Viewing the facts in the light most favorable to the Districts, the Court cannot conclude there is sufficient evidence from which a reasonable jury could find that BellSouth knowingly made a false statement that could subject it to liability under the TFCA. Taking the evidence in the light most favorable to the Districts, the facts are as follows: 1) BellSouth represented that the reports contained a listing of all 911 charges due under the 911 Law; and 2) BellSouth did not include all the lines which the Districts claim should have been billed. This amounts to nothing more than a disagreement over statutory interpretation and is thus insufficient to establish the "knowing falsehood" element required for TFCA liability. There is no evidence that the reports stated BellSouth was collecting and remitting on lines which it was not. At most, BellSouth and the Districts had different interpretations of the proper approach to the 100-line cap, Centrex lines, Multiplex lines, and the lines supplied to the federal government. And "[w]here there are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim." *Southland Mgmt. Corp.*, 326 F.3d at 684.

BellSouth has pointed to evidence that it had longstanding disagreements with the District over how lines should be billed under the 911 Law, and the Districts have not put forth evidence from which a jury could conclude that BellSouth's interpretations were illegitimate or made in bad faith. Because the Districts have failed to meet their burden on a required element, the Court will **GRANT** BellSouth's motion for summary judgment on the TFCA claims.

48

### 3. Fraudulent Misrepresentation

BellSouth moves for summary judgment on the Districts' claim that it made fraudulent misrepresentations through statements in monthly and annual reports purporting to express false existing or past facts regarding the number of lines subject to 911 charges and the amount actually billed, collected, and remitted. Fraudulent misrepresentation requires the plaintiff show that:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (quoting *Metro. Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)).

For the reasons provided in the Court's analysis of the TFCA in Part IV.D.2 above, BellSouth is entitled to summary judgment on the fraudulent misrepresentations claim. That is, the Districts have not provided evidence that BellSouth made knowingly false statements in any of the reports. On the undisputed facts, any discrepancies were at worst due to disagreements over proper billing under the 911 Law. The Court will thus **GRANT** BellSouth's motion for summary judgment as to these claims.[28]

### 4. Fraudulent Concealment

The Districts' fraudulent concealment claim alleges BellSouth owed a duty under the 911 Law and common law to truthfully and accurately identify in its monthly and annual reports the

---

[28] For the reasons discussed *infra* at Part IV.D.5, the Districts have also failed to demonstrate a genuine issue of material fact as to whether their reliance was reasonable.

number of lines capable of reaching the Districts' call centers (subject to the 100-line per location rule), and yet it submitted reports that failed to disclose the accurate number and falsely represented it was billing all lines.

To establish fraudulent concealment under Tennessee law, a plaintiff must show that (1) the defendant had a duty to disclose a known fact or condition, (2) the defendant failed to disclose it, (3) the plaintiff reasonably relied upon the resulting misrepresentation, and (4) the plaintiff suffered injury as a result. *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998). Tennessee courts have found that a duty to disclose can generally arise under three circumstances: "(1) where there is a previous definite fiduciary relation between the parties, (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other, and (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith." *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 195 (Tenn. Ct. App. 2010). The Tennessee Supreme Court has explained that

> [f]iduciary relationship, confidential relationship, constructive fraud and fraudulent concealment are all parts of the same concept. [T]he nature of the relationship which creates a duty to disclose, and a breach of [that] duty constitutes constructive fraud or fraudulent concealment, springs from the confidence and trust reposed by one in another, who by reason of a specific skill, knowledge, training, judgment or expertise, is in a superior position to advise or act on behalf of the party bestowing trust and confidence in him.

*Shadrick v. Coker*, 963 S.W.2d 726, 736 (Tenn. 1998) (quoting *Garcia v. Presbyterian Hosp. Ctr.*, 593 P.2d 487, 489–90 (N.M. Ct. App. 1979)) (alterations in original).

Even when viewing the facts in the light most favorable to the District, there is insufficient evidence to show that there was a fiduciary relationship (whether *per se* or because of a confidential relationship) between BellSouth and the Districts. The Court fully discussed

50

this issue above in Part IV.C. Thus, the Districts cannot establish their fraudulent concealment claim on a fiduciary duty theory.

The Districts argue the 911 Law itself includes a duty to disclose the information they claim was not disclosed by BellSouth. According to the 911 Law, "the service supplier shall annually provide to the board of directors of the district an accounting of the amounts billed and collected and of the disposition of such amounts." Tenn. Code Ann. § 7-86-110(d). The Districts assert that this requires BellSouth to disclose all lines on which it was required to bill 911 charges. And because—as is discussed in great detail above—BellSouth did not bill and remit as the Districts argue was required, and BellSouth did not disclose the lines on which it was not billing, BellSouth violated its duty to disclose under the law.

While the provision does require BellSouth to disclose the lines it had billed, the Court cannot conclude the 911 Law required BellSouth to affirmatively and pro-actively disclose what types of lines it had *not* billed. The disclosure requirement the Districts point to in § 7-86-110(d) simply requires BellSouth to report to the Districts "an accounting of the amounts *billed and collected* and of the disposition of such amounts" (emphasis added). The Districts do not argue BellSouth failed to disclose the amounts of 911 charges it "billed and collected." Thus, to the extent that the 911 Law imposed a duty to disclose, BellSouth complied with that duty.

The Districts also attempt to establish a duty of disclosure by pointing to the special circumstances of the parties in this case. The Tennessee Supreme Court in *Simmons v. Evans* observed that "one may be guilty of fraud by his silence, as where it is expressly incumbent upon him to speak concerning material matters that are entirely within his own knowledge." 206 S.W.2d 295, 296 (Tenn. 1947). The Districts, however, do not establish any basis for the Court to conclude it was "expressly incumbent" upon BellSouth to describe in detail its billing and

51

remitting practices, something not required by the 911 Law.  Courts only apply an equitable duty

in limited circumstances, generally arising out of contractual relationships where two parties

repose trust and confidence in each other and which call for perfect good faith.  *See GuestHouse*

*Intern., LLC*, 330 S.W.3d at 195 (explaining that there is a duty to disclose where there is a

fiduciary relation or "where it appears one or each of the parties to the contract expressly reposes

a trust and confidence in the other, and . . . where the contract or transaction is intrinsically

fiduciary and calls for perfect good faith").  Here, the parties' relationship is a creature of statute,

and the Court sees no reason to inject special common law, fiduciary-type duties into a

relationship where the statute does not.  If the legislature wished to insert affirmative duties of

disclosure above and beyond charges "billed and collected," it could have done so.

To the extent the law imposed a duty of disclosure, BellSouth complied with that duty.

The Districts have failed to establish any other basis for a duty to disclose either arising from a

fiduciary relationship or otherwise.  The Court will thus **GRANT** BellSouth's motion for

summary judgment as to the fraudulent misrepresentation claims.

### 5.      Negligent Misrepresentation

Tennessee has adopted the definition of negligent misrepresentation from the

Restatement of Torts:

> (1) One who, in the course of his business, profession, or employment, or in any
> other transaction in which he has a pecuniary interest, supplies false information
> for the guidance of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their justifiable reliance upon the information, if
> he fails to exercise reasonable care or competence in obtaining or communicating
> the information.

*Bennet v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 301 (Tenn. 2007) (quoting Restatement

(Second) of Torts § 552 (1977)).  From its review of Tennessee case law, the Court is dubious as

to whether this tort is even properly applied to a context where a business is required to furnish information to a municipal entity. Even assuming the tort is properly applied, however, the Districts have not met their burden. Here, the undisputed facts show that even assuming the information in the billing statements were false, the Districts was not justified in relying on the statements.

The Districts claim BellSouth supplied them with false information—the certification that BellSouth was reporting all lines properly billed under the 911 Law. To establish a claim for negligent representation, a plaintiff must show it justifiably relied on the false information. *McNeil v. Nofal*, 185 S.W.3d 402, 409 (Tenn. Ct. App. 2005). "A false representation alone does not amount to fraud; there must be a showing by plaintiff that the representation was relied on by him or her, and that the reliance was reasonable under the circumstances." *Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 752 (Tenn. Ct. App. 2009). A plaintiff may not simply accept a statement on "blind faith" and then expect to recover under a negligent misrepresentation theory if ordinary diligence would have uncovered the statement's falsity. *Id.*

As explained at greater length above, each of the alleged billing discrepancies was subject to public debate in the ECD community. For example, the undisputed facts show that the multiplex issue was debated within the ECD regulatory community for at least a decade preceding the filing of this suit. *See supra* Part IV.D.2.c). With regard to the treatment of Federal Government lines, the dispute was subject to dueling opinions by the United States Comptroller General and the Tennessee Attorney General. *See supra* Part IV.D.2.d). Even crediting the Districts' assertions that they had no idea BellSouth was billing this way, any reasonable effort to keep apprised of developments in the field would have revealed that at least some phone companies were not complying with what the Districts thought was the proper

53

reading of the law. Given that BellSouth was by far the largest source of the Districts' income, it would be reasonable to expect the Districts—in exercising ordinary diligence—to investigate to see if BellSouth was billing as the Districts believed was required.

The Districts also had a means to investigate; the TRA Rule itself gives the Districts the right to audit BellSouth's billing. Tenn. Comp. R. & Regs. 1220-4-8-.13(3)(e). The Districts now assert that the audit right is "baseless." They interpret the language of the TRA Rule— which requires BellSouth "to provide a mutually agreeable means of auditing the subscriber base by number and type by the Emergency Communications District auditor"—to mean that BellSouth is required to provide a means of auditing but also gives the Districts no grounds to demand or enforce an audit (Court File No. 281, p. 32). The Court finds this reading difficult to square with the obvious purpose of the regulation—that is, to provide the Districts with a means of ensuring that entities like BellSouth are properly billing under the law. The Districts give no alternative explanation as to what exactly the law required BellSouth to do if it was not to provide a means of auditing upon request. In any event, it is undisputed that none of the Plaintiff Districts ever sought to exercise its audit right under the 911 Law.[29] Under these circumstances, no reasonable jury could find the Districts' reliance justifiable. The Court will **GRANT**

---

[29] Both the Districts and BellSouth acknowledge that a nonparty District—Williamson County— sought an audit. Indeed, the Districts point to a memo from the Tennessee Emergency Communications Board to the Districts relaying that the Williamson County ECD was planning to file a petition to enforce its right to an audit and soliciting other ECDs to join (Court File No. 285-40). Both parties agree that no other District joined the effort. The Districts assert that the Williamson County audit attempt was resisted by BellSouth and that Williamson County abandoned the effort due to lack of funds (Court File No. 282, p. 32). The source they cite for this proposition discusses the initiation of this action, but makes no reference to it being resisted or abandoned. In any event, to the extent this bears on whether the Districts' reliance was justified, it cuts against the Districts. The fact that another ECD felt the need to assert its audit right against BellSouth makes the Plaintiff Districts' failure to do so even more glaring.

BellSouth's motion for summary judgment as to the Districts' negligent misrepresentation claims.

## V.      CONCLUSION

Given the passage of the 911 Funding Modernization and IP Transition Act of 2014, declaratory and injunctive relief is not appropriate. The Court also rejects the Districts' substantive theories of liability. The Districts' joint-liability theory is contrary to the plain language of the 911 Law. There is no basis for finding that BellSouth had a fiduciary duty to the Districts, as they neither controlled nor were controlled by the Districts; rather, the parties were engaged in an arm's-length business transaction. As to the Districts' TFCA claims and fraudulent misrepresentation claims, the Districts have failed to establish that the parties' disagreement was anything more than an interpretive dispute. With regard to the fraudulent concealment claims, the Districts have not established a duty to disclose with which BellSouth failed to comply. Finally, the Districts' negligent misrepresentation claims fail because the Districts did not put forth evidence from which a jury could conclude that the Districts reasonably relied on any alleged misrepresentation by BellSouth.

For the foregoing reasons, the Court will **GRANT** both of BellSouth's motions for summary judgment (Court File Nos. 152, 256) and **DENY** the Districts' second motion for partial summary judgment (Court File No. 248).

**AN APPROPRIATE ORDER WILL ENTER.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**